RACHEL VAN MULLEM, COUNTY COUNSEL
MARY PAT BARRY, SR. DEPUTY (Bar No. 148354)
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA  93101
(805) 568-2950 / FAX: (805) 568-2982
E-mail: mpbarry@countyofsb.org

Attorneys for Defendants
COUNTY OF SANTA BARBARA,
DEPUTY CAMERON HOSSLI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON CELLONA, | Case No: 2:25-cv-01503 AH (Ex) |
| Plaintiff, | **JOINT APPENDIX OF EVIDENCE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| v. | |
| COUNTY OF SANTA BARBARA, DEPUTY CAMERON HOSSLI, and DOES 1-10 inclusive, | Judge: Hon. Anne Hwang<br>Courtroom: 7D, First St. Courthouse |
| Defendants. | Hearing Date: June 3, 2026<br>Time: 1:30 p.m. |

**TO THE HONORABLE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Defendant County of Santa Barbara ("County"), Deputy Cameron Hossli ("Hossli"), and Plaintiff Clinton Cellona ("Cellona"), hereby jointly submit the following evidence in support of their respective portions of the joint brief covering the County and Deputy Hossli's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

1.

| JOINT APPENDIX OF EVIDENCE | |
|---|---|
| **No.** | **DESCRIPTION OF EVIDENCE** |
| 1 | Declaration of Mary Pat Barry |
| | Defendants' **Exhibit 1**: Plaintiff's Complaint for Damages (ECF No. 1) |
| | Defendants' **Exhibit 9**: Santa Barbara County Sheriff's Office ("SBSO") Policy 300 Use of Force |
| | Defendants' **Exhibit 10**: SBSO Policy Section 308.5 Kinetic Energy Projectiles |
| | Defendants' **Exhibit 14**: SBSO Incident Detail Report, dated August 6, 2022 |
| | Defendants' **Exhibit 18**: Diagram of 140 & 148 Alcor with mark made by Deputy Hossli |
| | Defendants' **Exhibit 57**: Excerpts from Deposition of Claudia Moser |
| | Defendants' **Exhibit 62**: Excerpts from Deposition of Clinton Cellona |
| | Defendants' **Exhibit 63**: Excerpts from Deposition of Deputy Michael Reynoso |
| | Defendants' **Exhibit 64**: Excerpts from Deposition of Special Duty Deputy Robert Baisa |
| | Defendants' **Exhibit 65**: Excerpts from Deposition of Deputy Cameron Hossli |

| No. | DESCRIPTION OF EVIDENCE |
|---|---|
|  | Defendants' **Exhibit 66**: Email from SBSO Commander Erik Randy dated Dec. 19, 2022. |
| 2 | Declaration of Veronica Amezola |
|  | Defendants' **Exhibit 53**: Photographs of Forensics Bureau measurements |
|  | Defendants' **Exhibit 54**: Diagram of 140 & 148 Alcor Ave. |
| 3 | Declaration of Parris Ward |
|  | Defendants' **Exhibit 15**: Forward-Looking Infrared ("FLIR") Imager Video (lodged manually) |
|  | Defendants' **Exhibit 17**: Deputy Hossli's Axon Body Worn Camera video from August 6, 2022 (lodged manually) |
|  | Defendants' **Exhibit 55**: Clip of FLIR Stabilized and Matched to Body Worn Camera Audio (lodged manually) |
|  | Defendants' **Exhibit 56**: Clip of Synchronized Body Worn Camera and FLIR Imager Videos (lodged manually) |
| 4 | Declaration of Deputy Michael Reynoso |
|  | Defendants' **Exhibit 23**: Deputy Reynoso's Patrol Unit COBAN video, Aug. 6, 2022 [time stamp 18:50:54 to 19:29:32] (lodged manually) |
|  | Defendants' **Exhibit 29**: Deputy Reynoso's Patrol Unit COBAN video, Aug. 6, 2022 [time stamp 22:50:11 to 23:35:43] (lodged manually) |
| 5 | Declaration of Deputy Cameron Hossli |
|  | Defendants' **Exhibit 58**: Email from Deputy Davis |

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

3.

| No. | DESCRIPTION OF EVIDENCE |
|---|---|
| | Defendants' **Exhibit 59**: Pismo Beach Police Department Bulletin – attachment to Deputy Davis Email |
| | Defendants' **Exhibit 60**: Screenshot of Clinton Cellona social media – attachment to Deputy Davis Email |
| | Defendants' **Exhibit 61**: Video Clip of Clinton Cellona with Katana swords – attachment to Deputy Davis Email (lodged manually) |
| 6 | Declaration of Jeffrey S. Sanger |
| | Plaintiff's **Exhibit 67**: Excerpts from Deposition of Deputy Charles Strange. |
| | Plaintiff's **Exhibit 24**: Deputy Reynoso's Patrol Unit COBAN video, Aug. 6, 2022 [time stamp 19:28:40 to 21:39] (lodged manually) |
| | Plaintiff's **Exhibit 20**: Deputy Reynoso's Police Report dated Aug. 6, 2022. |
| | Plaintiff's **Exhibit 39**: 911 Call audio, Aug. 6, 2022 (lodged manually) |
| | Plaintiff's **Exhibit 68**: Lieutenant Camarena's Patrol Unit COBAN video, Aug. 6, 2022 [time stamp 22:43:39 to 00:08:07] (lodged manually) |
| | Plaintiff's **Exhibit 69**: Excerpts from Deposition of Chief Kenneth Wallentine. |
| | Plaintiff's **Exhibit 13**: Incident Detail Report from August 6, 2022, at 6:52 p.m. |

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

4.

| No. | DESCRIPTION OF EVIDENCE |
|---|---|
| | Plaintiff's **Exhibit 70**: Excerpts from Deposition of Deputy Michael Reynoso. |
| | Plaintiff's **Exhibit 71**: Excerpts from Deposition of Deputy Cameron Hossli. |
| | Plaintiff's **Exhibit 72**: Rule 26(a)(2)(B) report of Philip Delio, M.D. |
| | Plaintiff's **Exhibit 73**: Rule 26(a)(2)(B) report of Veronica Llamas, Ph.D. |
| | Plaintiff's **Exhibit 74**: Excerpts of Deposition of Clinton Cellona. |
| | Plaintiff's **Exhibit 75**: Excerpts of Deposition of Special Deputy Robert Baisa |

Dated: April 29, 2026        Respectfully submitted,

SANGER, HANLEY, SANGER & AVILA, LLP

By: /s/ - Jeffrey S. Sanger
    JEFFREY S. SANGER
    MIGUEL A. AVILA
Attorneys for Plaintiff CLINTON CELLONA

Dated: April 29, 2026        RACHEL VAN MULLEM
                             COUNTY COUNSEL

By: /s/ - Mary Pat Barry
    MARY PAT BARRY
    Senior Deputy County Counsel
Attorneys for Defendants
COUNTY OF SANTA BARBARA and
DEPUTY CAMERON HOSSLI

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

5.

**<u>Attestation re: Signatures of Registered CM/ECF Filers</u>**

Pursuant to Local Civil Rule 5-4.3.4(a)(2)(i), I, Mary Pat Barry, as the filer of this document, attest that all other signatories listed on this signature page(s), and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: April 29, 2026

By: <u>/S/ - Mary Pat Barry</u>
    Mary Pat Barry
    County of Santa Barbara
    Senior Deputy County Counsel

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

6.

RACHEL VAN MULLEM, COUNTY COUNSEL
MARY PAT BARRY, SR. DEPUTY (Bar No. 148354)
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA  93101
(805) 568-2950 / FAX: (805) 568-2982
E-mail: mpbarry@countyofsb.org

Attorneys for Defendants
COUNTY OF SANTA BARBARA,
DEPUTY CAMERON HOSSLI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON CELLONA,<br><br>                     Plaintiff,<br><br>v.<br><br><br>COUNTY OF SANTA BARBARA,<br>DEPUTY CAMERON HOSSLI,<br>and DOES 1-10 inclusive,<br><br>                     Defendants. | Case No: 2:25-cv-01503 AH (Ex)<br><br>**DECLARATION OF MARY PAT BARRY IN SUPPORT OF DEFENDANTS' MOTON FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: June 3, 2026<br>Time: 1:30 p.m.<br><br>Judge: Hon. Anne Hwang<br>Courtroom: 9C, First St. Courthouse |

I, Mary Pat Barry, declare as follows:

1.      I am one of the attorneys of record for Defendants County of Santa Barbara (the "County") and Deputy Cameron Hossli ("Hossli") in the above-entitled matter. If called as a witness, I could and would competently testify to the matters set forth herein of my own personal knowledge.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

1.

2.      Attached to the Joint Appendix of Evidence ("Joint Appendix") as **Exhibit 1** is a true and correct copy of Plaintiff Clinton Cellona's ("Cellona") Complaint for Damages (ECF No. 1), which is the operative complaint in this action.

3.      Attached to the Joint Appendix as **Exhibit 9** is Santa Barbara County Sheriff's Office ("SBSO") Policy 300 Use of Force. This document was marked by Plaintiff as Exhibit 9 at the deposition of Deputy Cameron Hossli.

4.      Attached to the Joint Appendix as **Exhibit 10** is SBSO Policy 308 Control Devices and Techniques, section 308.5 Kinetic Energy Projectiles. This document was marked by Plaintiff as Exhibit 10 at the deposition of Deputy Cameron Hossli.

5.      Attached to the Joint Appendix as **Exhibit 14** is an Incident Detail Report from August 6, 2022 at 10:25 p.m. This document was marked by Plaintiff as Exhibit 14 at the deposition of Deputy Cameron Hossli.

6.      Attached to the Joint Appendix as **Exhibit 18** is a diagram. This document was marked by Plaintiff as the second page of Exhibit 18 at the deposition of Deputy Cameron Hossli.

7.      Attached to the Joint Appendix as **Exhibit 57** are true and correct copies of the cover page, reporter's certificate, and the relevant pages from the transcript of the deposition of Claudia Moser, which was conducted on January 13, 2026.

8.      Attached to the Joint Appendix as **Exhibit 62** are true and correct copies of the cover page, reporter's certificate, and the relevant pages from the transcript of the deposition of Clinton Cellona, which was conducted on February 4, 2026.

9.      Attached to the Joint Appendix as **Exhibit 63** are true and correct copies of the cover page, reporter's certificate, and the relevant pages from the transcript of the deposition of Deputy Michael Reynoso, which was conducted

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

2.

on February 12, 2026.

10.    Attached to the Joint Appendix as **Exhibit 64** are true and correct copies of the cover page, reporter's certificate, and the relevant pages from the transcript of the deposition of Special Duty Deputy Robert Baisa, which was conducted on February 18, 2026.

11.    Attached to the Joint Appendix as **Exhibit 65** are true and correct copies of the cover page, reporter's certificate, and the relevant pages from the transcript of the deposition of Deputy Cameron Hossli, which was conducted on February 10, 2026.

12.    Attached to the Joint Appendix as **Exhibit 66** is a true and correct copy of an email from SBSO Commander Erik Raney dated December 19, 2022 with a subject heading "RE: UOF Review:22-9155." This document was produced by Plaintiff in discovery and is stamped with Bates numbers CELLONA 002495-CELLONA 002497.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of April, 2026 at Santa Barbara, California.

/s/ - Mary Pat Barry
MARY PAT BARRY

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

3.

# EXHIBIT 1

**SANGER LAW FIRM, P.C.**
Robert M. Sanger, SBN 058214
Miguel A. Avila, SBN 319498
222 E. Carrillo Street, Suite 300
Santa Barbara, CA 93101
Tel.: (805) 962-4887
Fax: (805) 963-7311
Email: rmsteam@sangerlawfirm.com

Attorneys for Plaintiff
Clinton Cellona

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON CELLONA,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SANTA BARBARA,<br>DEPUTY CAMERON HOSSLI, and<br>DOES 1 through 10 inclusive,<br><br>Defendant. | Case No. 25-CV-1503<br><br>**COMPLAINT FOR DAMAGES FOR**:<br>    1. **42 U.S.C. § 1983 – Excessive Force (Fourth and Fourteenth Amendment)**<br>    2. **42 U.S.C. § 1988 - Monell Claim**<br><br>**JURY TRIAL DEMANDED** |

## JURISDICTION AND VENUE

1. This is an action for monetary damages brought under 42 U.S.C. §§ 1983 and 1988 against the County of Santa Barbara and officers of its subordinate agency, the Santa Barbara Sheriff's Department.

2. Federal jurisdiction is invoked upon the existence of federal question pursuant to 28 U.S.C. § 1331 and the District Court's original jurisdiction over matters alleging violations of civil rights pursuant to 28 U.S.C. § 1343(a)(3). Supplemental jurisdiction over the state law claims is invoked pursuant to 28

1

COMPLAINT FOR DAMAGES

**EXHIBIT 1**

U.S.C. § 1367.

3. Venue in this district and division is proper under 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e), because the events giving rise to the claims asserted herein occurred in the County of Santa Barbara, within the Central District of California.

**THE PARTIES**

4. Plaintiff CLINTON CELLONA ("PLAINTIFF") is, and at all relevant times was, a citizen of the State of California residing in the County of Santa Barbara.

5. Defendant COUNTY OF SANTA BARBARA ("COUNTY") is a legal entity duly established under the laws of the State of California with all the powers specified and necessarily implied by the Constitution and the laws of the State of California. The Santa Barbara County Sheriff's Office ("SBSO") is a subordinate agency of Defendant COUNTY.

6. PLAINTIFF is informed and believes and, on that basis, alleges that Defendant DEPUTY CAMERON HOSSLI ("HOSSLI") is an individual and, at all times mentioned herein, was a duly appointed Deputy with SBSO.

7. PLAINTIFF is ignorant of the true names and capacities of the defendants sued herein as DOES 1-10 and therefore sues these defendants by such fictitious names and will amend the complaint to allege their true names and capacities once ascertained.

8. PLAINTIFF is informed and believes, and on that basis alleges, that each defendant included each DOE defendant, was an employee of and/or agent of defendant COUNTY.

9. PLAINTIFF is informed and believes, and on that basis alleges, that each DOE defendant was negligently, wrongfully, or otherwise responsible in some manner for the injuries and damages sustained by Plaintiff as set forth herein. Further, one or more DOE defendants were, at all times mentioned herein, responsible for the hiring, training, supervision, and discipline of other defendants including other DOE defendants.

COMPLAINT FOR DAMAGES

**EXHIBIT 1**

10. PLAINTIFF is informed and believes and, on that basis, alleges that each of the Defendants herein acted under color of law and by virtue of the statutes, customs, ordinances and usages of the State of California, and the customs policies, practices and procedures of Defendant COUNTY.

**TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO GOVERNMENT CODE § 945.3**

11. PLAINTIFF was criminally prosecuted from August 9, 2022, through February 28, 2023, in the Superior Court of California, County of Santa Barbara, for acts related to the injuries he suffered during his arrest which are at issue in this Complaint.

12. Government Code section 945.3 provides:

No person charged by indictment, information, complaint, or other accusatory pleading charging a criminal offense may bring a civil action for money or damages against a peace officer or the public entity employing a peace officer based upon conduct of the peace officer relating to the offense for which the accused is charged, including an act or omission in investigating or reporting the offense or arresting or detaining the accused, while the charges against the accused are pending before a superior court.

Any applicable statute of limitations for filing and prosecuting these actions shall be tolled during the period that the charges are pending before a superior court.

13. Pursuant to Government Code section 945.3, PLAINTIFF'S claims were tolled from August 9, 2022, through February 28, 2023, while the criminal proceedings against him were pending and this claim is timely brought.

**GENERAL ALLEGATIONS**

14. This action for excessive force involves the use of a kinetic less-lethal projectile or "beanbag" round fired from a department-issued 12-guage shotgun that was used to shoot PLAINTIFF in the head and severely injured him.

15. On information and belief, SBSO and the COUNTY have published specific policies and procedures for the application of kinetic less-lethal projectiles. SBSO

COMPLAINT FOR DAMAGES

**EXHIBIT 1**

Policy 308.5.3 specifically prohibits aiming at the head and neck area when deadly force is not reasonably justified as in the case at issue in this complaint.

16. On August 6, 2022, SBSO deputies followed PLAINTIFF who was driving on California Highway 135 to 157 Mizar Place in Lompoc, California, County of Santa Barbara. Deputies found PLAINTIFF'S vehicle outside of 157 Mizar Place, his mother's residence, but did not find PLAINTIFF. SBSO towed the vehicle away and commenced a search of the area on foot.

17. Later that evening, SBSO received a call saying that PLAINTIFF was in the backyard of 151 Mizar Place. SBSO deputies responded to that location and found PLAINTIFF.

18. PLAINTIFF was unarmed. He did not make any threats towards SBSO deputies and did not advance towards them. Instead, PLAINTIFF jumped over the backyard fence into the adjacent backyard at 140 Alcor Avenue. SBSO deputies followed him over the fence while a K9 unit also approached from the front of the house of 140 Alcor Avenue. PLAINTIFF was effectively surrounded by law enforcement.

19. HOSSLI was standing on a planter box in the yard at 148 Alcor Avenue at the fence line where 148 and 140 Alcor met. HOSSLI aimed his department issued Remington 800 Magnum 12-guage shotgun at PLAINTIFF at a downward angle. As PLAINTIFF was climbing over the fence, HOSSLI fired a beanbag round that struck PLAINTIFF in the left temple.

20. HOSSLI walked over to PLAINTIFF who was lying on the ground in a fetal position on his right side with a hat over his head. Defendant HOSSLI removed PLAINTIFF'S hat, saw the bean bag round embedded into PLAINTIFF'S temple. PLAINTIFF was bleeding from his head and unconscious.

21. Additional deputies arrived moments later and began providing emergency medical aid. PLAINTIFF, who was semiconscious at the time, repeatedly muttered "help me" as the deputies tried rendering medical care. PLAINTIFF was

COMPLAINT FOR DAMAGES

**EXHIBIT 1**

subsequently transported by airlift to Santa Barbara Cottage Hospital, approximately 60 miles away.

22. PLAINTIFF arrived at Cottage Hospital in critical condition where he received emergency surgery. Medical staff diagnosed him with (1) depressed skull fracture, left temporal; (2) multiple left temporal contusions and bone fragments in the temporal lobe; and (3) diffuse brain swelling after gunshot injury.

23. PLAINTIFF suffered permanent disfigurement as a result of HOSSLI'S assault. He has a permanent scar where he was struck by the beanbag.

24. As a direct and proximate cause of defendants' conduct, Plaintiff suffered serious harm including but not limited to open fracture of the parietal bone, cerebral edema, acute respiratory failure, brain contusion, permanent disfigurement, significant cognitive deficit, impaired memory, headaches, loss of wages and earning capacity, pain and suffering, past and future medical damages, general and special damages in an amount to be determined according to proof.

### FIRST CAUSE OF ACTION 42 U.S.C. § 1983
### EXCESSIVE FORCE IN VIOLATION OF PLAINTIFF'S FOURTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### AGAINST ALL DEFENDANTS

25. PLAINTIFF re-alleges and incorporates by this reference each and every paragraph above and each of its allegations as if fully set forth herein.

26. Defendant HOSSLI was a peace officer with the County of Santa Barbra and was on duty, operating under color-of-law, when he responded to 151 Mizar Place and engaged PLAINTIFF.

27. Defendant HOSSLI violated PLAINTIFF'S clearly established federal

COMPLAINT FOR DAMAGES

**EXHIBIT 1**

constitutional rights under the Fourth and Fourteenth Amendment to the United States Constitution to be free from excessive force and unreasonable force when he shot PLAINITFF in the head with a bean bag.

28. As a direct and proximate cause of Defendant HOSSLI'S conduct, PLAINITFF suffered serious harm including but not limited to open fracture of the parietal bone, cerebral edema, acute respiratory failure, brain contusion, permanent disfigurement, significant cognitive deficit, impaired memory, headaches, loss of wages and earning capacity, pain and suffering, past and future medical damages, general and special damages in an amount to be determined according to proof.

29. As a direct and proximate cause of Defendant HOSSLI'S conduct, PLAINTIFF is entitled to an award of reasonable attorney fees pursuant to 42 U.S.C. § 1988.

30. Defendant HOSSLI'S conduct in violating PLAINTIFF'S constitutional rights was done in a malicious, wanton, and oppressive manner entitling PLAINTIFF to an award of punitive damages.

6

COMPLAINT FOR DAMAGES

**EXHIBIT 1**

## SECOND CAUSE OF ACTION 42 U.S.C. § 1988

## CUSTOM, POLICY, AND PRACTICE OF USING EXCESSIVE FORCE

## MONELL CLAIM

## AGAINST ALL DEFENDANTS

31. PLAINTIFF re-alleges and incorporates by this reference each and every paragraph above and each of its allegations as if fully set forth herein.

32. Defendant HOSSLI and DOES 1-10, engaged in conduct described herein in violation of 42 U.S.C. § 1983, and applied excessive and unreasonable force in violation of PLAINTIFF'S rights under the Fourth and Fourteenth Amendment to the United States Constitution.

33. Defendant COUNTY had a duty to employ and follow adequate policies and procedures to ensure that SBSO deputies were properly trained and supervised in the use of firearms when making an arrest and the proper documentation of the event.

34. Defendant COUNTY failed to protect PLAINTIFF'S constitutional rights when Defendant HOSSLI shot PLAINTIFF in the head with a department issued 12-gauge shotgun in violation of SBSO's policy and procedures.

35. On information and belief Defendant COUNTY failed to train and supervise defendant HOSSLI on the proper use of a firearm against an unarmed individual during an arrest.

36. On further information and belief, defendant HOSSLI was not reprimanded for this incident and the COUNTY ratified HOSSLI'S conduct as acceptable.

37. As a direct and proximate cause of COUNTY'S failure to train and supervise HOSSLI on the proper use and application of force with a shotgun when making an arrest, PLAINTIFF suffered serious harm including but not limited to open fracture of the parietal bone, cerebral edema, acute respiratory failure, brain contusion, permanent disfigurement, significant cognitive deficit, impaired memory, headaches, loss of wages and earning capacity, pain and suffering, past

7

COMPLAINT FOR DAMAGES

## EXHIBIT 1

and future medical damages, general and special damages in an amount to be determined according to proof.

38. As a direct and proximate cause of Defendants HOSSLI, COUNTY, and DOES 1-10, PLAINTIFF is entitled to an award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Wherefore, PLAINTIFF prays as follows:

1. For compensatory damages;
2. For costs of suit;
3. For reasonable attorneys' fees under 42 U.S.C. § 1988;
4. For punitive damages;
5. For any other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

PLAINTIFF hereby demands this matter be tried before a jury.

Dated: February 21, 2025

Respectfully submitted,

**SANGER LAW FIRM, P.C.**
Robert M. Sanger
Miguel A. Avila

By: _____
Miguel A. Avila
Attorneys for Plaintiff
Clinton Cellona

8

COMPLAINT FOR DAMAGES

## EXHIBIT 1

# EXHIBIT 9

**EXHIBIT**
*q*
H0SSli

**Policy
300**

Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

# Use of Force

### 300.1  PURPOSE AND SCOPE
This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of the Santa Barbara Sheriff's Office is expected to use these guidelines to make such decisions in a professional, impartial, and reasonable manner (Government Code § 7286).

In addition to those methods, techniques, and tools set forth below, the guidelines for the reasonable application of force contained in this policy shall apply to all policies addressing the potential use of force, including but not limited to the Control Devices and Techniques and Conducted Energy Device policies.

### 300.1.1  DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Any use of force that creates a substantial risk of causing death or serious bodily injury, including but not limited to the discharge of a firearm (Penal Code § 835a).

**Feasible** - Reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the deputy or another person (Government Code § 7286(a)).

**Force** - The application of physical techniques or tactics, chemical agents, or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed, or restrained.

**Serious bodily injury** - A serious impairment of physical condition, including but not limited to the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement (Penal Code § 243(f)(4)).

**Totality of the circumstances** - All facts known to the deputy at the time, including the conduct of the officer and the subject leading up to the use of force (Penal Code § 835a).

### 300.2  POLICY
The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. The use of force is a serious responsibility that must be exercised judiciously and with respect for human rights and dignity, and for the sanctity of every human life (Penal Code § 835a). Deputies must use force in the same way they must carry out all of their duties: in a fair and unbiased manner.

Deputies are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties. Deputies must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

Use of Force - 46

CELLONA 000626

**EXHIBIT 9**

# Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

*Use of Force*

The Santa Barbara Sheriff's Office recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting deputies with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

### 300.2.1  REASONABLENESS OF FORCE

Deputies shall use only that amount of force that reasonably appears necessary given the facts and totality of the circumstances known to, or perceived by the deputy at the time of the event to accomplish a legitimate law enforcement purpose (Penal Code § 835a). Additionally, deputies should only utilize force they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance. When safe and feasible, deputies should consider utilizing de-escalation, crisis intervention tactics and other alternatives to force in order to slow down or mitigate situations that may otherwise lead to the use of force.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires a deputy to retreat or be exposed to possible physical injury before applying reasonable force.

Given that no policy can realistically predict every possible situation a deputy might encounter, deputies are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident. It is also recognized that circumstances may arise in which deputies reasonably believe that it would be impractical or ineffective to use any of the tools, weapons, or methods provided by the Santa Barbara Sheriff's Office. Deputies may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be objectively reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable deputy on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that deputies are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Reasonableness factors: When determining whether to apply force and evaluating whether a deputy has used reasonable force, a number of factors should be taken into consideration as time and circumstances permit. These factors include, but are not limited to:

(a)  Immediacy and severity of the threat to deputies or others

(b)  The conduct of the person being confronted, as reasonably perceived by the deputy at the time

(c)  Deputy/ subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion and number of deputies vs. subjects)

(d)  The effects of drugs or alcohol

---

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

**EXHIBIT 9**

# Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

*Use of Force*

(e)   The person's mental state or capacity

   1.   People with physical, mental health, developmental, or intellectual disabilities are, "Significantly more likely to experience greater levels of physical force during police interactions, as their disability may affect their ability to understand or comply with commands from peace officers. It is estimated that individuals with disabilities are involved in between one-third and one-half of all fatal encounters with law enforcement." (Penal Code § 835a)

(f)   Proximity of weapons or dangerous improvised devices

(g)   The degree to which the person has been effectively restrained and his/her ability to resist despite being restrained

(h)   The availability of other options and their possible effectiveness

(i)   Seriousness of the suspected offense or reason for contact with the person

(j)   Training and experience of the deputy

(k)   Potential for injury to citizens, deputies and suspects

(l)   Whether the person appears to be resisting, attempting to evade by flight or attacking the deputy

(m)   Risk and reasonably foreseeable consequences of escape

(n)   The apparent need for immediate control of the person or a prompt resolution of the situation

(o)   Whether the conduct of the person being confronted no longer reasonably appears to pose an imminent threat to the deputy or others.

(p)   Prior contacts with the person or awareness of any propensity for violence

(q)   Additional considerations within a custodial environment (Hudson v. McMillian):

   1.   Threat perceived by a reasonable officer

   2.   Need for use of force

   3.   Amount of force used in relation to the need for force

   4.   Effort(s) made to temper a forceful response

(r)   Any other exigent circumstances

## 300.2.2   DUTY TO INTERCEDE
Any deputy present and observing another law enforcement officer or an employee using or about to use force that is clearly beyond that which is necessary, as determined by an objectively reasonable deputy under the circumstances, shall, when in a position to do so, intercede to prevent the use of unreasonable force.

When observing force used by a law enforcement officer, each deputy should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject (Government Code § 7286(b)).

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

CELLONA 000628

**EXHIBIT 9**

## Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

*Use of Force*

### 300.2.3  DUTY TO REPORT EXCESSIVE FORCE
Any deputy who observes a law enforcement officer or an employee use force that potentially exceeds what the deputy reasonably believes to be necessary shall promptly report these observations to a supervisor as soon as feasible (Government Code § 7286(b)).

### 300.2.4  FAIR AND UNBIASED USE OF FORCE
Deputies are expected to carry out their duties, including the use of force, in a manner that is fair and unbiased (Government Code § 7286(b)). See the Bias-Based Policing Policy for additional guidance.

### 300.3  USE OF FORCE
The following subsections address specific use of force considerations. Additional force considerations for specific tools are addressed within separate policies contained within this manual.

### 300.3.1  USE OF FORCE TO EFFECT AN ARREST
Any peace officer may use reasonable force to effect an arrest, to prevent escape, or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested, nor shall such peace officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance (Penal Code § 835a).

### 300.3.2  USE OF FORCE TO SEIZE EVIDENCE
In general, deputies may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, deputies are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, deputies should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Deputies are encouraged to use techniques and methods taught by the Santa Barbara Sheriff's Office for this specific purpose.

### 300.3.3  PAIN COMPLIANCE TECHNIQUES
Pain compliance techniques may be very effective in controlling a passive or actively resisting individual. Deputies may only apply those pain compliance techniques for which they have successfully completed agency-approved training. Deputies utilizing any pain compliance technique should consider:

(a)  The degree to which the pain compliance technique may be controlled in application according to the level of resistance

(b)  Whether the person can comply with the direction or orders of the deputy

(c)  Whether the person has been given sufficient opportunity to comply

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

CELLONA 000629

**EXHIBIT 9**

## Santa Barbara County Sheriff's Office

Santa Barbara SO Policy Manual

*Use of Force*

The application of any pain compliance technique shall be discontinued once the deputy determines that compliance has been achieved.

300.3.4   DEADLY FORCE
Where feasible, the deputy shall, prior to the use of deadly force, make reasonable efforts to identify him/herself as a peace officer and to warn that deadly force may be used, unless the deputy has objectively reasonable grounds to believe the person is aware of those facts (Penal Code 835a(5)(c)(1)(B)).

If an objectively reasonable deputy would consider it safe and feasible to do so under the totality of the circumstances, deputies shall evaluate and use other reasonably available resources and techniques when determining whether to use deadly force. To the extent that it is reasonably practical, deputies should consider their surroundings and any potential risks to bystanders prior to discharging a firearm (Government Code § 7286(b)).

Use of deadly force is justified in the following circumstances:

(a)    A deputy may use deadly force to protect him/herself or others from what he/she reasonably believes is an imminent threat of death or serious bodily injury to the deputy or another person.

(b)    A deputy may use deadly force to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the deputy reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, the deputy shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the deputy has objectively reasonable grounds to believe the person is aware of those facts.  Imminent does not mean immediate or instantaneous, an imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if a deputy reasonably believes any of the following.

1.    The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the deputy or another.

2.    The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

Deputies shall not use deadly force against a person based on the danger that person poses to him/ herself, if an objectively reasonable deputy would believe the person does not pose an imminent threat of death or serious bodily injury to the deputy or to another person. (Penal Code § 835a)

An "imminent" threat of death or serious bodily injury exists when, based on the totality of the circumstances, a reasonable deputy in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the deputy or another person. A deputy's subjective fear of future harm alone is insufficient as an imminent threat. An imminent threat is one that from appearances is reasonably believed to require instant attention (Penal Code § 835a).

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

Use of Force - 50

CELLONA 000630

**EXHIBIT 9**

## Santa Barbara County Sheriff's Office
### Santa Barbara SO Policy Manual

*Use of Force*

### 300.3.5   USE OF FIREARMS - ADDITIONAL CONSIDERATIONS
Bystander considerations: To the extent that it is reasonable under the circumstances present at the time, deputies should consider their surroundings and the potential risk to bystanders prior to discharging a firearm.

Shooting at or from moving vehicles: Shots fired at or from a moving vehicle are rarely effective and may involve additional considerations and risks.  Whenever feasible, deputies should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants.  A deputy should only discharge a firearm at a moving vehicle or its occupants when the deputy reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, where the vehicle itself is being used as a weapon, or if deadly force other than the vehicle is directed at the deputy or others from within the vehicle (Government Code § 7286(b)).

Deputies should not shoot at any part of a vehicle in an attempt to disable the vehicle except in the most extreme and narrow circumstances.

### 300.3.6   ALTERNATIVE TACTICS - DE-ESCALATION
As time and circumstances reasonably permit, and when community and officer safety would not be compromised, deputies should consider actions that may increase deputy safety and may decrease the need for using force:

(a)   Summoning additional resources that are able to respond in a reasonably timely manner.

(b)   Formulating a plan with responding deputies before entering an unstable situation that does not reasonably appear to require immediate intervention.

(c)   Employing other tactics that do not unreasonably increase deputy jeopardy.

In addition, when reasonable, deputies should evaluate the totality of circumstances presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force (Government Code § 7286(b)). Such alternatives may include but are not limited to:

(a)   Attempts to de-escalate a situation.

(b)   If reasonably available, the use of crisis intervention techniques by properly trained personnel.

### 300.3.7   RESTRICTIONS ON THE USE OF A CAROTID RESTRAINT AND CHOKE HOLD
Deputies of the Santa Barbara Sheriff's Office are not authorized to use a carotid restraint (Lateral Vascular Neck Restraint) or a choke hold. Carotid restraint means a vascular neck restraint or any similar restraint, hold, or other defensive tactic in which pressure is applied to the sides of a person's neck that involves a substantial risk of restricting blood flow and may render the person unconscious in order to subdue or control the person. A choke hold means any defensive tactic

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

CELLONA 000631

**EXHIBIT 9**

# Santa Barbara County Sheriff's Office

Santa Barbara SO Policy Manual

## Use of Force

or force option in which direct pressure is applied to a person's trachea or windpipe (Government Code § 7286.5).

### 300.4  MEDICAL ATTENTION FOR INJURIES SUSTAINED USING FORCE

If a person sustains a potentially life threatening injury as result of a deputy's actions, deputies are expected to render first aid to the person as soon as it is safe to do so. In all instances in which a person is injured as result of a use of force incident, deputies shall promptly provide or procure medical assistance for the injured person as soon as it is safe and reasonable to do so.

Prior to booking or release, medical assistance shall be obtained for anyone who exhibits signs of physical distress, has sustained visible injury, expressed a complaint of injury or continuing pain, or who has been rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/ she can be medically assessed.

Based upon the deputy's initial assessment of the nature and extent of the person's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If the person refuses medical attention, such a refusal shall be fully documented in related reports and whenever practicable, should be witnessed by another deputy and/or medical personnel. If an audio recording is made of the contact or an interview with the person, any refusal should be included in the recording, if possible.

The on-scene supervisor(or if the on-scene supervisor is not available, the primary handling deputy) shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force.  This notification shall include a description of the force used and any other circumstances the deputy reasonably believes would be potential safety or medical risks to the person (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called 'excited delirium"), or who require a protracted physical encounter with multiple deputies to be brought under control, may be at an increased risk of sudden death. Calls involving these person should be considered medical emergencies.  Deputies who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

### 300.5  REPORTING AND DOCUMENTING THE USE OF FORCE

It is recognized that in the course of performing their duties, deputies will be faced with situations where they will need to utilize physical force/ restraint in order to accomplish the law enforcement and custodial missions they are charged with.  In order to ensure public trust, governmental accountability and to protect the Sheriff's Office and our employees from unnecessary civil and criminal liability, it is important that Sheriff's employees promptly report and document all instances in which they have used physical force/ restraint against members of the public and persons who are in our custody.  This policy sets forth the level of documentation and supervisory/ administrative

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's Office

CELLONA 000632

**EXHIBIT 9**

# Santa Barbara County Sheriff's Office
### Santa Barbara SO Policy Manual

## *Use of Force*

review that is required after the application of force by a deputy, whether on or off-duty at the time of the incident.

Deputies are permitted to review available Mobile Audio Video (MAV), body-worn video or other video or audio recordings prior to completing the required documentation.

### 300.5.1   LEVELS OF FORCE FOR REPORTING PURPOSES
1. Reporting Level I - Minor or routine physical restraint.  Reporting requirements:

    (a)    Field personnel (non-custodial setting):  Deputies are required to document physical contact/ restraint that fall into this category. The documentation must sufficiently describe the force/ restraint used and the legal justification for having used the force/ restraint.  Because of the minimal nature of this physical contact/ restraint, the required documentation can be accomplished via the use of either:

        i.    The Sheriff's Automated Report System (ARS)

        ii.    Submission of a Field Interview (FI) reporting form

        iii.    Notes placed into the Computer Aided Dispatch (CAD) incident detail record by the deputy who utilized the force/restraint

    (b)    Custody Operations - Personnel utilizing minor or routine physical restraint of inmates within a custody facility, court facility or during transport between these locations are not required to document the routine physical restraint of an inmate.  However, when this type of restraint is used against a person who does not fall within the above exception, the force/ restraint should be documented.  The documentation must sufficiently describe the force/ restraint used and the legal justification for having used the force/ restraint.  Because of the minimal nature of this physical contact/ restraint, the required documentation can be accomplished via the use of either:

        i.    Completion of an Inmate Discipline Report (IDR)

        ii.    Submission of a Field Interview (FI) reporting form

        iii.    The Sheriff's Automated Report System (ARS)

2. Reporting Level II - Previously known as a "reportable" use of force:

    (a)    This level of reporting is required after the application of physical force/ restraint, when the sole use of approved control holds does not sufficiently restrain an individual who is resisting deputies and/ or:

        i.    Deputies utilize various types of heightened physical restraint/ force to overcome the suspect's resistance.  For the purpose of this policy, heightened physical restraint/ force is defined as techniques or actions that involve a reasonable potential to cause injury to the suspect and situations in which deputies use "improvised" control holds or techniques.

        ii.    If any of the involved parties are injured, lose consciousness, or express a continuing complaint of pain as a direct or indirect result of the application of force on the subject.  If the deputy is unsure as to whether or not their use of force caused the injury, the deputy shall report and document the situation using the same protocol as if the deputy knew the injury was caused by their use of force.

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

CELLONA 000633

**EXHIBIT 9**

## Santa Barbara County Sheriff's Office
### Santa Barbara SO Policy Manual

*Use of Force*

     (a)     As used in this policy, the term "injury" includes:  Any known physical damage to the person's body that normally necessitates medical attention or any known visible damage to the person's body which is reasonably expected to continue existing after the passage of a couple hours.

     (b)     As used within this policy, a "continuing complaint of pain" is present when the involved individual expresses a belief that they are experiencing pain after the deputy is no longer applying the force/ restraint that presumably caused the pain.

    iii.    The deputy strikes or attempts to strike a person with an impact weapon (whether issued or "improvised"), or utilizes other striking techniques against the body of the person.

    iv.    The deputy discharges or attempts to discharge particular weapons/ restraint devices such as chemical agents, pepperball, TASER, as specified elsewhere within Sheriff's policy.

  (b)    Reporting requirements:

    i.    Reporting: Any deputy who engages in a Level II use of force/ restraint (previously known as a "reportable use of force") shall notify their immediate supervisor of their use of force/ restraint, as soon as is practical and safe to do so.

    ii.    Documentation: The deputy utilizing this level of force/ restraint shall document the physical force/ restraint via the submission of a Sheriff's report, authored by the involved deputy within the Sheriff's Automated Report System. The content of the report must comprehensively document the actual force/ restraint used and the legal justification for having used the force/ restraint.

     (a)     The involved deputy's supervisor must review and approve the report. Once approved, the supervisor will notify the person next in command. The report will be reviewed by the applicable chain of command, through the Chief Deputy rank. Once the force review is complete, the Undersheriff will be notified of its completion and may review the applicable reports as deemed appropriate.

     (b)     The report must be available to the Sheriff's Training Bureau for the purposes of evaluating current and future training needs.

3. Reporting Level III – California Department of Justice (DOJ) required reporting for force incidents involving firearms and/ or force resulting in serious bodily injury:

  (a)    As of January 1, 2016, our agency is required to report officer involved shootings <u>and</u> other force incidents that result in serious bodily injury to suspects and/ or the involved deputies.  The required information shall be submitted to the California Department of Justice on an annual basis pursuant to Government Code §12525.2.

  (b)    Supervisor notification requirement:  Any deputy who engages in a Level III use of force, shall notify their immediate supervisor as soon as is it is safe to do so.

  (c)    Investigation and documentation requirements:

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

CELLONA 000634

**EXHIBIT 9**

## Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

*Use of Force*

---

(a)  Force incidents involving the discharge of firearms will be investigated and documented pursuant to the Officer Involved Shootings and Deaths policy, Firearms policy and Deadly Force Review policy. The use of a firearm shall be documented within an ARS report.

  (a)  This applies to both situations where the deputy discharges a firearm at a suspect, as well as to incidents in which a suspect discharges a firearm at a deputy.

  (b)  As described within this policy, the use of the word "firearm" does not include electronic control devices and weapons that discharge bean bags or rubber/foam projectiles.

(b)  Force incidents that result in serious bodily injury or death to the suspect(s) or deputies will be investigated and documented in the same manner as a Level II use of force, or by Criminal Investigations Division detectives when they are specifically assigned to investigate the force incident.  The involved deputy and his/ her supervisor or the assigned Criminal Investigations Division detective personnel shall ensure that all DOJ required data points are contained within the submitted ARS report.

  (a)  Serious bodily injury is defined as an injury that involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member or organ. This specifically includes injuries that result in the need for extensive suturing, bone fractures, unconsciousness and concussions.

(d)  The Records Bureau manager or authorized designee shall ensure that our organization complies with the California Department of Justice reporting requirements, pursuant to Government Code §12525.2.  At a minimum, this will require that authorized Records Bureau personnel submit all Level III force incident data via the designated California Department of Justice force reporting system on an annual basis

### 300.5.2  NOTIFICATION TO SUPERVISORS
Supervisory notification shall be made as soon as practical following the application of force in any of the following circumstances:

(a)  All level 2 and 3 uses of force (see above)

(b)  An arrested or detained person alleges any of the above has occurred

### 300.5.3  DISPLAYING OF FIREARMS
Deputies should carefully evaluate each tactical situation and use sound discretion when drawing a firearm in public by considering the following guidelines (Government Code § 7286(b)):

(a)  If the deputy does not initially perceive a threat but reasonably believes that the potential for such threat exists, firearms may be drawn or otherwise deployed and kept at the ready, but should generally not be directed toward an individual.

---

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

CELLONA 000635

**EXHIBIT 9**

## Santa Barbara County Sheriff's Office

Santa Barbara SO Policy Manual

*Use of Force*

(b) If the deputy reasonably believes that a threat exists based on the totality of circumstances presented at the time (e.g., high-risk stop, tactical entry, armed encounter), firearms may be directed toward such threat until the deputy no longer perceives such threat.

Once it is reasonably safe to do so, deputies should carefully secure all firearms.

### 300.6 SUPERVISOR RESPONSIBILITY

When a supervisor is able to respond to an incident in which there has been a reported Level II or III application of force, the supervisor is expected to:

(a) Obtain the basic facts from the involved deputy(s).

(b) Ensure that any injured parties are examined and treated.

(c) Ensure that the person upon whom force was applied is interviewed and that the results of the interview are documented in the related reports.

(d) Ensure that photographs are taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas and submitted to the Forensics Bureau under the associated case number.

(e) Ensure that attempts have been made to locate, identify, and interview additional witnesses and the results of those interviews are documented in the related reports.

(f) Review and approve all related reports.

(g) Ensure compliance with this policy and address any training or equipment issues.

(h) If there is any indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through their chain of command.

(i) Should the supervisor determine that any application of force was not within policy, the supervisor will immediately contact his/her supervisors to initiate an administrative investigation coordinated through the Professional Standards Unit.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported Level II or III application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

### 300.7 USE OF FORCE ANALYSIS

At least annually, the Operations Branch Chief Deputy should cause to be prepared an analysis report on use of force incidents. The report should be submitted to the Sheriff. The report should not contain the names of deputies, involved persons or case numbers. The report will be utilized for:

(a) The identification of any trends in the use of force by members.

(b) Training needs recommendations.

(c) Equipment needs recommendations.

(d) Policy revision recommendations.

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

CELLONA 000636

**EXHIBIT 9**

# Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

## Use of Force

### 300.8  TRAINING
Deputies will receive periodic training on this policy and demonstrate their knowledge and understanding of the policy. This policy will be incorporated into ongoing weapons and force tool training, including firearms related training. The Sheriff's Training Bureau will ensure this training addresses the intersection between the use of force and vulnerable populations, to include children, elderly persons and people with physical, mental and developmental disabilities. All deputies will complete Crisis Intervention Training (CIT).

Deputies will review and acknowledge all changes and updates to this policy on an annual basis.

### 300.9  POLICY REVIEW
The Sheriff's Office will regularly review and update this policy to reflect current laws and best practices. The division commander assigned to oversee this manual will be responsible for conducting this review on an annual basis (Government Code § 7286(b)).

### 300.10  USE OF FORCE COMPLAINTS
The receipt, processing, and investigation of civilian complaints involving use of force incidents should be handled in accordance with § 1020 of this Policy, Personnel Complaints (Government Code § 7286(b)).

### 300.11  POLICY AVAILABILITY
The Sheriff or the authorized designee should ensure this policy is accessible to the public (Government Code § 7286(c)) and that it is posted to the Sheriff's Office Internet website pursuant to California Penal Code §13650.

### 300.12  PUBLIC RECORDS REQUESTS
Requests for public records involving a deputy's personnel records shall be processed in accordance with Penal Code § 832.7 and with § 810 and § 1026 of this policy, Records Maintenance and Release and Personnel Records (Government Code § 7286(b)).

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's Office

CELLONA 000637

Use of Force - 57

**EXHIBIT 9**

**EXHIBIT 10**

# Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

EXHIBIT
10
Hosel

*Control Devices and Techniques*

---

### 308.4.5  REPORT OF USE
All uses of OC spray and Pepper Ball projectiles shall be documented in the related arrest/crime reports and on a Department Use of Force form.

### 308.5  KINETIC ENERGY PROJECTILES
This department is committed to reducing the potential for violent confrontations when suspects and vicious animals are encountered. Kinetic energy projectiles, when used properly, are less likely to result in death or serious physical injury.

Kinetic energy projectiles are approved by the Department and are fired from 12-gauge shotguns or 37/40 mm launchers. Certain munitions can be used in an attempt to de-escalate a potentially deadly situation, with a reduced potential for death or serious physical injury.

### 308.5.1  DEPLOYMENT
Approved munitions are justified and may be used to compel an individual to cease his/her actions when such munitions present a reasonable option for resolving the situation at hand.

A deputy is not required or compelled to use approved munitions in lieu of other reasonable tactics if the involved deputy determines that deployment of these munitions cannot be done safely. The safety of hostages, innocent persons, and deputies takes priority over the safety of subjects engaged in criminal or suicidal behavior or the safety of vicious animals.

### 308.5.2  EXAMPLES OF CIRCUMSTANCES APPROPRIATE FOR DEPLOYMENT
Examples include, but are not limited to, the following types of situations where the subject:

(a)    Is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions

(b)    Has made credible threats to harm himself/herself or others

(c)    Is engaged in riotous behavior or is throwing rocks, bottles, or other dangerous projectiles at people and/or deputies

### 308.5.3  DEPLOYMENT CONSIDERATIONS
Before discharging projectiles, the deputy should consider the following factors:

(a)    Severity of the crime or incident

(b)    Subject's capability to pose an imminent threat to the safety of deputies or others

(c)    If the subject is actively resisting arrest or attempting to evade arrest by flight

(d)    Credibility of the subject's threat as evaluated by the deputies present, and physical capacity/capability

(e)    Proximity of weapons available to the subject

(f)    Deputy's versus the subject's physical factors (e.g., age, size relative strength, skill level, injury/exhaustion, the number of deputies versus subjects)

---

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's Office

Control Devices and Techniques - 69

CELLONA 000649

**EXHIBIT 10**

## Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

*Control Devices and Techniques*

(g)   Availability of other force options and their possible effectiveness

(h)   Distance and angle to target

(i)   Type of munitions employed

(j)   Type and thickness of subject's clothing

(k)   Subject's actions which dictate the need for an immediate response and the use of control devices appears appropriate

(l)   Availability of a backup deputy to provide a lethal force option, if necessary

### 308.5.4   DEPLOYMENT DISTANCES
A deputy should keep in mind the manufacturer's recommendations regarding deployment when using control devices but is not solely restricted to use according to these manufacturer recommendations. Each tactical situation must be evaluated on the totality of circumstances at the time of deployment.

### 308.5.5   SHOT PLACEMENT
The need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death. The head and neck should not be intentionally targeted when deadly force is not reasonably justified.

A deputy should generally follow the manufacturer's recommendations regarding minimum deployment distances and target areas; however, any target area or distance may be considered when it reasonably appears necessary to accomplish immediate incapacitation in order to prevent serious injury or death and other reasonable methods have failed or reasonably appear ineffective.

In order to avoid a contagious fire situation, an announcement should be made to all personnel on scene that the stun bag shotgun is about to be fired.

### 308.5.6   APPROVED MUNITIONS
Only Department-approved kinetic energy munitions shall be carried and deployed.

### 308.5.7   TRAINING REQUIRED FOR USE
Personnel who have successfully completed a Department-approved training course shall be authorized to use kinetic energy projectiles. Deputies deploying kinetic energy projectiles will complete an annual recertification course.

Deputies assigned to the Special Enforcement Team, who have completed a Departmental training course, may carry and employ 12 gauge or 40 mm projectiles while on duty or while performing Special Weapons and Tactics missions.

### 308.5.8   SUPERVISOR'S RESPONSIBILITIES
A specially-marked shotgun, designated for the use of 12-gauge projectiles, will normally be carried in the trunk of each supervisor unit but may be assigned to other personnel by the on-duty supervisor.

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

CELLONA 000650

**EXHIBIT 10**

## Santa Barbara County Sheriff's Office
Santa Barbara SO Policy Manual

*Control Devices and Techniques*

(a) Supervisors or authorized deputies will inspect this shotgun at the beginning of each shift to ensure that it is in proper working order and the appropriate munitions are available for loading prior to deployment. **Under no circumstances shall these weapons be loaded with duty shotgun ammunition.**

(b) After any deployment, the on-duty supervisor will ensure the subject receives any necessary medical treatment. This use will be documented in the appropriate reports and Department Use of Force form. Whenever possible, the subject's wounds will be photo documented. If photo documentation cannot be completed, the reason will be identified in aforementioned reports.

### 308.5.9   RANGEMASTER RESPONSIBILITIES
The Rangemaster shall control the inventory and shall issue all Kinetic energy devices. All damaged or inoperative kinetic energy devices shall be returned to the Rangemaster for disposition, repair or replacement.

### 308.6   OLEORESIN CAPSICUM (OC) GUIDELINES
As with other control devices, oleoresin capsicum (OC) spray and pepper projectiles may be considered for use to bring under control an individual or groups of individuals who are engaging in, or are about to engage in violent behavior. Pepper projectiles and OC spray should not, however, be used against individuals or groups who merely fail to disperse or do not reasonably appear to present a risk to the safety of officers or the public.

### 308.7   POST-APPLICATION NOTICE
Whenever tear gas or OC has been introduced into a residence, building interior, vehicle or other enclosed area, deputies should provide the owners or available occupants with notice of the possible presence of residue that could result in irritation or injury if the area is not properly cleaned. Such notice should include advisement that clean up will be at the owner's expense. Information regarding the method of notice and the individuals notified should be included in related reports.

Copyright Lexipol, LLC 2021/01/25, All Rights Reserved.
Published with permission by Santa Barbara County Sheriff's
Office

**EXHIBIT 10**

**EXHIBIT 14**

8/7/22, 3:42 AM

Inform Browser - 21.102.245.11 - Reports - Incident Report



EXHIBIT
14
HOSSli

# Incident Detail Report

Data Source: **Data Warehouse**
Incident Status: **Closed**
Incident number: **SBSO220071799**
Case Numbers:
Incident Date: **8/6/2022 22:25:44**
Report Generated: **8/7/2022 03:42:04**

| | | | |
|---|---|---|---|
| **Incident Type:** | Perin | **Alarm Level:** | |
| **Priority:** | Perin | **Problem:** | Persons Crimes - All other |
| **Determinant:** | | **Agency:** | Law |
| **Base Response#:** | 08062022-0004219 | **Jurisdiction:** | SBSO |
| **Confirmation#:** | | **Division:** | LOSO |
| **Taken By:** | Slone, Kari | **Battalion:** | LOSO |
| **Response Area:** | LOSO | **Response Plan:** | Perin 34 |
| **Disposition:** | Report to Follow RTF | **Command Ch:** | |
| **Cancel Reason:** | | **Primary TAC:** | |
| **Incident Status:** | Closed | **Secondary TAC:** | |
| **Certification:** | Patrol | **Delay Reason (if any):** | |
| **Longitude:** | 120466379 | **Latitude:** | 34709934 |

| | | | |
|---|---|---|---|
| **Location Name:** | | **County:** | |
| **Address:** | | **Location Type:** | |
| **Apartment:** | | **Cross Street:** | |
| **Building:** | | **Map Reference:** | |
| **City, State, Zip:** | | | |

| | | | |
|---|---|---|---|
| **Caller Name:** | | | |
| **Method Received:** | | **Call Back Phone:** | |
| **Caller Type:** | | **Caller Location:** | |
| **Caller Address:** | | **Caller Location Phone:** | |
| **Caller Building:** | | **Caller Apartment:** | |
| **Caller City, State, Zip:** | | **Caller County:** | |

**Stamps**

| Description | Date | Time | User | Description | Time |
|---|---|---|---|---|---|
| Phone Pickup | 8/6/2022 | 22:25:30 | | | |
| 1st Key Stroke | 8/6/2022 | 22:25:30 | | Received to In Queue | 00:00:01 |
| In Waiting Queue | 8/6/2022 | 22:25:45 | | Call Taking | 00:01:49 |
| Call Taking Complete | 8/6/2022 | 22:27:33 | Slone, Kari | In Queue to 1st Assign | 00:00:27.2 |
| 1st Unit Assigned | 8/6/2022 | 22:26:12 | | Call Received to 1st Assign | 00:00:42.2 |
| 1st Unit Enroute | 8/6/2022 | 22:30:01 | | Assigned to 1st Enroute | 00:03:48.7 |
| 1st Unit Arrived | 8/6/2022 | 22:30:01 | | Enroute to 1st Arrived | -00:00:00. |
| Closed | 8/7/2022 | 02:58:38 | Hargreaves, Kristen | Incident Duration | 04:33:08 |

**Resources Assigned**

| Unit | Primary Flag | Assigned | Disposition | Enroute | Staged | Arrived | At Patient | Delay Avail | Complete | Odm. Enroute | Odm. Arrived | Cancel Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3434 | Y | 22:26:12 | | 22:30:01 | | 22:30:01 | | | 02:50:44 | | | |
| 3435 | N | 22:26:12 | | 22:30:01 | | 22:30:01 | | | 01:24:25 | | | |
| 3461 | N | 22:27:45 | | 22:48:25 | | 22:48:25 | | | 00:37:48 | | | |
| COP2 | N | 22:28:05 | | 22:44:25 | | 23:04:48 | | | 23:06:46 | | | |
| K93 | N | 22:28:19 | | 22:42:29 | | 22:42:29 | | | 02:58:11 | | | |
| 3231 | N | 22:28:24 | | 22:47:43 | | 22:47:43 | | | 02:58:08 | | | |
| 36S5 | N | 22:33:04 | Report to Follow RTF | 22:52:16 | | 22:52:16 | | | 02:58:38 | | | |
| 3233 | N | 22:35:36 | | 22:44:13 | | 22:44:18 | | | 02:58:20 | | | |
| 32X4 | N | 00:49:19 | | | | | | | 02:58:05 | | | |

**Personnel**

| Unit | Name |
|---|---|
| 3434 | Strange, Charles (P5054) - Patrol (Sworn) |
| 3435 | Evert, Tyler (P5562) - Patrol (Sworn) |
| 3461 | Hernandez, Lizbet (P5463) - Patrol (Sworn) |
| K93 | Davis, Tyler (P4311) - Patrol (Sworn) |
| 3231 | Reynoso, Michael (P4988) - Patrol (Sworn) |
| 36S5 | Camarena, Juan Manuel (P2819) - Patrol (Sworn) |
| 3233 | Hossli, Cameron (P4199) - Patrol (Sworn) |
| 32X4 | Frawley, David C (P3875) - Patrol (Sworn) |

**Caution Notes**

**No Caution Notes found**

**Pre-Scheduled Information**

**No Pre-Scheduled Information**

**No Transports Information**

**No Transports Information**

**Comments**

| Date | Time | User | Type | Conf. | Comments |
|---|---|---|---|---|---|
| 8/6/2022 | 22:25:30 | Automatic by System | Response | | [Address: _____ [Medium] [Unfiled] NEGITIVE LE CONTACT 06 10 2019 - COPY NOTES FROM THIS DATE FOR FURTHER PRIOR TO MAKING CONTACT |
| 8/6/2022 | 22:25:53 | KAQ4064 | Response | | SUBJ JUST CAME BACK FOR HIS CAR |
| 8/6/2022 | 22:26:22 | KAQ4064 | Response | Y | [Notification] [Law]-CAN HEAR HIM IN THE BACK GROUND ASKING FOR HELP TO FIND HIS CAR |
| 8/6/2022 | 22:26:58 | KAQ4064 | Response | Y | [Notification] [Law]-HE IS NOW SPEAKING TO THE NEIHGBOR |
| 8/6/2022 | 22:27:06 | KAQ4064 | Response | Y | [Notification] [Law]-SHOWED UP ON FOOT |
| 8/6/2022 | 22:27:28 | JAW5099 | Response | Y | SANTA BARBARA COUNTY WARRANT SEARCH: This workstation can view ACTIVE WARRANTS only |

CELLONA 002345

# EXHIBIT 14

| | | | | | | |
|---|---|---|---|---|---|---|
| 8/6/2022 | 22:27:41 | KAH5005 | Response | | Y | 3434 SEE IF 54 UNIT CAN START |
| 8/6/2022 | 22:27:45 | KAH5005 | Response | | Y | Backed up 3434 with 3461 |
| 8/6/2022 | 22:27:46 | JAW5099 | Response | | Y | CALLING 54 |
| 8/6/2022 | 22:28:05 | KAH5005 | Response | | Y | Backed up 3461 with COP2 |
| 8/6/2022 | 22:28:18 | JAW5099 | Response | | Y | 54 CHECKING WITH SGT / WILL CB |
| 8/6/2022 | 22:28:19 | KAH5005 | Response | | Y | Backed up 3434 with K93 |
| 8/6/2022 | 22:28:24 | KAH5005 | Response | | Y | Backed up K93 with 3231 |
| 8/6/2022 | 22:28:43 | JAW5099 | Response | | Y | CHECKING W/ CHP |
| 8/6/2022 | 22:29:15 | KAH5005 | Response | | Y | K93 CODE 3 FROM 32 |
| 8/6/2022 | 22:29:38 | KAQ4064 | Response | | Y | AT THE NIEGHBORS IN THE BACK YARD - HOUSE TO THE LEFT |
| 8/6/2022 | 22:30:15 | JAW5099 | Response | | Y | CHP CHECKING WILL CB |
| 8/6/2022 | 22:30:18 | KAQ4064 | Response | | Y | [Notification] [Law]-RP REQUESTING TO COME IN QUETLY |
| 8/6/2022 | 22:30:30 | KAH5005 | Response | | Y | 3434 STANDING BY ALDEBARAN/CONSTELLATION |
| 8/6/2022 | 22:31:22 | KAQ4064 | Response | | Y | [Notification] [Law]-SAID SOMEONE SHOULD GO ONTO ███████ CAUSE HE MIGHT JUMP THE FENCE |
| 8/6/2022 | 22:31:49 | KAQ4064 | Response | | Y | [Notification] [Law]-CORRECTION THE STREET BEHIND THE RP IS ██ |
| 8/6/2022 | 22:31:53 | KAH5005 | Response | | Y | M K93 WILL SHUT DOWN WHEN I GET TO THE BASE |
| 8/6/2022 | 22:31:58 | JAW5099 | Response | | Y | CHP WILL BE ENRT FROM BUELLTON WHEN CLEAR FROM STOP |
| 8/6/2022 | 22:32:33 | KAH5005 | Response | | Y | COP2 24 MIN ETA |
| 8/6/2022 | 22:33:04 | KAH5005 | Response | | Y | Backed up 3434 with 36S5 |
| 8/6/2022 | 22:33:35 | KAQ4064 | Response | | Y | [Notification] [Law]-███ THE NEIGHBOR IS TALKING TO HIM AND TRYING TO CALM HIM DOWN |
| 8/6/2022 | 22:35:36 | KAH5005 | Response | | Y | Backed up K93 with 3233 |
| 8/6/2022 | 22:35:43 | KAQ4064 | Response | | Y | [Notification] [Law]-HE'S SCARED - HAS MENTAL ISSUES |
| 8/6/2022 | 22:38:21 | RMO5204 | Response | | Y | 54 UNAVAIL TO RESPOND - 10 6 ON A 211 / 215 |
| 8/6/2022 | 22:42:40 | KAH5005 | Response | | Y | COP2 10 OUT |
| 8/6/2022 | 22:43:21 | JAW5099 | Response | | Y | CHP STILL ON THE STOP / WILL ASK FOR ETA |
| 8/6/2022 | 22:45:53 | KAQ4064 | Response | | Y | [Notification] [Law]-PER RP IF HE GETS MAD HE IS A REALLY STRONG GUY |
| 8/6/2022 | 22:50:23 | KAQ4064 | Response | | Y | [Notification] [Law]-RP STATES MAYBE SOMEONE SHOULD GO INTO HER YARD BECAUSE HE MIGHT JUMP INTO HER YARD |
| 8/6/2022 | 22:50:54 | KAH5005 | Response | | Y | COP2 3 MIN OUT |
| 8/6/2022 | 22:51:16 | KAH5005 | Response | | Y | COP2 ARE YOU READY FOR US K9? |
| 8/6/2022 | 22:51:29 | KAQ4064 | Response | | Y | [Notification] [Law]-RP REQ YOU COME IN QUIETLY |
| 8/6/2022 | 22:51:38 | KAH5005 | Response | | Y | K93 WE ARE 30 SECONDS OUT CODE 33 |
| 8/6/2022 | 22:51:45 | KAH5005 | Response | | Y | CODE 33 ISSUED |
| 8/6/2022 | 22:52:30 | KAQ4064 | Response | | Y | CORRECTION ███ HOUSE IS THE HOUSE ON THE RIGHT |
| 8/6/2022 | 22:52:39 | JAW5099 | Response | | Y | [Notification] [Law]-CHP ENRT FROM BUELLTON |
| 8/6/2022 | 22:53:13 | KAH5005 | Response | | Y | 3231 UNITS 97 |
| 8/6/2022 | 22:54:18 | KAH5005 | Response | | Y | 3434 IN FRONT OF THE RESD |
| 8/6/2022 | 22:54:38 | KAH5005 | Response | | Y | 3435 ███ IS SAYING THE SUBJ IS IN THE SHED IN THE BACKYARD |
| 8/6/2022 | 22:54:42 | KAQ4064 | Response | | Y | RPS MOTHER THINKS HE MIGHT EVEN TRY TO CLIMB THE TREE IN THE BACK YARD |
| 8/6/2022 | 22:55:10 | KAH5005 | Response | | Y | [Notification] [Law]-GOING OVER THE BACK FENCE |
| 8/6/2022 | 22:55:18 | KAH5005 | Response | | Y | [Notification] [Law]-COP2 BACK FENCE |
| 8/6/2022 | 22:55:32 | KAH5005 | Response | | Y | [Notification] [Law]-COP2 OVER THE BACK FENCE K9 YOU ARE IFO THE HOUSE HE IS RUNNING THROUGH |
| 8/6/2022 | 22:55:55 | KAQ4064 | Response | | Y | [Notification] [Law]-TRYING TO KEEP HIS MOM INSIDE |
| 9/6/2022 | 22:55:57 | KAH5005 | Response | | Y | [Notification] [Law]-COP2 IN THE CENTER OF THE BACKYARD W HIS HANDS UP |
| 8/6/2022 | 22:56:03 | KAH5005 | Response | | Y | [Notification] [Law]-COP2 NO LONGER SEE HIM |
| 8/6/2022 | 22:56:08 | KAH5005 | Response | | Y | [Notification] [Law]-3435 BLEEDING FROM HIS HEAD |
| 8/6/2022 | 22:56:19 | KAH5005 | Response | | Y | 3435 BLEEDING HEABILY FROM HEAD |
| 8/6/2022 | 22:56:23 | SMM4067 | Response | | Y | Multi-Agency EMS Incident #: ECNTY-2229016 |
| 8/6/2022 | 22:56:23 | SMM4067 | Response | | Y | STAGE FOR SO HEAD INJ [Shared] |
| 8/6/2022 | 22:56:23 | SMM4067 | Response | | Y | Multi-Agency Fire Incident #: FSBC220010309 |
| 8/6/2022 | 22:56:31 | RMO5204 | Response | | Y | Automatic Case Number(s) issued for Incident #[FSBC220010309], Jurisdiction: SBC. Case Number(s): FSBC220009837. requested by ME34. [Shared] |
| 8/6/2022 | 22:56:33 | PAGINGSERVICE | Response | | Y | Paging Groups Notified:SBC Call Feed [Shared] |
| 8/6/2022 | 22:56:38 | ZM25 | Response | | Y | 34 Alerted at 08/06/2022 22:56:38 for ME34.MED34 [Shared] |
| 8/6/2022 | 22:56:41 | RMO5204 | Response | | Y | STAGE FOR SO *** HEAD INJURY [Shared] |
| 8/6/2022 | 22:56:42 | KAQ4064 | Response | | Y | [EMS] has closed their incident [ECNTY-2229016] |
| 8/6/2022 | 22:56:50 | KAH5005 | Response | | Y | COP2 K9 APPRAOCHING THE SUBJ NOW |
| 8/6/2022 | 22:57:21 | KAH5005 | Response | | Y | K93 WEST OF ██████ |
| 8/6/2022 | 22:57:28 | KAH5005 | Response | | Y | [Page] COP2 AT ██ |
| 8/6/2022 | 22:57:36 | KAH5005 | Response | | Y | [Page] K93 SEE IF CSTAR AVAIL |
| 8/6/2022 | 22:57:51 | SMM4067 | Response | | | [Page] REQ CSTAR7 RESPOND [Shared] |
| 8/6/2022 | 22:57:56 | RMO5204 | Response | | Y | UPDATED LOC ███████ [Shared] |
| 8/6/2022 | 22:58:16 | ZM25 | Response | | Y | CSTAR Alerted at 08/06/2022 22:58:16 for CSTAR7 [Shared] |
| 8/6/2022 | 22:59:27 | KAH5005 | Response | | Y | COP2 ARE YOU COPYING THE TRAFFIC FOR CODE 3 MEDICS? |
| 8/6/2022 | 22:59:32 | KAH5005 | Response | | Y | NEGATIVE NOT GOING OUT OVER 1 |
| 8/6/2022 | 22:59:39 | KAH5005 | Response | | | [Page] K93 CLEAR TO ENTER WHEN OS |
| 8/6/2022 | 22:59:51 | KAH5005 | Response | | | [Page] [Page] K93 CLEAR TO ENTER WHEN OS [Shared] |
| 8/6/2022 | 23:00:48 | RMO5204 | Response | | Y | CSTAR7 CHECKING WEATHER |
| 8/6/2022 | 23:02:32 | RMO5204 | Response | | Y | Secondary Location for CSTAR7: LOMPOC AIRPORT. [Shared] |
| 8/6/2022 | 23:02:52 | KAH5005 | Response | | Y | COP2 STANDING BY FOR MEDICS |
| 8/6/2022 | 23:03:01 | KAH5005 | Response | | Y | COP2 THEYRE 97 |
| 8/6/2022 | 23:04:04 | SMM4067 | Response | | | [Page] CALSTAR7 ENRT ETA 23:22 [Shared] |
| 8/6/2022 | 23:04:30 | SMM4067 | Response | | Y | CHP ADV TO CANCEL |
| 8/6/2022 | 23:04:44 | KAH5005 | Response | | Y | COP2 CODE 34 |
| 8/6/2022 | 23:04:57 | KAH5005 | Response | | Y | CODE 33 LIFTED |
| 8/6/2022 | 23:16:56 | RMO5204 | Response | | Y | CSTAR7 LIFTED ETA TO AIRPORT - 10 MIN [Shared] |
| 8/6/2022 | 23:19:00 | RMO5204 | Response | | Y | MED34 100 KILOS [Shared] |
| 8/6/2022 | 23:19:15 | RMO5204 | Response | | Y | MED34 PT IS COMBATIVE IN PROCESS OF PREPARING FOR TRANSPORT [Shared] |
| 8/6/2022 | 23:19:49 | RMO5204 | Response | | Y | Secondary Location for ME34: LOMPOC AIRPORT. [Shared] |
| 8/6/2022 | 23:20:23 | KAH5005 | Response | | Y | K93 FOLLCWING MED34 |
| 8/6/2022 | 23:25:04 | KAH5005 | Response | | Y | Secondary Location for K93: LOMPOC AIRPORT. |
| 8/6/2022 | 23:25:22 | KAH5005 | Response | | Y | Secondary Location for 3231: LOMPOC AIRPORT. |
| 8/6/2022 | 23:25:31 | RMO5204 | Response | | Y | CSTAR7 LANDED [Shared] |
| 8/6/2022 | 23:28:33 | KAH5005 | Response | | Y | Secondary Location for 3233: SMSO. |
| 8/6/2022 | 23:29:52 | KAH5005 | Response | | Y | 3434 AT THE RESD |
| 8/6/2022 | 23:30:27 | KAH5005 | Response | | Y | Secondary Location for 3461: ██████ |
| 8/6/2022 | 23:32:15 | KAH5005 | Response | | Y | [Page]Paging Group Notified: Aviation Management, Sent From: CADDSP03, Comment: AVIATION MANAGEMENT- COP2 ON THE GROUND SY / CALL COMPLETE SUBJ IN CUSTODY |
| 8/6/2022 | 23:37:23 | SMM4067 | Response | | Y | [Page] RP ██████ CALLING TO ADVISE HE FOUND A PLASTIC CURVED KNIFE ON THE SIDWALK IFO 062 MIZAR , SET IT NEXT TO THE LIGHT POLE . UNK IF ITS RELATED TO CURRENT INCIDENT BUT WANTED TO LET DEPUTIES KNOW. PREFER HIS INFO NOT GO OUT ON THE AIR |
| 8/6/2022 | 23:38:20 | SMM4067 | Response | | Y | [Page] **CORRECTION IFO 162 MIZAR**** |
| 8/6/2022 | 23:43:33 | KAH5005 | Response | | Y | 3231 MYSELF AND K9 AND GOING BACK TO ██ |
| 8/6/2022 | 23:43:42 | KAH5005 | Response | | Y | Secondary Location for 3231 ██ |
| 8/6/2022 | 23:43:42 | KAH5005 | Response | | Y | Secondary Location for K93: ██████ |
| 8/7/2022 | 00:02:21 | ████████ | Response | | Y | Reynoso, Michael - INCIDENT DOCUMENTED UNDER PREVIOUS CASE NUMBER 22-9155 |
| 8/7/2022 | 00:36:13 | JAW5099 | Response | | Y | 32X4 REQ 54 ATC 32L1 / 54 ADVD |
| 8/7/2022 | 00:44:04 | SMM4067 | Response | | Y | [Page] 54 STILL 10-6 WILL ADV ON RESPONSE WHEN AVAIL |
| 8/7/2022 | 00:47:37 | JAW5099 | Response | | Y | CHP WILL BE ENRT FROM 101 |

CELLONA 002346

**EXHIBIT 14**

8/7/22, 3:42 AM                                        Inform Browser : 21.102.245.11 - Reports - Incident Report

| 8/7/2022 | 00:49:19 | KAH5005 | Response | Y | Secondary Location for 32X4: SMSO, |
| 8/7/2022 | 00:49:19 | KAH5005 | Response | Y | Backed up 3233 with 32X4 |
| 8/7/2022 | 00:52:46 | RMO5204 | Response | Y | [Fire] has closed their incident [FSBC220010309] |
| 8/7/2022 | 00:52:50 | JAW5099 | Response | Y | K93 HANDLING ATC / 54 AND CHP CXLD |
| 8/7/2022 | 00:57:17 | KAH5005 | Response | Y | K93 CONTACT WAS MADE HE WILL L/L 32X4 |
| 8/7/2022 | 01:14:36 | KAH5005 | Response | Y | Secondary Location for 3231: SMSO. |
| 8/7/2022 | 01:37:02 | Davis, █████ | Response | Y | Davis, Tyler - 10-19 TO 32 |
| 8/7/2022 | 01:50:34 | KAH5005 | Response | Y | Secondary Location for K93: SMSO. |
| 8/7/2022 | 02:18:29 | KAH5005 | Response | Y | Secondary Location for 36S5: LOSO NEW, 3500 HARRIS GRADE RD █████ |
| 8/7/2022 | 02:51:20 | KAH5005 | Response | Y | 3434 FORENSICS CLEARED THE SCENE |

**No Address Changes**

**No Priority Changes**

**No Alarm Level Changes**

**Activity Log**

| Date | Time | Radio | Activity | Location | Log Entry | User |
|---|---|---|---|---|---|---|
| 8/6/2022 | 22:25:30 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:25:45 | | Incident in Waiting Queue | | | |
| 8/6/2022 | 22:25:45 | | Waiting Pending Incident Time Warning | | Waiting Pending Incident Time Warning timer expired | |
| 8/6/2022 | 22:25:46 | | ANI/ALI Statistics | | INT Insert:Aug 06 2022 22:25:27 / INT SendNP:Aug 06 2022 22:25:27 / WS RecvNP:Aug 06 2022 22:25:27 / WS Process:Aug 06 2022 22:25:46 | KAQ4064 |
| 8/6/2022 | 22:25:46 | | Problem Nature | | Incident problem nature changed from <Blank> to Persons Crimes - All other | KAQ4064 |
| 8/6/2022 | 22:25:48 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/6/2022 | 22:25:53 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:26:00 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAQ4064 |
| 8/6/2022 | 22:26:00 | | Remove Waiting Pending Incident Warning | | Removing Waiting Pending Incident Time Warning timer expired | |
| 8/6/2022 | 22:26:01 | | Incident in Waiting Queue Timer Clear | | | |
| 8/6/2022 | 22:26:12 | 3434 | Disp | BURTON MESA\ARNEB AV | █████ Response Number: 08062022-0004219 | KAH5005 |
| 8/6/2022 | 22:26:12 | 3435 | Disp | 3500 Harris Grade Rd [LOSO NEW] | █████ Response Number: 08062022-0004220; | KAH5005 |
| 8/6/2022 | 22:26:19 | | Premise History Access | | Premise History Viewed | RMO5204 |
| 8/6/2022 | 22:26:22 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:26:22 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:26:37 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAQ4064 |
| 8/6/2022 | 22:26:58 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:26:58 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:27:06 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:27:10 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAQ4064 |
| 8/6/2022 | 22:27:19 | | Premise History Access | | Premise History Viewed | KAQ4064 |
| 8/6/2022 | 22:27:19 | 3435 | Update Vehicle Destination | 3500 Harris Grade Rd [LOSO NEW] | Update Unit Destination To | KAQ4064 |
| 8/6/2022 | 22:27:19 | 3434 | Update Vehicle Destination | BURTON MESA\ARNEB AV | Update Unit Destination To █████ | KAQ4064 |
| 8/6/2022 | 22:27:28 | | Read Comment | █████ | Comment for Incident 419 was marked as read. | JAW5099 |
| 8/6/2022 | 22:27:33 | | UserAction | | User clicked Exit/Save | KAQ4064 |
| 8/6/2022 | 22:27:45 | 3461 | Disp | HWY 246\THUMBELINA DR | █████ Response Number: 08062022-0004221; | KAH5005 |
| 8/6/2022 | 22:27:45 | 3461 | Update Sector | | From Sector BUEL to LOSO | KAH5005 |
| 8/6/2022 | 22:27:45 | 3434 | Unit Backed up | BURTON MESA\ARNEB AV | Backed up with 3461 | KAH5005 |
| 8/6/2022 | 22:28:05 | COP2 | Disp | Hwy 135 / Foster Rd | █████ Response Number: 08062022-0004222; | KAH5005 |
| 8/6/2022 | 22:28:05 | COP2 | Update Sector | | From Sector PSAP to LOSO | KAH5005 |
| 8/6/2022 | 22:28:05 | 3461 | Unit Backed up | HWY 246\THUMBELINA DR | Backed up with COP2 | KAH5005 |
| 8/6/2022 | 22:28:19 | K93 | Disp | WOODLAND\WOODLAND ST | █████ Response Number: 08062022-0004223; | KAH5005 |
| 8/6/2022 | 22:28:19 | K93 | Update Sector | | From Sector SMSO to LOSO | KAH5005 |
| 8/6/2022 | 22:28:19 | 3434 | Unit Backed up | BURTON MESA\ARNES AV | Backed up with K93 | KAH5005 |
| 8/6/2022 | 22:28:24 | 3231 | Disp | S COLLEGE\AUTO PLAZA DR | █████ Response Number: 08062022-0004224; | KAH5005 |
| 8/6/2022 | 22:28:24 | 3231 | Update Sector | | From Sector SMSO to LOSO | KAH5005 |
| 8/6/2022 | 22:28:24 | K93 | Unit Backed up | WOODLAND\WOODLAND ST | Backed up with 3231 | KAH5005 |
| 8/6/2022 | 22:28:30 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 22:28:31 | | UserAction | | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 22:28:33 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 22:28:43 | | Read Comment | | Comment for Incident 419 was marked as read. | JAW5099 |
| 8/6/2022 | 22:29:08 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAQ4064 |
| 8/6/2022 | 22:29:11 | | UserAction | | User clicked Exit/Save | KAQ4064 |
| 8/6/2022 | 22:29:15 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 22:29:16 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAQ4064 |
| 8/6/2022 | 22:29:25 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 22:29:39 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:30:01 | 3434 | Enrt | | Status bypassed by user due to allowable status change | KAH5005 |
| 8/6/2022 | 22:30:01 | 3434 | Enrt | | Responding From = CONSTELLATION\BURTON MESA BL. | KAH5005 |
| 8/6/2022 | 22:30:01 | 3434 | At Scene | | | KAH5005 |
| 8/6/2022 | 22:30:01 | 3435 | Enrt | | Status bypassed by user due to allowable status change | KAH5005 |
| 8/6/2022 | 22:30:01 | 3435 | Enrt | | Responding From = CONSTELLATION\BURTON MESA BL. | KAH5005 |
| 8/6/2022 | 22:30:01 | 3435 | At Scene | | | KAH5005 |
| 8/6/2022 | 22:30:18 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:31:20 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/6/2022 | 22:31:22 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:31:22 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:31:49 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:32:14 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 22:32:48 | | Read Comment | | Comment for Incident 419 was Marked as Read. | JAW5099 |
| 8/6/2022 | 22:33:04 | 36S5 | Disp | MISSION\SKYTT MESA DR | █████; Response Number: 08062022-0004225; | KAH5005 |
| 8/6/2022 | 22:33:04 | 3434 | Unit Backed up | | Backed up with 36S5 | KAH5005 |
| 8/6/2022 | 22:33:04 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 22:33:35 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:35:31 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 22:35:36 | 3233 | Disp | HWY 1\UNNAMED ST | █████ Response Number: 08062022-0004226; | KAH5005 |
| 8/6/2022 | 22:35:36 | 3233 | Update Sector | | From Sector SMSO to LOSO | KAH5005 |
| 8/6/2022 | 22:35:36 | K93 | Unit Backed up | HWY 1\UNNAMED ST | Backed up with 3233 | KAH5005 |
| 8/6/2022 | 22:35:43 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:36:48 | | Read Comment | | Comment for Incident 419 was Marked as Read. | SMM4067 |
| 8/6/2022 | 22:37:58 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 22:38:03 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 22:38:21 | | Read Comment | | Comment for Incident 419 was marked as read. | RMO5204 |
| 8/6/2022 | 22:38:25 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 22:39:12 | | UserAction | | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 22:40:02 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/6/2022 | 22:40:12 | | UserAction | | User clicked Exit/Save | RMO5204 |

https://cadbrowser.sbsheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=3444419&ds=a

CELLONA 002347

**EXHIBIT 14**

8/7/22, 3:42 AM

Inform Browser : 21.102.245.11 - Reports - Incident Report

| Date | Time | Unit | Status | Location | Comment | User |
|---|---|---|---|---|---|---|
| 8/6/2022 | 22:42:29 | K93 | Enrt | | Status bypassed by user due to allowable status change | KAH5005 |
| 8/6/2022 | 22:42:29 | K93 | Enrt | | Responding From = CONSTELLATION\APOLLO WY. | KAH5005 |
| 8/6/2022 | 22:42:29 | K93 | At Scene | | | KAH5005 |
| 8/6/2022 | 22:42:40 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 22:43:45 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 22:44:00 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 22:44:18 | 3233 | Enrt | | Status bypassed by user due to allowable status change | 3233 |
| 8/6/2022 | 22:44:18 | 3233 | Enrt | | Responding From = CONSTELLATION\BURTON MESA BL. | 3233 |
| 8/6/2022 | 22:44:18 | 3233 | At Scene | | | 3233 |
| 8/6/2022 | 22:44:25 | COP2 | Enrt | | Responding From = Hwy 135 / Foster Rd. | KAH5005 |
| 8/6/2022 | 22:45:09 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 22:45:53 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:45:53 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:47:43 | 3231 | Enrt | | Status bypassed by user due to allowable status change | KAH5005 |
| 8/6/2022 | 22:47:43 | 3231 | Enrt | | Responding From = CONSTELLATION\BURTON MESA BL. | KAH5005 |
| 8/6/2022 | 22:47:43 | 3231 | At Scene | | | KAH5005 |
| 8/6/2022 | 22:48:25 | 3461 | Enrt | | Status bypassed by user due to allowable status change | KAH5005 |
| 8/6/2022 | 22:48:25 | 3461 | Enrt | | Responding From = CONSTELLATION\BURTON MESA BL. | KAH5005 |
| 8/6/2022 | 22:48:25 | 3461 | At Scene | | | KAH5005 |
| 8/6/2022 | 22:48:54 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 22:49:34 | | Read Comment | | Comment for Incident 419 was Marked as Read. | JAW5099 |
| 8/6/2022 | 22:50:23 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:50:23 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:50:42 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 22:51:19 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 22:51:29 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:51:29 | | Read Comment | | Comment for Incident 419 was marked as read. | KAQ4064 |
| 8/6/2022 | 22:51:41 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 22:51:45 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 22:52:16 | 36S5 | Enrt | | Status bypassed by user due to allowable status change | KAH5005 |
| 8/6/2022 | 22:52:16 | 36S5 | Enrt | | Responding From = CONSTELLATION\ALDEBARAN AV. | KAH5005 |
| 8/6/2022 | 22:52:16 | 36S5 | At Scene | | | KAH5005 |
| 8/6/2022 | 22:52:39 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:53:01 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/6/2022 | 22:53:13 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 22:55:10 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:55:18 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:55:31 | | Read Comment | | Comment for Incident 419 was Marked as Read. | SMM4067 |
| 8/6/2022 | 22:55:32 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:55:32 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 22:55:55 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:55:57 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:56:03 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:56:08 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:56:23 | | MultiAgencyResponse | | Generated Inc: EMS Inc#: ECNTY-2229016 | SMM4067 |
| 8/6/2022 | 22:56:27 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 22:56:51 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/6/2022 | 22:57:21 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 22:57:28 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:57:36 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:57:42 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAQ4064 |
| 8/6/2022 | 22:57:51 | | Read Comment | | Comment for Incident 419 was marked as read. | SMM4067 |
| 8/6/2022 | 22:57:58 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 22:58:19 | | UserAction | | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 22:58:35 | | Read Comment | | Comment for Incident 419 was Marked as Read. | SMM4067 |
| 8/6/2022 | 22:59:27 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 22:59:39 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:59:41 | | Update IsConfidential | | Updated IsConfidential to False for Response_Comment record 71 | KAH5005 |
| 8/6/2022 | 22:59:51 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 22:59:57 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 23:01:47 | | UserAction | | User clicked Exit/Save | KAQ4064 |
| 8/6/2022 | 23:03:05 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:04:37 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 23:04:48 | COP2 | At Scene | | | KAH5005 |
| 8/6/2022 | 23:04:53 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 23:04:57 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 23:05:20 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/6/2022 | 23:05:25 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:05:40 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 23:06:46 | COP2 | Available | | Unit Cleared From Incident SBSO220071799 | KAH5005 |
| 8/6/2022 | 23:07:06 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 23:07:46 | | UserAction | | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 23:07:50 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 23:10:46 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 23:16:56 | | Read Comment | | Comment for Incident 419 was marked as read. | RMO5204 |
| 8/6/2022 | 23:19:12 | | Read Comment | | Comment for Incident 419 was Marked as Read. | JAW5099 |
| 8/6/2022 | 23:19:15 | | Read Comment | | Comment for Incident 419 was marked as read. | RMO5204 |
| 8/6/2022 | 23:25:04 | K93 | Enrt 2nd | LOMPOC AIRPORT | Incident ID = 3444419, 0. 0. | KAH5005 |
| 8/6/2022 | 23:25:22 | 3231 | Enrt 2nd | LOMPOC AIRPORT | Incident ID = 3444419, 0, 0. | KAH5005 |
| 8/6/2022 | 23:25:36 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 23:25:42 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:27:48 | 3231 | At Scene 2nd | LOMPOC AIRPORT | Incident ID = 3444419, 0, 0, , | KAH5005 |
| 8/6/2022 | 23:27:48 | K93 | At Scene 2nd | LOMPOC AIRPORT | Incident ID = 3444419, 0, 0, . | KAH5005 |
| 8/6/2022 | 23:28:33 | 3233 | Enrt 2nd | SMSO | Incident ID = 3444419, 0, 0. | KAH5005 |
| 8/6/2022 | 23:28:33 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 23:28:48 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 23:28:53 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:29:42 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:29:52 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 23:30:27 | 3461 | At Scene 2nd | | Incident ID = 3444419, 34710040, 120466187, | KAH5005 |
| 8/6/2022 | 23:31:50 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 23:32:15 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/6/2022 | 23:32:17 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:32:34 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 23:35:45 | | Read Comment | | Comment for Incident 419 was Marked as Read. | SMM4067 |
| 8/6/2022 | 23:37:23 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 23:37:23 | | Read Comment | | Comment for Incident 419 was marked as read. | SMM4067 |
| 8/6/2022 | 23:37:30 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/6/2022 | 23:38:20 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 23:38:20 | | Read Comment | | Comment for Incident 419 was marked as read. | SMM4067 |

CELLONA 002348

EXHIBIT 14

8/7/22, 3:42 AM                          Inform Browser : 21.102.245.11 - Reports - Incident Report

| Date | Time | Unit | Action | Location | Description | User |
|---|---|---|---|---|---|---|
| 8/6/2022 | 23:38:57 | | UserAction | | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 23:41:29 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:43:42 | 3231 | Enrt 2nd | | Incident ID = 3444419, 0, 0, | KAH5005 |
| 8/6/2022 | 23:43:43 | K93 | Enrt 2nd | | Incident ID = 3444419, 0, 0, | KAH5005 |
| 8/6/2022 | 23:44:57 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/6/2022 | 23:45:01 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 23:49:53 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:50:25 | K93 | At Scene 2nd | | Incident ID = 3444419, 0, 0, , | KAH5005 |
| 8/6/2022 | 23:50:25 | 3231 | At Scene 2nd | | Incident ID = 3444419, 0, 0, , | KAH5005 |
| 8/6/2022 | 23:51:01 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 23:53:59 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:01:00 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:04:20 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:04:31 | | Read Comment | | Comment for Incident 419 was marked as read. | Mobile1 |
| 8/7/2022 | 00:10:50 | | Read Comment | | Comment for Incident 419 was Marked as Read. | JAW5099 |
| 8/7/2022 | 00:10:53 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/7/2022 | 00:21:44 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:24:33 | 3233 | At Scene 2nd | | Incident ID = 3444419, 0, 0, | KAH5005 |
| 8/7/2022 | 00:24:44 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:25:17 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:30:10 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:31:40 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:33:12 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:35:25 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:36:13 | | Read Comment | | Comment for Incident 419 was marked as read. | JAW5099 |
| 8/7/2022 | 00:36:18 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/7/2022 | 00:36:33 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 00:36:38 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:36:51 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:37:48 | 3461 | Available | | Unit Cleared From Incident SBSO220071799 | KAH5005 |
| 8/7/2022 | 00:38:36 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/7/2022 | 00:41:36 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:42:08 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 00:43:04 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:43:33 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 00:44:04 | | Notify Comment | | (Response Viewer) | |
| 8/7/2022 | 00:44:04 | | Read Comment | | Comment for Incident 419 was marked as read. | SMM4067 |
| 8/7/2022 | 00:44:05 | | UserAction | | User clicked Exit/Save | SMM4067 |
| 8/7/2022 | 00:45:22 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/7/2022 | 00:46:01 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 00:47:07 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 00:47:37 | | Read Comment | | Comment for Incident 419 was marked as read. | JAW5099 |
| 8/7/2022 | 00:47:45 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:48:19 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/7/2022 | 00:49:00 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 00:49:19 | 32X4 | Disp | CALIFORNIA\UNION VALLEY PKWY | Response Number: 08072022-0004229; | KAH5005 |
| 8/7/2022 | 00:49:19 | 32X4 | Update Sector | SMSO | From Sector SMSO to LOSO | KAH5005 |
| 8/7/2022 | 00:49:19 | 32X4 | At Scene 2nd | SMSO | Incident ID = 3444419, 0, 0, , | KAH5005 |
| 8/7/2022 | 00:49:19 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/7/2022 | 00:49:19 | 3233 | Unit Backed up | SMSO | Backed up with 32X4 | KAH5005 |
| 8/7/2022 | 00:50:44 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/7/2022 | 00:51:21 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:52:46 | | Read Comment | | Comment for Incident 419 was marked as read. | RMO5204 |
| 8/7/2022 | 00:52:50 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/7/2022 | 00:54:57 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/7/2022 | 00:55:01 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 00:55:39 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:57:17 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/7/2022 | 00:57:35 | | Read Comment | | Comment for Incident 419 was Marked as Read. | RMO5204 |
| 8/7/2022 | 00:57:39 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 01:02:37 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 01:10:43 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 01:14:37 | 3231 | Enrt 2nd | SMSO | Incident ID = 3444419, 0, 0, | KAH5005 |
| 8/7/2022 | 01:14:37 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/7/2022 | 01:24:25 | 3435 | Available | | Unit Cleared From incident SBSO220071799 | KAH5005 |
| 8/7/2022 | 01:25:12 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/7/2022 | 01:25:14 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 01:28:15 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 01:32:21 | | Read Comment | | Comment for Incident 419 was marked as read. | Mobile1 |
| 8/7/2022 | 01:50:28 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/7/2022 | 01:50:34 | K93 | Enrt 2nd | SMSO | Incident ID = 3444419, 0, 0. | KAH5005 |
| 8/7/2022 | 01:50:34 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/7/2022 | 01:50:38 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 01:50:46 | K93 | At Scene 2nd | SMSO | Incident ID = 3444419, 0, 0, , | KAH5005 |
| 8/7/2022 | 01:51:10 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/7/2022 | 01:52:03 | | Premise History Access | | Premise History Viewed | KAH5005 |
| 8/7/2022 | 01:52:18 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 01:52:18 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 01:57:55 | 3231 | At Scene 2nd | SMSO | Incident ID = 3444419, 0, 0, , | 3231 |
| 8/7/2022 | 02:02:43 | | UserAction | | User clicked Exit/Save | KAQ4064 |
| 8/7/2022 | 02:18:29 | 36S5 | At Scene 2nd | LOSO NEW | Incident ID = 3444419. 3500 HARRIS GRADE RD 34693493, 120446149, | KAH5005 |
| 8/7/2022 | 02:18:29 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/7/2022 | 02:42:29 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/7/2022 | 02:42:33 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 02:50:44 | 3434 | Available | | Unit Cleared From Incident SBSO220071799 | KAH5005 |
| 8/7/2022 | 02:51:20 | | Read Comment | | Comment for Incident 419 was marked as read. | KAH5005 |
| 8/7/2022 | 02:51:22 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 02:56:53 | | Read Comment | | Comment for Incident 419 was Marked as Read. | KAH5005 |
| 8/7/2022 | 02:57:12 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 02:58:05 | 32X4 | Available | | Unit Cleared From Incident SBSO220071799 | KAH5005 |
| 8/7/2022 | 02:58:08 | 3231 | Available | | Unit Cleared From Incident SBSO220071799 | KAH5005 |
| 8/7/2022 | 02:58:11 | K93 | Available | | Unit Cleared From Incident SBSO220071799 | KAH5005 |
| 8/7/2022 | 02:58:20 | 3233 | Available | | Unit Cleared From Incident SBSO220071799 | KAH5005 |
| 8/7/2022 | 02:58:38 | 36S5 | Disposition | | Report to Follow RTF | KAH5005 |
| 8/7/2022 | 02:58:38 | 36S5 | Available | | Unit Cleared From Incident SBSO220071799 | KAH5005 |
| 8/7/2022 | 02:58:38 | 36S5 | Response Closed | | Response Disposition: Report to Follow RTF | KAH5005 |
| 8/7/2022 | 03:40:32 | | UserAction | | User clicked Exit/Save | RMO5204 |

Edit Log

| Date | Time | Field | Changed From | Changed To | Reason | Table | Workstation | User |
|---|---|---|---|---|---|---|---|---|
| 8/6/2022 | 22:25:29 | Agency Name | | EMS | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Call_Back_Phone | | | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Address | (Blank) | | New Entry | Response_Master_Incident | CADDSP08 | KAQ4084 |
| 8/6/2022 | 22:25:30 | Jurisdiction | | E_COUNTY_FIRE | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Division | | VAVIL | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Battalion | | VAVIL | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Response_Area | | VANDSEMI | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | ResponsePlanType 0 | | 0 | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |

CELLONA 002349

**EXHIBIT 14**

| Date | Time | Field | Old | New | Change | Table | Workstation | User |
|---|---|---|---|---|---|---|---|---|
| 8/6/2022 | 22:25:30 | Address | | | Entry Selected/Returned from GeoLocator | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | City | | | Updated City | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Latitude | 0 | | Entry Selected/Returned from GeoLocator | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Longitude | 0 | | Entry Selected/Returned from GeoLocator | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Call Back Phone | | | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:30 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:39 | Address | | | Address Change | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | Jurisdiction | | E_COUNTY_FIRE | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | Division | | VAVIL | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | Battalion | | VAVIL | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | Response_Area | | VANDSEMI | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | ResponsePlanType | 0 | 0 | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | Address | | | Change Verified | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | City | | | Updated City | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | Latitude | | | Change Verified | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:40 | Longitude | | | Change Verified | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:43 | Jurisdiction | | SBSO | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:43 | Division | | LOSO | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:43 | Battalion | | LOSO | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:43 | Response_Area | | LOSO | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:43 | ResponsePlanType | 0 | 0 | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:45 | Problem | | Persons Crimes - All other | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:47 | Pickup_Map_Info | | 10SGD3243 | | Response_Transports | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:47 | Map_Info | | 10SGD3243 | | Response_Transports | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:25:48 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 22:25:53 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:26:00 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:26:04 | Caller_Name | | | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:26:22 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:26:37 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:26:58 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:27:10 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:27:18 | Apartment | 0816d20 | | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:27:28 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 22:28:33 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:28:43 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 22:29:08 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:29:15 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:29:16 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:29:39 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:31:20 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 22:31:22 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:32:48 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 22:33:04 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:36:48 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 | SMM4067 |
| 8/6/2022 | 22:38:21 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 22:39:49 | Caller_Name | | | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:40:02 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 22:42:40 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:45:09 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:45:53 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:49:34 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 22:50:23 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:51:19 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:51:29 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:51:41 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:51:45 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:53:01 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 22:53:13 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:55:31 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 | SMM4067 |
| 8/6/2022 | 22:55:32 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:56:51 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 22:57:21 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:57:35 | Address | | 14 | Address Change | Response_Master_Incident | CADDSP05 | SMM4067 |
| 8/6/2022 | 22:57:42 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 | KAQ4064 |
| 8/6/2022 | 22:57:51 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP05 | SMM4067 |
| 8/6/2022 | 22:58:35 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 | SMM4067 |
| 8/6/2022 | 22:59:27 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 22:59:41 | isConfidential | True | False | Change Confidential Comment | IncidentComment | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:04:53 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:04:57 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:05:20 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 23:16:56 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 23:19:12 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 23:19:15 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 23:25:36 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:28:33 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:28:48 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:29:52 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:31:50 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:32:15 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:35:45 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 | SMM4067 |
| 8/6/2022 | 23:37:23 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP05 | SMM4067 |
| 8/6/2022 | 23:37:30 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 23:38:20 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP05 | SMM4067 |
| 8/6/2022 | 23:44:57 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/7/2022 | 00:04:31 | Unread Comment | False | True | (Response Viewer) | Incident | CADMOB01 | Mobile1 |
| 8/7/2022 | 00:10:50 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/7/2022 | 00:36:13 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP09 | JAW5099 |
| 8/7/2022 | 00:36:18 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/7/2022 | 00:44:04 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP05 | SMM4067 |
| 8/7/2022 | 00:45:22 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/7/2022 | 00:47:37 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP09 | JAW5099 |
| 8/7/2022 | 00:48:19 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/7/2022 | 00:49:19 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/7/2022 | 00:50:44 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/7/2022 | 00:52:46 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP10 | RMO5204 |
| 8/7/2022 | 00:54:57 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/7/2022 | 00:57:17 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/7/2022 | 00:57:35 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/7/2022 | 01:14:37 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |

CELLONA 002350

**EXHIBIT 14**

| 8/7/2022 | 01:25:12 | Read Comment | False | True | (Response Viewer) Response_Master_Incident | CADDSP03 KAH5005 |
|---|---|---|---|---|---|---|
| 8/7/2022 | 01:32:21 | Unread Comment | False | True | (Response Viewer) Incident | CADMOB01 Mobile1 |
| 8/7/2022 | 01:50:28 | Read Comment | False | True | (Response Viewer) Response_Master_Incident | CADDSP03 KAH5005 |
| 8/7/2022 | 01:50:34 | Unread Comment | False | True | (Response Viewer) Incident | CADDSP03 KAH5005 |
| 8/7/2022 | 01:51:10 | Read Comment | False | True | (Response Viewer) Response_Master_Incident | CADDSP03 KAH5005 |
| 8/7/2022 | 02:18:29 | Unread Comment | False | True | (Response Viewer) Incident | CADDSP03 KAH5005 |
| 8/7/2022 | 02:42:29 | Read Comment | False | True | (Response Viewer) Response_Master_Incident | CADDSP03 KAH5005 |
| 8/7/2022 | 02:51:20 | Unread Comment | False | True | (Response Viewer) Incident | CADDSP03 KAH5005 |
| 8/7/2022 | 02:56:53 | Read Comment | False | True | (Response Viewer) Response_Master_Incident | CADDSP03 KAH5005 |

Custom Time Stamps
**No Custom Time Stamps**

Custom Data Fields
**No Custom Data Fields**

Attachments
**No Attachment**

DO NOT DUPLICATE

SBCleyb5810 8/8/2023 1:38 PM

CELLONA 002351

**EXHIBIT 14**

# EXHIBIT 18

**22-9155**    Supplement No
0013

# Santa Barbara County Sheriff



4434 Calle Real

Santa Barbara, CA 93110-1002
Report Type
FORENSICS

(805) 681-4100

Reported Date
08/11/2022

Officer
AMEZOLA, V

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | | Reported Time | Status |
|---|---|---|---|---|---|---|---|---|---|
| Santa Barbara County Sheriff | | | 22-9155 | | 0013 | 08/11/2022 | | 10:15 | Offense |
| Report Type | | | Location | | | | | | |
| Forensics BOC | | | FOSTER RD/HWY 135 | | | | | | |
| City | ZIP Code | | Rep Dist | Area | Beat | From Date | | From Time | |
| Santa Maria City | 93455 | | SM70 | 2 | SM | 08/06/2022 | | 18:52 | |
| Officer | | | | | Assignment | Entered by | Assignment | | |
| 3949/AMEZOLA, V | | | | | FORENSICS | 3949 | FORENSICS | | |
| RMS Transfer | Prop Trans Stat | Approving Officer | | | Approval Date | | Approval Time | | |
| Successful | Successful | 2819 | | | 08/11/2022 | | 14:40:23 | | |

## Summary Narrative

This report contains information in reference to the measurements taken from the backyards of 140 Alcor Avenue and 148 Alcor Avenue on Tuesday, 08/09/22. *Refer to attached E-file document for details.*

## Narrative

Based on measurements taken at the scene, approximate distance between the deputy and the subject is 39 feet. The approximate distance from where the deputy was standing to where the casing was located is 35 feet.



EXHIBIT
18
Hossli

| Report Officer | Printed At | |
|---|---|---|
| 3949/AMEZOLA, V | 08/11/2022 14:49 | Page 1 of 1 |

## EXHIBIT 18



**EXHIBIT 18**

**EXHIBIT 57**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CLINTON CELLONA,                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )No. 2:25-cv-01503-AH-(Ex)
                                    )
COUNTY OF SANTA BARBARA,            )
DEPUTY CAMERON HOSSLI, and          )
DOES 1-10 inclusive,                )
                                    )
            Defendants.             )
                                    )
_____)

**CERTIFIED TRANSCRIPT**

DEPOSITION OF CLAUDIA MOSER

---oOo---

Tuesday, January 13, 2026

10:12 a.m. - 12:44 p.m.

REPORTED BY:

CARI A. WILSON, CVR/CSR NO. 10190

FILE NO. 79042

# EXHIBIT 57

Tuesday, January 13, 2026

---OOO---

CLAUDIA MOSER,

The witness herein, having been first duly

sworn, testified as follows:

EXAMINATION

BY MS. BARRY:

Q.   So I've introduced myself off the record, but I'll go ahead and introduce myself on the record.  So my name is Mary Pat Barry, and I am here representing two defendants in this action.  The two defendants I represent are the County of Santa Barbara and Santa Barbara County Sheriff's Deputy Cameron Hossli.

Q.   And what is your date of birth?

A.   █/█/1977.

Q.   Have you ever had your deposition taken before?

A.   I don't think so.

**EXHIBIT 57**

and Z as in "zebra."

BY MS. BARRY:

Q.   Okay.

A.   I'm sorry for letting you all know all of this, but I have a lot of things that have happened.

Q.   No, I appreciate it.

A.   Yeah.

Q.   Yeah.  And I understand it's -- it's probably difficult, so I just appreciate that you're --

A.   Yeah.  That's why --

Q.   -- making your best effort.

A.   Yeah.  That's why I just had a hard time coming because of -- of all the incidents of, you know, cops being at my house.  It's not the first time.

Q.   And who lives at 157 Mizar Place with you?

A.   Right now, it's my mom, because she was sick. After the incident happened, she got so sick that she left.  She went back to Guam, and then she went back to the Seychelles.  And then, after the Seychelles, she came to me.  She was only 98 pounds.  I got her back to 140 pounds just taking her to the hospital and trying to

**EXHIBIT 57**

CELLONA vs COUNTY OF SANTA BARBARA
MOSER, CLAUDIA on 01/13/2026                                                  Page 59

with me, you know, I'm going to handle it," you know, things like that.

And I told him, I said, "Is that" -- "is that good behavior?"  I mean, I just -- I -- I told him.  I don't remember exactly what I told him, ma'am.  It's been years.  I mean, there's information -- like I said, it's been years that I haven't, you know -- I've put it way behind me, so a lot of the information that I'm trying to tell you, I'm trying to tell you by as much memory as I can, you know.

Did my brother do wrong?  I -- part of me feel like, yeah, there's sometimes he -- he should have been accountable or get help or seek help for his mental health.  He didn't do it, because I don't know, maybe he was -- he was sick, maybe he talked the way he did. There's a lot of thing I didn't condone, and I didn't like what he was doing.  That's why I kind of distance a lot of myself from him.

**EXHIBIT 57**

CELLONA vs COUNTY OF SANTA BARBARA
MOSER, CLAUDIA on 01/13/2026                                                    Page 60



**EXHIBIT 57**



And then -- and then I -- I go out there, and I see cops with the guns.  You know, they're -- like, there's a lot of them coming on my property, and then I was just -- it's just -- I was upset.  I was really, really upset.  Because, like, one, my brother should not have brought this issue to my home because, like I said, it's -- I've had a little bit more of a peace and quiet, you know, time in our lives that we've -- I don't need chaos coming, you know.

And then for them to just -- you know, I wish they would have called on the phone -- or the law enforcement would have called my number and said, hey, they notice that -- they -- I'm not sure if they suspect that he was coming, but I -- his driver's license said 157 Mizar, so my brother have used my address without,

**EXHIBIT 57**

like, my permission because I told him to not use my address.

And that's when they asked me, "We're looking for Clinton.  Does he live here?"  And I said, "No, he doesn't."

Q.   You described him seeming hyped up and not there.

What else did you witness in terms of his demeanor?

A.   He was just scared.  See, Clinton has -- to me, Clinton is -- is an adult, but he's still a little boy trapped in his body.  He hasn't grown.  He's -- he's not -- I don't think he -- he still acted like a kid at times.  He's still -- he's still, like, childish.  He's not -- he didn't -- I mean, he -- he seems like he's an adult, but he's, you know --

Q.   And you said he handed you his backpack?

A.   Yeah.



**EXHIBIT 57**



Q.   When he arrived at your house, do you remember him saying to you, "I'm going to jail and watch over my vehicle"?

A.   I don't remember, but it sound -- it sound

**EXHIBIT 57**

CELLONA vs COUNTY OF SANTA BARBARA
MOSER, CLAUDIA on 01/13/2026

Page 64



like -- it sound like it, or "Here's my" -- yeah,
"Here's my backpack," yeah, but I don't -- I -- like I
said, I don't remember for sure, and I can't tell you
"yes" or "no," because that memory, it's just not in my
mind.  So I apologize.

Q.   So between the time that he first knocked on
your door and then the second time that you saw him, you
didn't see him at any point between those two incidents?

A.   No.

**EXHIBIT 57**

A.   I don't know for sure.  I -- I didn't hear any of the nature.  I mean, if they did, they did, but I -- I was clueless, to tell you the truth.  I don't recall anything like that.

Q.   Did you see your brother's car that night?

A.   My brother's car?  Yeah, because I park in my driveway, and then there's -- after the cement, there's an area where there's rocks, and he pulled right along the side of my -- right by me.

Q.   And when did he do that?

A.   When he first arrived my property, and some -- you know.

Q.   And what happened with his vehicle?  Do you know?

A.   They towed it.  I gave the sheriff -- I gave -- I don't recall -- I don't know for sure, but as to the best of my knowledge and my memory, I handed -- I believe I handed the bag to Chuck Strange, but I could be wrong.  It could have been because I was so stressed out with law enforcement again being on my residence that I, you know --

**EXHIBIT 57**

CELLONA vs COUNTY OF SANTA BARBARA
MOSER, CLAUDIA on 01/13/2026                                              Page 67



*McDaniel Reporting*  (805) 544-3363 | *1302 Osos Street, San Luis Obispo, Ca 93401*

**EXHIBIT 57**

CELLONA vs COUNTY OF SANTA BARBARA
MOSER, CLAUDIA on 01/13/2026                                                    Page 68



Q.   And do you recall him telling you, "I don't need help.  They're making it bigger than it is"?

A.   I don't remember that.

**EXHIBIT 57**

CELLONA vs COUNTY OF SANTA BARBARA
MOSER, CLAUDIA on 01/13/2026                                          Page 107

CERTIFICATE OF

CERTIFIED REPORTER

* * * * *

I, the undersigned Certified Reporter in and for the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me; that the testimony of the witness and all objections made at the time of the proceedings were captured by me and were thereafter transcribed under my direction; that the foregoing is a true record of the testimony and of all objections made at the time of the proceedings.

I further certify that I am a disinterested person and am in no way interested in the outcome of said action, or connected with or related to any of the parties in said action, or to their respective counsel.

The dismantling, unsealing or unbinding of the original transcript will render the reporter's certificate null and void.

In witness whereof, I have subscribed my name on this date:  January 27, 2026

_____
CARI A. WILSON, CVR/CSR NO. 10190

**EXHIBIT 57**

**EXHIBIT 62**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON CELLONA,       ) | **CERTIFIED TRANSCRIPT** |
|          ) | |
|       PLAINTIFF,     ) | |
|          ) | |
|   vs.          ) | Case No. |
|          ) | 2:25-cv-01503-AH- |
| COUNTY OF SANTA BARBARA, DEPUTY) | (Ex) |
| CAMERON HOSSLI, AND DOES 1-10  ) | |
| INCLUSIVE,        ) | |
|          ) | |
|       DEFENDANTS. | |

VIDEO-RECORDED DEPOSITION OF CLINTON CELLONA

WEDNESDAY, FEBRUARY 4, 2026, 9:54 A.M.

SANTA BARBARA, CALIFORNIA

Reported by:  Brittany Badger
              CSR No. 13970
Job No.:      79129

**EXHIBIT 62**

and then swear in the witness?

THE REPORTER:  Good morning.  My name is Brittany Badger.  I am a certified shorthand reporter and the deposition officer for today's deposition.  My CSR license number is 13970.

CLINTON CELLONA,

having been first duly sworn by the reporter, testifies as follows:

EXAMINATION

BY MS. BARRY:

Q   Mr. Cellona, I introduced myself before we went on the record, but I'll do it again.  My name is Mary Pat Barry, and I am the attorney for the County of Santa Barbara and for Deputy Cameron Hossli in this case, and I'm the attorney who noticed your deposition.  So thank you for being here this morning.

Q   So they spelled your middle name incorrectly on

**EXHIBIT 62**

pay for it?

A    I may have.

Q    And you agree --

A    I don't know.  I don't remember.

Q    You don't remember that right now?

A    I don't.

Q    Okay.  And I'm going to mark as Exhibit 3 a photo identified with Bates stamp Cellona 001910.

A    That's the person that had the RV outside.  I went over there, and I stayed under the RV.

(Exhibit 3 marked.)

BY MS. BARRY:

Q    Do you recognize the house in Exhibit 3, Mr. Cellona?

A    No.  Not this house.  No.

I was at somebody's RV, under the RV.  I probably can even -- if I think of it more, I probably can find it.  I was staying under some person's RV for hours.

**EXHIBIT 62**

CLINTON CELLONA vs CAMERON HOSSLI
CELLONA, CLINTON on 02/04/2026                                              Page 96

4-4.  Do you recognize that?

A     This one is coming in somehow.  I'm not sure why.

Q     Okay.  But you don't know what this is?

A     No.  Maybe it's his backyard.  I'm not sure. It's coming in like I've seen it before.  I don't know why.

Q     Okay.  Turning to the next page which is 4-5. Do you recognize that?

A     Yeah.  I'm not sure.  Maybe.

Q     Okay.  And turning to the last page, 4-6.  Do you recognize that?

A     Not sure.

Q     Okay.  That's the part I want to ask you about.

Do you remember running through Mike's yard?

A     Yeah.  Running through Mike's yard, and then I was hopping the fence, and then I remember just falling

**EXHIBIT 62**

REPORTER'S CERTIFICATION

I, Brittany Badger, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name on this date:

*Brittany Badger*
_____
Brittany Badger, CSR No.  13970

**EXHIBIT 62**

**EXHIBIT 63**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED TRANSCRIPT**

CLINTON CELLONA,                          )
                                          )
                Plaintiff,                )
                                          )
  vs.                                     )   Case No.   2:25-cv-01503
                                          )              AH-(Ex)
COUNTY OF SANTA BARBARA, DEPUTY           )
CAMERON HOSSLI, and DOES 1-10,            )
Inclusive,                                )
                                          )
                Defendants.               )
_____)

DEPOSITION OF DEPUTY MICHAEL REYNOSO

THURSDAY, FEBRUARY 12, 2026

JOB NO.: #79208

REPORTED BY:  KRISANNE CACIOLA, CSR 6617

# EXHIBIT 63

SANTA BARBARA, CALIFORNIA, THURSDAY, FEBRUARY 12, 2026

2:00 P.M.


DEPUTY MICHAEL REYNOSO,

having been first duly sworn by the reporter, was examined

and testified as follows:


THE REPORTER:  My name is Krisanne Caciola, CSR

license number 6617.

MR. SANGER:  So my name is Jeff Sanger, and I'm

appearing -- or representing the plaintiff in this matter,

Clinton Cellona.

MR. AVILA:  Miguel Avila, also for Plaintiff Cellona.

MS. BARRY:  Mary Pat Barry, present and on behalf of

Defendants County of Santa Barbara and Deputy Cameron

Hossli.


EXAMINATION

BY MR. SANGER:



Q.   Now, Deputy Reynoso, do you understand that even

**EXHIBIT 63**



and some pictures from the incident, as well.

Q.   Did you review any videos or audio files?

A.   Yes.

Q.   Can you tell me which videos or audio files you reviewed.

A.   The interview -- interviews with the involved parties, which would be the neighbor, his mom, and sister.

Q.   Have you spoken with anyone about the subject matter of your deposition today?

A.   No.

Q.   After your testimony today, you will have the opportunity to review the transcript and make any changes to your answers.  However, do you understand that if you change a substantive answer, I can comment on that change at trial to impeach your credibility by showing the jury the difference between what you said today and what you changed later?

A.   Yes.

Q.   At which school?

McDaniel Reporting   (805) 544-3363 | 1302 Osos Street, San Luis Obispo, Ca 93401

**EXHIBIT 63**



watch the entire video.

Q.   Do you recall, as the pursuit unfolded, the Prius continued to use his turn indicators throughout?  Do you recall that?

A.   I don't.

Q.   Okay.

And at some point, did you radio in and request other units to assist?

A.   I recall radioing in and mentioned that I was in pursuit.  At that time, I don't recall asking for additional deputies.  All I remember is that I initiated a pursuit.

Q.   What was the traffic on Highway 135 at that time?  What was the traffic like?

A.   I would say it was a moderate amount of traffic. It wasn't 100 percent empty; however, there were vehicles on the road.

Q.   But it would be fair to say it was fairly light

**EXHIBIT 63**

traffic compared to, say, a morning or late afternoon?

A.    I can't say for sure.

Q.    And have you ever watched this video of your COBAN?

A.    Yes.

Q.    Do you recall when you watched it?

A.    I believe during the initial hearing for the incident, when he was going to court.

Q.    For Mr. Cellona's criminal case that resulted from the incident we're here to discuss?

A.    Yes.



Q.    Now, other than the high rate of speed and the somewhat reckless driving, you never noticed that the driver of the Prius appeared to be using his vehicle as a weapon, wasn't targeting other vehicles, or trying to ram law enforcement, was he?

MS. BARRY:    Objection; calls for speculation.

BY MR. SANGER:

Q.    You can answer it if you understand it.

**EXHIBIT 63**

traffic that is recorded here on the CAD log?

A.   I'm not sure I understand exactly what you're asking.

Q.   Strike that.

Were you listening to the radio during the pursuit?

A.   Yes.

Q.   And were you aware of -- strike that.

There are a few entries on the CAD log that seem to be marked "Canine 3" before the subject matter of what came over the radio.  Do you know who Canine 3 was on that day?

A.   Yes.

Q.   Was that Deputy Davis?

A.   Yes.



**EXHIBIT 63**

Q.    Would it refresh your recollection -- and it might help you to use a piece of paper and kind of come down here -- on the third page of Exhibit 13, if you come down to the time stamp of what appears to be 18:58:22.

A.    Uh-huh.  I see it.

Q.    Does that refresh your recollection as to something that Deputy Davis may have said over the radio?

A.    Yes.

Q.    And does that indicate that Deputy Davis is saying that the driver of the Prius may be en route to Mizar, which is in the 34 area?

A.    Yes.

Q.    Can you tell me what is meant by the 34 area?

A.    34 is a code we use for kind of pinpointing the cities.  So 34 is specific to Lompoc.

Q.    So Deputy Davis has, while you're driving, perhaps at 100 miles per hour, come over the radio -- strike that.

**EXHIBIT 63**



Was Deputy Davis involved in this pursuit at this time?

A.   I don't recall.  I don't recall if he was behind my vehicle or following the pursuit at the time.

Q.   And you were the lead pursuit vehicle during this chase; right?

A.   Yes.

Q.   And there were several other black and whites behind you also in pursuit; correct?

A.   Correct.

Q.   Do you recall how many?

A.   No.

Q.   And you don't recall if Deputy Davis was among the other vehicles involved in the pursuit?

A.   No.

**EXHIBIT 63**



Q.   Do you recall that after that, the pursuit was terminated?

A.   I don't recall if that is specific to when he called it off; however, I do recall that I think we were going towards Lompoc at the time.

MR. SANGER:  Do we have the actual audio that should be -- we asked for the dispatch audio.  Did that not make it on there?  Can we go back to the --

I apologize.  I was hoping that we would have the actual audio file of the dispatch which is represented in the CAD log.  Before we're done, I'll try to have that marked.

Q.   And you don't know if that information came from

**EXHIBIT 63**

(Video playing.)

MR. SANGER:  If we can skip forward to -- take it back to when they actually get there.  Yeah, there.

MR. AVILA:  There?

MR. SANGER:  Yeah.

(Video playing.)

MR. SANGER:  Pause it there.

Q.  So at this point in the video, we've got a time stamp of -- that's really frustrating.  It appears to be 19:08 and 10 seconds.

What has occurred at this point in the video?

A.  It's when I arrived on the -- on scene at the residence on Mizar.

Q.  On Mizar.  And from this direction, overlooking that, can you identify where 157 Mizar would be?

A.  I believe it's on the right-hand side of this video.

Q.  Is it to the front of the vehicle or to the back of the vehicle?

A.  To the front.



**EXHIBIT 63**

CELLONA vs HOSSLI
REYNOSO, MICHAEL on 02/12/2026                                                    Page 83

A.   Yes.

Q.   -- is that correct?

A.   Yes.

Q.   And you didn't have with you any sort of night-vision goggles or anything to assist seeing in the dark?

A.   Other than our light, our flashlight.  That's pretty much it.

Q.   And do you recall if you had your weapons drawn when you approached the house on Mizar?

A.   I don't believe so, no.  Based on the short brief video there, compared to the other one where the rifle was drawn, this one, it doesn't appear that our firearms are drawn.



**EXHIBIT 63**



**EXHIBIT 63**

CELLONA vs HOSSLI
REYNOSO, MICHAEL on 02/12/2026                                          Page 85



*McDaniel Reporting* (805) 544-3363 | *1302 Osos Street, San Luis Obispo, Ca 93401*

**EXHIBIT 63**



**EXHIBIT 63**

CELLONA vs HOSSLI
REYNOSO, MICHAEL on 02/12/2026                                              Page 87



**EXHIBIT 63**

Q.   What was the tone of your voice when you contacted Mr. Cellona?

A.   I don't recall the tone of my voice.

Q.   Okay.  I suppose at this point --

MR. SANGER:  Well, why don't we play the video.  I think we only have a minute or two from here and then we can stop it.  Go ahead and press play again on Exhibit 29 at approximately 22:53 and 28 seconds.  Let's go ahead.

(Video playing.)

MR. SANGER:  Actually, we can pause it there, pausing it at 22:54 and 7 seconds.

Q.   Do you recall if a request had been made for an airship that evening?

A.   Yes.

Q.   By "airship," I'm referring to a helicopter.

A.   Yes.

Q.   And do you recall what time the helicopter arrived on scene?

A.   No.  However, it sounded like this was a helicopter in the background on that recording.

Q.   Do you recall -- do you recall, at whatever moment the helicopter or airship arrived on scene, was it

**EXHIBIT 63**

equipped with a searchlight?

A.   I don't know for sure if it was or not.  I would assume they all are.  I don't know specifics.

Q.   Do you recall if it had deployed a searchlight illuminating the area that you were walking into?

A.   No, I don't recall.

Q.   And based on the audio of this recording here, you believe you can make out the sound of the rotors in the background?

A.   Yes.

Q.   Okay.

MR. SANGER:  Let's go ahead and continue.

(Video playing.)

MR. SANGER:  I think we should pause it here.



**EXHIBIT 63**

CELLONA vs HOSSLI
REYNOSO, MICHAEL on 02/12/2026                                                      Page 90



**EXHIBIT 63**

CELLONA vs HOSSLI
REYNOSO, MICHAEL on 02/12/2026                                          Page 91



    Q.    What was his body position at the time that you saw him?

    A.    I believe he was laying down, I believe, on his

**EXHIBIT 63**

REPORTER'S CERTIFICATE

I, KRISANNE CACIOLA, C.S.R. #6617, a Certified

Shorthand Reporter in and for the State of California, do

hereby certify that the deponent was by me first duly sworn

and the foregoing testimony was reported by me and was

thereafter transcribed with computer-aided transcription;

that the foregoing is a full, complete, and true record of

said proceedings.

I further certify that I am neither counsel for nor

related to any party to said action nor in any way

interested in the outcome of the cause in said action.

The dismantling, unsealing, unbinding of or tampering

with the original transcript will render this reporter's

certificate null and void.

IN WITNESS WHEREOF, I have hereunto subscribed my name

this ___ day of _____, 2026.

[x] Reading and Signing was requested.

[ ] Reading and Signing was waived.

[ ] Reading and Signing was not requested.

_Krisanne Caciola_

KRISANNE CACIOLA
Certified Shorthand Reporter No. 6617

**EXHIBIT 63**

STATE OF CALIFORNIA                    )
                                       )
COUNTY OF SANTA BARBARA                )


        I, the undersigned, say that I have read the foregoing deposition and hereby declare under penalty of perjury the foregoing is true and correct.

        Executed this 23rd day of __March__, 2026, at __Santa Maria__, California.



                            _____
                                      DECLARANT

McDaniel Reporting  (805) 544-3363 | 1302 Osos Street, San Luis Obispo, Ca 93401

**EXHIBIT 63**

**EXHIBIT 64**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CLINTON CELLONA,                    )
                                    )
            PLAINTIFF,              )
                                    )
VS.                                 )   CASE NO: 2:25-cv-01503-AH-(Ex)
                                    )
COUNTY OF SANTA BARBARA,            )
DEPUTY CAMERON HOSSLI, AND          )
DOES 1-10 INCLUSIVE,                )
                                    )
            DEFENDANTS.             )
_____)

**CERTIFIED TRANSCRIPT**

REMOTE ZOOM DEPOSITION OF SPECIAL DUTY DEPUTY ROBERT BAISA

WEDNESDAY, FEBRUARY 18TH, 2026

10:08 A.M. - 2:47 P.M.

REPORTED BY WAYNE WALCOFF CSR #4382

CHANDLER ALVINO

# EXHIBIT 64

-o-

ROBERT BAISA,

HAVING BEEN DULY SWORN,

WAS EXAMINED AND TESTIFIED AS FOLLOWS:

-o-

EXAMINATION

BY MR. SANGER:

Q    Special Duty Deputy Baisa?

A    Yes.

Q    Is there a way that I can refer to you in a shorter form?

A    Deputy Baisa would be fine.

Q    Okay.  So you've taken your oath.  Would you spell your name for the Court Reporter, please.

A    First, Robert, R-O-B-E-R-T.  Last, Baisa.
B, as in boy, A-I-S-A.

Q    So Deputy Baisa, do you understand that even though we are not in a courtroom and we're in various locations, that you're under the same oath to tell the truth as if the judge or jury were present?

A    Yes.

Q    I appears I have lost the audio again.  I can't hear anything.  I assume your answer was yes?

**EXHIBIT 64**



the opportunity to review the transcript and make any changes to your answers.

However, do you understand that if you change a substantive answer, I can comment on that change at trial to impute your credibility showing the difference between what you said today and what you changed to later?

A    Yes.

Q    That's impressive.  And before that have you worked or during this time have you worked for other law enforcement agencies?

A    No.

Q    And do you have any military background or

**EXHIBIT 64**

CELLONA vs COUNTY OF SANTA BARBARA
BAISA, ROBERT on 02/18/2026                                                      Page 10

experience?

A    I was a sergeant in the Marine Corps Reserves.

Q    And was that during your time with the sheriff's office or was that before?

A    It overlapped.  I enlisted in 2001 and then I became a sheriff's deputy in 2003.  And then I ended up finishing my term in the Marine Corps in 2006.

Q    And in the Marine Corps -- sorry.  I'm more familiar with the army.  Do they have a MOS or a job specification?

A    Yes, they do.

Q    And what was your MOS?

A    Field radio operator.

Q    Other than that, what was the highest level of education that you achieved?

A    Masters of science from the University of San Diego in law enforcement and public safety leadership.

Q    And as part of that training -- well, let me back up.  Do have you any involvement with training deputies at the POST Academy or just when they arrived at the Sheriff's Office?

**EXHIBIT 64**



Q    Within the subjects that you listed that you train deputies, is one of those areas also crisis intervention training for deescalation?

A    I do not teach crisis intervention training and I'm not certified in being an instructor in crisis intervention training.

Q    Any overlap in the training that you do with use of force standards with the deescalation and crisis intervention training?

**EXHIBIT 64**

MS. BARRY:  Objection; compound.

Q   BY MR. SANGER:  Let me try to rephrase that.

Is there an overlap between the training that you do with use of force standards?  Is there overlap with the deescalation techniques and crisis intervention training?

MS. BARRY:  Same objections.

Q   BY MR. SANGER:  You can answer if you understand it.

A   I was going to say we train deescalation in the training bureau and all training deescalation.  What the deputies learn from crisis intersection training, they can take that as part of their experience to apply to what we teach on the deescalation side.

Q   So when we talk about deescalation and use of force, when you're training deputies in the use of force, are you also training them when not to use force?

A   Yes.



**EXHIBIT 64**

CELLONA vs COUNTY OF SANTA BARBARA
BAISA, ROBERT on 02/18/2026                                         Page 14



As far as shotgun and patrol rifle, we'll do that annually at the minimum for our policy. And sometimes we'll do more on that.

**EXHIBIT 64**

CELLONA vs COUNTY OF SANTA BARBARA
BAISA, ROBERT on 02/18/2026                                    Page 15



There are other things we'll cover.  But at the top of my head those are some of the memory things we'll be focusing on.

Q    So you mentioned that you will study or train on case law.  So are deputies actually tasked with reading opinions in cases or what type of training on case law is involved?

A    A lot of it is going to be found in some form or the other through our policies.  Especially with 835A, drawing in a lot of case law to meet that part of 835A in the penal code.

Every deputy is responsible for acknowledging that they've read and understand all of the policies in in the manual.  We will reinforce that in training and then discuss how that pertains to whatever weapon system

McDaniel Reporting  (805) 544-3363 | 1302 Osos Street, San Luis Obispo, Ca 93401

**EXHIBIT 64**

or whatever technique, whether it's use of force, arrest and control.  Whatever it may be, how it pertains, we'll give updates as it's pertinent.

Q    Is that the end of your answer?

A    Yes.

Q    Now, when we're discussing less lethal training, that doesn't imply just one weapon system or one system.  Is that correct?

A    Correct.

Q    What are the systems that a deputy is trained on under the category of less lethal?

A    Well, under less lethal we're primarily working with the 12 gauge platform, the 40-millimeter less lethal platform.  And then we also update intermediate force options that will include things like tasers, batons, OC spray.

Q    So I think you mentioned 40 millimeter.  Is that what would be called a grenade launcher?

A    No.

**EXHIBIT 64**



A    No.

Q    So you also testified that under less lethal there is the shotgun round and that's where we want to focus.

First of all, what type of shotguns does the Santa Barbara Sheriff's Office deploy?

A    Our lethal shotguns are Remington 870 12 gauge shotguns.  Our less lethal platforms are 12 gauge Remington 870 less lethal launchers.

Q    And we'll get a little more into that in a bit.

**EXHIBIT 64**

CELLONA vs COUNTY OF SANTA BARBARA
BAISA, ROBERT on 02/18/2026                                          Page 19



**EXHIBIT 64**

CELLONA vs COUNTY OF SANTA BARBARA
BAISA, ROBERT on 02/18/2026                                                    Page 20

Q     And when you say it resembled a human silhouette, is that a human form with a face on that the deputies would be firing at?

A     I didn't understand your --

Q     You didn't understand.  When you say silhouette, would that mean a form of a person that would be facing you?

A     Yes.

Q     So not turned to the side but actually with a face on?

A     Correct.

MR. SANGER:  I want to go back for one second here back to talking about use of force.  And we talked about the LEXIPOL POST learning domains.

At this time I would like to introduce next in order, Exhibit Number 40.

(Whereupon Exhibit 40 was marked for identification.)

Q     BY MR. SANGER:  Let's see if the technical issues are going to work here.

Do you recognize this document that is being shared on the screen right now as Exhibit 40?  We can

**EXHIBIT 64**



A    We'd give them another round to fire.

Q    And if we can scroll down to the bottom of the page right there, if you can see in the bottom left-hand corner there is some small print with a date of what appears to be a 2021 0/1/25.

Can you tell me would that be the policy that would be in place for the Santa Barbara Sheriff's Office around August of 2022 to the best of your recollection?

A    I can't say. I don't know if there was another update between that January 25th and then 2022. I do not know.

Q    But this would have been -- would deputies that you were training be responsible for the materials contained within this Section 308.5 of the policy?

A    Say that again.

Q    I warned you at the beginning that I would ask

**EXHIBIT 64**

CELLONA vs COUNTY OF SANTA BARBARA
BAISA, ROBERT on 02/18/2026                                                Page 31



some questions that were vague.

Q    And the policy also if we go to 308.5.5, it does talk about shot placement.  Is that correct?

A    Yes.

Q    And below that we have policy 308.5.6, approved munitions.  Is it your testimony that on August 6 of 2022 -- strike that.  What would have been the approved munitions by the department in August of 2022?

A    The Defense Technology's drag stabilized bean bag round.

Q    If we scroll down a bit further to policy

**EXHIBIT 64**

R E P O R T E R   C E R T I F I C A T E

-o-

I, WAYNE WALCOFF, THE UNDERSIGNED, DULY AUTHORIZED TO ADMINISTER OATH PURSUANT TO SECTION 2093(B) OF THE CALIFORNIA CODE OF CIVIL PROCEDURE, DO HEREBY CERTIFY THAT THE WITNESS IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN TO TESTIFY THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH IN THE WITHIN-ENTITLED CAUSE;

THAT SAID DEPOSITION WAS TAKEN AT THE TIME AND PLACE THEREIN STATED; THAT THE TESTIMONY OF THE SAID WITNESS WAS REPORTED BY ME AND WAS THEREFORE TRANSCRIBED UNDER MY DIRECTION, THAT THE FOREGOING IS A FULL, COMPLETE, AND TRUE RECORD OF SAID TESTIMONY; AND THAT THE WITNESS WAS GIVEN AN OPPORTUNITY TO READ AND CORRECT SAID DEPOSITION AND SUBSCRIBE TO THE SAME.

I FURTHER TESTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING DEPOSITION AND CAPTIONED NAMED OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN THE SAID CAPTION.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 13TH DAY OF MARCH 2026.

_____

WAYNE WALCOFF CSR #4382

**EXHIBIT 64**

**EXHIBIT 65**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CLINTON CELLONA,                      )
                                      )
        PLAINTIFF,                    )
                                      )
    vs.                               )   Case No.
                                      )   2:25-cv-01503-AH-
COUNTY OF SANTA BARBARA, DEPUTY)      (Ex)
CAMERON HOSSLI, AND DOES 1-10  )
INCLUSIVE,                            )
                                      )
        DEFENDANTS.                   )
_____)

**CERTIFIED TRANSCRIPT**

DEPOSITION OF DEPUTY CAMERON JAMES HOSSLI

TUESDAY, FEBRUARY 10, 2026, 9:00 A.M.

SANTA BARBARA, CALIFORNIA

Reported by:  Brittany Badger
              CSR No. 13970
Job No.:      79181

# EXHIBIT 65

TUESDAY, FEBRUARY 10, 2026, 9:00 A.M.

SANTA BARBARA, CALIFORNIA


THE REPORTER:  Good morning.  My name is Brittany Badger.  I am a certified shorthand reporter and the deposition officer for today's deposition.  My CSR license number is 13970.


DEPUTY CAMERON JAMES HOSSLI, having been first duly sworn by the reporter, testifies as follows:


MR. SANGER:  Okay.  I need to introduce everybody who's here at the table, I suppose.

MS. BARRY:  Yeah.  We can state appearances. Mary Pat Barry present on behalf of Defendant County of Santa Barbara and Defendant Cameron Hossli.

MR. SANGER:  Jeffrey Sanger on behalf of Plaintiff Clinton Cellona.

MR. AVILA:  Miguel Avila for Plaintiff as well.

THE WITNESS:  Deputy Cameron Hossli.

EXAMINATION

BY MR. SANGER:

**EXHIBIT 65**

Q    So, Deputy Hossli, you understand that even though we're here in a law office, that you're under the same oath that you would be in a courtroom and your obligations are the same to tell the truth?

A    I do.

Q    And you understand that your testimony today is given under the penalty of perjury under the laws of the United States?

A    I do.

Q    So a few, kind of, housekeeping things to start with.

Our court reporter can't record nods, gestures.

Would you agree to provide a clear and verbal yes or no or clear verbal answer for the record?

A    Yes.

Q    And to ensure that we have a clean transcript of today's testimony, will you agree to wait until I finish my entire question before you begin to answer?

A    Yes.

Q    And I will try to do the same for you.  I will let you finish your answer without talking over you.

If I ask any questions -- and this may happen

**EXHIBIT 65**

to impeach your credibility by showing the jury the difference between what you said today and what you changed later?

A    Yes.



Q    And what, if any, law enforcement positions did you hold prior to joining the Santa Barbara sheriff's office?

A    I was a Santa Barbara county sheriff explorer.

Q    Can you explain to me what a sheriff explorer is?

A    A sheriff explorer is somebody who is in high school or high school age that has an interest in law enforcement.  You wear the uniform, you go to trainings, you learn about law enforcement and kind of get exposed to how everything is.

Q    And how long were you an explorer?

A    For about two years.

Q    So that was your junior and senior year in high school?

**EXHIBIT 65**

Q    And is that the type of thing that would lead to promotion opportunities within the department?

A    It is one of the precursors for being, like, on our crisis intervention team.

Q    And subsequent to taking the 40-hour CIT course, did you become a member of the crisis intervention team?

A    No, I did not.

Q    Was that something that you had aspired to in volunteering for the 40-hour CIT course?

A    At the time, no.

Q    Okay.  I may come back to that later but let's move on.

     Were you specifically certified to carry and discharge the 12-gauge shotgun dedicated to shooting the beanbag rounds on August 6th of 2022?

A    Our kinetic are less lethal launchers, yes.

Q    Is there a good acronym for that that I can use?

A    Typically it's usually less lethal launcher is what we go with.

Q    Less lethal launcher.  I just want to make sure we're talking about the same thing.

**EXHIBIT 65**



Q   Can you describe to me the difference between the shotgun less lethal launcher and the 40-millimeter less lethal launcher?

A   The 12-gauge less lethal launcher is off of a Remington 870 frame.  Again, all of the less lethal launchers are different in the sense that they're all orange so that you can tell a visible difference between them and a traditional Remington 870.  All of the rounds are usually a fluorescent color or white as opposed to what would normally be a traditional shotgun round.  And then the 40 millimeter launcher is a single-shot 40 millimeter projectile that usually has a blue foam tip.

Q   And is that the type of thing that appears to be a tube that breaks up and you put the round in for the 40-millimeter?

A   Yes.

Q   So the Remington 870 less lethal shotgun launcher, that was orange in color; correct?

A   Yes.

Q   And so the one that you had with you on August

**EXHIBIT 65**

A    It is not an appropriate target area.



Q    How frequently would you study or refresh your knowledge of the policy manual?

MS. BARRY:  Objection.  Vague and ambiguous as to time.

BY MR. SANGER:

///

**EXHIBIT 65**



Q    Is the policy manual something that is updated from time to time?

A    Yes, sir.

Q    And when updates to the policy manual occur, is it part of your employment and training to keep up-to-date on changes made to the policy manual?

A    Yes, sir.  We are given notification when there was an update of policy.

Q    And do you recall any updates to the policy manual in the -- we'll say one year prior to August 6, 2022?

A    I can't recall.  We have a lot of policy updates throughout the years that I've been in.  So I would not be able to answer that.

Q    Before I move on, can you take a look at

**EXHIBIT 65**

energy projectile could still result in death or serious physical injury?

A    Yes.

Q    And as part of your training on the Remington 870 with the less lethal projectiles, did you familiarize yourself with the standards contained in Section 308.5?

A    Yes.



**EXHIBIT 65**



**EXHIBIT 65**

Q   Now, the next paragraph down, second paragraph under 308.5.5, it says "In order to prevent serious injury or death" -- well, strike that.

Let's go on to 308.5.6.

Can you describe what's listed there?

A   Approved munitions.  Only department-approved kinetic munitions shall be carried and deployed.

Q   And what munitions had been approved by the department on August 6, 2022?

A   At that time, it was the defense tech Super-Sock.

Q   That was the only munition approved by the department to be fired from the less lethal Remington 870?

A   For patrol use, yes.

Q   On August 6, 2022, you had the Remington 870 less lethal shotgun.

Was that in your patrol vehicle?

A   Yes.

Q   And was that specific Remington 870 assigned only to you?  Or was it a pool weapon, for lack of a term?

**EXHIBIT 65**

stations?

A    And New Cuyama.

Q    Sorry.  And New Cuyama.

And how many times in your career with the Santa Barbara sheriff's office have you discharged, in the line of duty, your 12-gauge Remington 870 less lethal?

A    One time.

Q    Was that the incident that we're here talking about today?

A    Yes.



McDaniel Reporting    (805) 544-3363 | 1302 Osos Street, San Luis Obispo, Ca 93401

**EXHIBIT 65**

from law enforcement after having been in a high-speed pursuit and putting other -- public safety.

So there's a variance between a CIT response versus a law enforcement response.



Q    Now, when you arrived, was the mother out in front of the house by herself?

A    I do not recall if it was just the mom or if there was somebody else out there with her.  Again, my focus was on the side of the house as I'm responding.  So I'm not watching everybody right there.

Q    You didn't stop to ask questions or investigate or anything like that.  You were just focused on apprehending?

A    My point would have been containment and just worrying about my safety section, which would have been the side of the house.

Q    Now, when you talk about the side of the house,

**EXHIBIT 65**



practice that you do both.

Q    Do you recall the nature of the announcement coming over the helicopter?

A    I don't recall, no.

Q    How long did you remain on scene?  There it looks like at this point, you've moved to Alcor.

How long, to the best of your recollection, did you remain in the neighborhood continuing the search for Mr. Cellona?

A    I would say approximately another 40ish minutes, I believe.  I believe in the time that it took us to do the K9 search around that.  I'm not 100 percent sure.

**EXHIBIT 65**



Q    And would you have still had your AR-15 rifle deployed at the time?

A    I don't know if I had a rifle deployed or if I had my pistol, which would have been holstered at the time while we were probably doing the track down the road.

**EXHIBIT 65**

A    Yes.

Q    At some point, were you called back to Mizar?

A    Yes.

Q    And I think we can get our second CAD log here.

So this will be Exhibit 14.

(Exhibit 14 marked.)

BY MR. SANGER:

Q    And at that time, to the best of your recollection, you were back up in Santa Maria?

A    Yes.

Q    So why were you specifically tasked from driving from Santa Maria back to Mizar when there were other units presumably stationed in Lompoc?

A    So because the initial call started in Santa Maria and it started with Santa Maria units, that's part of one of the reasons we were being sent back out

**EXHIBIT 65**

from Santa Maria to Lompoc.

54 was unavailable at the time to send its units and CHP didn't have units as well.  So that left two Lompoc deputies in Lompoc.

Q    And when we say Lompoc deputies, they're Lompoc sheriff deputies, not to be confused with the Lompoc Police Department?

A    Yes.

Q    So because of the lack of manpower, who was it that told you that should move from the space force base to Mizar?

A    I had already had permission based on if we needed resources, and given that the other units weren't responding, I ended up deploying from there.



**EXHIBIT 65**



Q    And Deputy Davis still had his K9 at this point; is that true?

A    He always has his K9 with him, yes, in his vehicle.

Q    You got to dot the Is here, and cross the Ts.

A    Yes.

Q    Okay.  Was an airship helicopter called for?

A    The helicopter was requested, yes.

Q    And did you wait in the staging area for the helicopter to arrive on scene?

A    I don't believe we did.  I believe it was getting relatively close before we deployed.

**EXHIBIT 65**



Q    And you were aware that the neighbor had called and said he had sighted Mr. Cellona and that's why you had responded back to Constellation and eventually Mizar?

A    I believe that's what was broadcast out by dispatch.

Q    And if you look at the second page of Exhibit 14, we'll say at approximately 2229:15, is that information coming from dispatch that appears to be coming from the neighbor?

        MS. BARRY:  Objection.  Calls for speculation.

        THE WITNESS:  Yeah.  I don't know.

BY MR. SANGER:

Q    Well, if you go down to the line at 2230:18 -- what helps is if you -- yeah.

        So the line at 2230:18, it says "notification, law" both in brackets, "RP requesting to come in quietly."

        What does that represent to you?

A    That the reporting party is asking us not to

**EXHIBIT 65**

CELLONA vs HOSSLI
HOSSLI, CAMERON on 02/10/2026                                                    Page 108



street over so you didn't respond specifically to either 157 Mizar or to the neighbor's residence; correct?

A     Correct.

Q     And any information that the deputies responding to Mizar may have received, you weren't aware of anything being broadcast to you at that time?

A     I don't understand the question.

Q     It was a bad question.

**EXHIBIT 65**



*McDaniel Reporting* (805) 544-3363 | 1302 Osos Street, San Luis Obispo, Ca 93401

**EXHIBIT 65**



Q    But it was you that made that decision to deploy the less lethal?

A    Yes.

Q    And when you removed the less lethal shotgun from your vehicle -- is it locked in the vehicle in a rack or is it just...

A    It is locked in a rack.  Yes.

Q    So you unlocked it.

And did you load it?

A    Yes.

Q    And again, just -- we talked about this earlier, but did you take an opportunity to inspect the rounds as you loaded them into the shotgun?

A    I visually confirm every single round that goes in there to ensure it is not -- for whatever reason, got mixed with a lethal round.  Yes.

Q    Again, you didn't see any defects or deformities on the rounds that you loaded into the shotgun?

A    No.

**EXHIBIT 65**

Q    And even though that shotgun was just assigned to that vehicle, did you notice any issues loading the cartridges into the shotgun?

A    No.

Q    And how many rounds did you load into the shotgun?

A    I believe either four or five.  It depends on each different shotgun as to what the -- if they have an extension tube on them.  I believe that one was a four-round capacity.



Q    And you told me earlier that you had had an opportunity to review the video footage from the airship; is that correct?

**EXHIBIT 65**

Q    And perhaps at this point, it would be a good time to introduce your body-worn camera footage, if we could.

We can go off the record for a second while we settle our IT issues.

(Recess.)

BY MR. SANGER:



**EXHIBIT 65**



McDaniel Reporting  (805) 544-3363 | 1302 Osos Street, San Luis Obispo, Ca 93401

**EXHIBIT 65**



(Video played.)

BY MR. SANGER:

Q    You can pause it there.

So based on this video, it was only a matter of seconds from your time arriving at that back fence line to actually firing your less lethal shotgun; correct?

A    Yes.

Q    And prior to what we just heard there, you had had no contact with Mr. Cellona; is that correct?

A    That is correct.

Q    And I don't know if our court reporter took down the audio from the -- yeah.

Can you tell me, for the record, what you said to Mr. Cellona once you made contact?

We can listen to it again.

A    Probably not verbatim.  But, you know, it was a series of warnings and -- yeah.  We could listen to it again.  That would actually help.

(Video played.)

**EXHIBIT 65**

BY MR. SANGER:

Q   So can you tell us what you said to Mr. Cellona?

A   I believe it was "Stop.  Don't run.  You're going to get hit with a beanbag.  You're going to get hit with a fucking beanbag.  Stop."  And then after that, I broadcast it over the radio he's on the back fence.

So a series of warnings and commands.

Q   And that, according to your training, before you deploy a less lethal, you're required to give audible warnings prior to actually firing; correct?

A   When reasonable.  Yes.

Q   And is one of the purposes for making that announcement to avoid a viral situation where over officers might start firing live rounds?

A   Yes.

Q   Okay.  And then you broadcast over the radio he's running?

A   No.

Q   No.

A   I broadcast over the radio he's hopping the back fence.

**EXHIBIT 65**

A    It could.



Q    And based on this drawing -- first of all, does this look accurate based on your recollection of where you were when you fired the beanbag round?

MS. BARRY:  Objection.  Vague and ambiguous.

BY MR. SANGER:

**EXHIBIT 65**



**EXHIBIT 65**



Q    And just to be clear, you didn't take any part in preparing this document?

A    No, I did not.

Q    But you've seen it before?

A    Yes.

Q    When did you see this document before?

A    Yesterday.

Q    And in your years of training with the Remington less lethal shotgun, I think we had already established you had never practiced aiming at a moving target; correct?

**EXHIBIT 65**

Q    Okay.  But obviously the helicopter was in the air at the time of the shooting?

A    Yes.

Q    And I think I had asked you before if the helicopter was equipped with a searchlight.

Do you recall if it was equipped with a searchlight?

A    I don't know.

Q    If it had, would the tree canopy have blocked any light coming from above?

MS. BARRY:  Objection.  Calls for speculation.

BY MR. SANGER:

Q    You can answer.

A    I don't know.

Q    And going back to Exhibit 18, our best guess at this point would be that that was over 40 feet away -- or around 40 feet; is that accurate?

A    Yes.

Q    What is the maximum effective distance of that particular beanbag ammunition?

**EXHIBIT 65**

A    75 feet.

Q    And the minimum?

A    Minimum safe distance is 20 feet.

Q    And to the best of your knowledge, that one round that you fired was in good working order and had no obvious defects or issues; is that correct?

A    Yes.



Q    This is an assessment that you made within seconds of spotting Mr. Cellona and squeezing the trigger?

A    Yes.

Q    When you spotted Mr. Cellona in the backyard there before he hopped the fence, did you have a clear view of his person?

A    As he was running up towards the fence, yes.

Q    And as he was climbing the fence, I'm imagining,

**EXHIBIT 65**

less than lethal; correct?

A    Yes.

Q    So that implies that the round is less lethal, it's not as lethal as a slug or a round of buckshot; is that correct?

A    I don't know based on that terminology.

Q    But you did intend to squeeze the trigger?  That was intentional; correct?

A    Yes.

Q    And we've established that it was dark; is that correct?

A    Yes.

Q    And that your less lethal shotgun was not equipped with night sights or the flashlight; correct?

A    That is correct.

Q    And you had never practiced with a moving target; correct?

A    Yes.

Q    When you approached Mr. Cellona and he was on the ground, was he conscious?

**EXHIBIT 65**

REPORTER'S CERTIFICATION

I, Brittany Badger, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name on this date:

*Brittany Badger*
_____

Brittany Badger, CSR No.  13970

**EXHIBIT 65**

DECLARATION UNDER PENALTY OF PERJURY

I, DEPUTY CAMERON JAMES HOSSLI, do hereby certify under the penalty of perjury that I have reviewed the foregoing transcript of my deposition taken on February 10, 2026; that I have made such corrections as appear noted herein in ink; that my testimony as contained herein, as corrected, is true and correct.

Dated this 3RD day of APRIL, 20 26, at _____ 1157 _____, California.

_____
(DEPUTY CAMERON JAMES HOSSLI)

**EXHIBIT 65**

**EXHIBIT 66**

## Badilla, Erika

| | |
|---|---|
| **From:** | Raney, Erik |
| **Sent:** | Monday, December 19, 2022 2:15 PM |
| **To:** | Vasquez, Frank; Plastino, Robert |
| **Cc:** | Banks, Matthew; Maxwell, John; Grossini, Jason |
| **Subject:** | RE: UOF Review: 22-9155 |

I have conducted my final review of this use of force. The delay in this use of force review was to wait for the AIT interview report to be completed, so I could evaluate not only the circumstances of the incident, but gain an understanding of the information that Deputy Hossli knew at the time of the incident as well as his mindset when he deployed the less lethal beanbag. After reviewing all of the materials associated with this case, and the interview report with Deputy Hossli, I have determined that the use of force was reasonable, justified and within policy.

Deputy Hossli had learned that the subject who was fleeing had made threats in the past, and recently displayed disregard for the safety of the public during a pursuit several hours earlier (which was canceled due to the subjects erratic and dangerous driving). Videos and social media posts that Deputy Hossli reviewed showed the subject wielding weapons and making threatening statements. All of this prior knowledge led Deputy Hossli to believe the subject was a possibly armed, violent felon who was fleeing apprehension. Just prior to firing the beanbag at the subject, Deputy Hossli had been assigned a position to the rear of the house where the subject had been seen. He had been deployed with a K9 deputy, and the two were assigned to hold the rear perimeter. A contact team at the front of the house had garbled radio traffic, which redirected the K9 from the rear position with Hossli, to the front of the house, leaving Hossli alone in the rear. Hossli saw the wanted subject fleeing to the rear, and moving towards a fence which separated the house he was fleeing from and another house occupied by a family. As the subject climbed the fence towards the occupied house, Deputy Hossli feared for safety of those in the home, and believed that the subject presented a real and immediate threat to them, and others, should he be able to escape the perimeter. Hossli made the appropriate warnings to the subject in an attempt to have him surrender. When the subject did not comply and started moving over the fence towards the occupied house, Hossli fired one round aimed at the upper arm. The subject was in the process of jumping over the fence as the round was fired, and it struck him in the side of the head, rather than the intended target area, rendering him incapacitated. Deputies immediately provided first aid and called for medical assistance.

Deputy Hossli made the appropriate deployment considerations per Lexipol Policy 308 – Controll Devices and Techniques, section 308.5.3 – Deployment Considerations. The below highlighted sections were considered in the deployment:

Before discharging projectiles, the deputy should consider the following factors:

a. Severity of the crime or incident
b. Subject's capability to pose an imminent threat to the safety of deputies or others
c. If the subject is actively resisting arrest or attempting to evade arrest by flight
d. Credibility of the subject's threat as evaluated by the deputies present, and physical capacity/capability
e. Proximity of weapons available to the subject
f. Deputy's versus the subject's physical factors (e.g., age, size relative strength, skill level, injury/exhaustion, the number of deputies versus subjects)
g. Availability of other force options and their possible effectiveness
h. Distance and angle to target
i. Type of munitions employed
j. Type and thickness of subject's clothing
k. Subject's actions which dictate the need for an immediate response and the use of control devices appears appropriate

1

**EXHIBIT 66**    CELLONA 002495

DO NOT DUPLICATE
SBC eyb5810 8/8/2023 1:38 PM

l.   Availability of a backup deputy to provide a lethal force option, if necessary

**ERIK**

Erik Raney, Commander
Santa Barbara Sheriff's Office
Criminal Investigations Division

**From:** Vasquez, Frank <​███████████████​>
**Sent:** Thursday, September 29, 2022 11:21 AM
**To:** Raney, Erik <​███████████​>
**Cc:** Banks, Matthew <​████████████████​>; Maxwell, John <​█████████████​>; Grossini, Jason <​████████████​>
**Subject:** UOF Review: 22-9155

Commander Raney,

I have reviewed materials associated with this case and concur with the assessment by Sgt. Banks (AIT), that this use of force was reasonable, legal, and within SBSO Lexipol policy.

\\SOFS01.sbc.shf.cc\Fileroom\Use of Force Review\NCOD\Northern Stations\SMSO UOF\22-9155

### Summary

On August 6, 2022, deputies were involved in a vehicle pursuit of a wanted subject with a felony no bail warrant for battery with GBI. During the pursuit, the suspect began driving recklessly and the pursuit was terminated. The subject, Clinton Cellona, later fled on foot and eluded capture. At approximately 2226 hours the same day, Deputies learned he was still in the area of ███████████. A perimeter was set up and aviation responded to assist in the search. While searching, Cellona was seen hiding in a backyard and was attempting to jump a back fence towards ███████ ███████ Deputy Hossli made announcements for Cellona to stop and get on the ground, as well as provided a verbal less lethal deployment warning. Cellona did not heed the warning, and as he climbed the fence; Deputy Hossli targeted Cellona's flank, and fired one Def Tech bean bag round. However, contemporaneously to the deployment, Cellona jumped over the fence, causing his body to drop, and his head moved into the path of the bean bag projectile. Cellona was immediately treated and transported to the hospital. Cellona was booked in absentia for: 2800.2(a) VC, 148(a)(1) PC, 647(h) PC, and the felony warrant.

Due to the nature of the injury, AIT responded and conducted an administrative review. According to their investigation at this point, they *"believed the circumstances of the bean bag deployment fell within department policy and the law."* See below email from Sgt. Banks.

### Training Points
None noted

### Conclusion
The level 3 use of force is due to the unintentional striking of the suspects head, which resulted in serious injury. *Lexipol §300.5.1.3(a)(b) – For incidents that result in serious bodily injury or death.*

2

**EXHIBIT 66**

CELLONA 002496

**From:** Banks, Matthew <​███████████████​>
**Sent:** Thursday, September 29, 2022 09:28
**To:** Vasquez, Frank <​███████████​>
**Cc:** Maxwell, John <​███████████​>
**Subject:** Re: AIT UOF 22-9155

Frank,

Deputy Hossli was interviews by AIT on September 02, 2022, by Sgt Henebry and myself at the Lompoc Station. He was represented by his attorneys during the interview. During the interview he outlined the circumstances that led to the deployment of the bean bag shotgun on the night of the incident. After the interview AIT discussed the incident and Deputy Hossli's statement and we believed the circumstances of the bean bag deployment fell within department policy and the law.

Thanks,

Matt

DO NOT DUPLICATE

SBCleyb5810 8/8/2023 1:38 PM

3

**EXHIBIT 66**

CELLONA 002497

RACHEL VAN MULLEM, COUNTY COUNSEL
MARY PAT BARRY, SR. DEPUTY (Bar No. 148354)
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA  93101
(805) 568-2950 / FAX: (805) 568-2982
E-mail: mpbarry@countyofsb.org

Attorneys for Defendants
COUNTY OF SANTA BARBARA,
DEPUTY CAMERON HOSSLI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON CELLONA,<br><br>             Plaintiff,<br><br>v.<br><br><br>COUNTY OF SANTA BARBARA,<br>DEPUTY CAMERON HOSSLI,<br>and DOES 1-10 inclusive,<br><br>             Defendants. | Case No: 2:25-cv-01503 AH (Ex)<br><br>**DECLARATION OF VERONICA AMEZOLA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: June 3, 2026<br>Time: 1:30 p.m.<br><br>Judge: Hon. Anne Hwang<br>Courtroom: 9C, First St. Courthouse |

I, Veronica Amezola, declare as follows:

1.    I state the following facts from my personal knowledge and, if called as a witness, I could and would so competently testify thereto.

///

///

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

1.

2.      I am a Senior Crime Scene Technician with the Santa Barbara County Sheriff's Office ("SBSO") in the Forensics Bureau. I have been employed as a Crime Scene Technician with SBSO since 2016.

3.      In my role as Crime Scene Technician, I am called upon by SBSO to document crime scenes both videographically and photographically, and to conduct measurements of crime scenes and prepare scene diagrams.

4.      The night of August 6, 2022, at approximately 2330 hours, I was asked to provide Forensics assistance to patrol related to a use-of-force call. I was directed to go to 140 Alcor Avenue in Santa Barbara County.

5.      I arrived at 140 Alcor Avenue on Sunday, August 7, 2022 at 0019 hours (12:19AM).

6.      Among other things, I was assigned to conduct video documentation and photographic documentation of the scene. The scene included locations at 151 Mizar Place, 140 Alcor Avenue, and 148 Alcor Avenue.

7.      After arriving at the scene, SBSO Deputy Michael Reynoso provided me with a quick walk-through of the pertinent areas. These included the side yard and backyard of 151 Mizar Place, the backyard of 140 Alcor Avenue where the subject landed after jumping the fence from 151 Mizar Place, and the southeast corner of the backyard of 148 Alcor Avenue where the deputy with the less-lethal shotgun was positioned when the incident occurred. In the backyard of 140 Alcor Avenue, Deputy Evert pointed out an area of suspected blood where the subject had landed after jumping the fence from 151 Mizar Place.

8.      When videographic and photographic documentation was completed at 0250 hours, I left the scene. However, I returned to the scene at 0300 hours on August 7, 2022 to take measurements.

9.      I was assisted in taking measurements by Crime Scene Technician ("CST") Miller. Together, we utilized a reel measuring tape and documented our measurements with photos.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

2.

10. The distance from the area of suspected blood in the backyard of 140 Alcor Avenue to the southwest corner property fence at 140 Alcor Avenue was approximately 40.5 feet.

11. Attached to the Joint Appendix of Evidence ("Joint Appendix") as **Exhibit 53** are photographs [COSB_WALLENTINE_000257 to COSB_WALLENTINE_000299], which document the measurement I and CST Miller took from the area of suspected blood to the southwest corner property fence at 140 Alcor Avenue and one photograph showing a wider view of the backyard area that we measured [COSB_WALLENTINE_000246]. I recognize the scene in the photographs. The photographs are a true depiction of the scene at the time I was performing my measurements in the backyard of 140 Alcor Avenue on August 7, 2022.

12. On August 9, 2022, I returned to the scene with SBSO Detective Joaquin Oliver to take additional measurements. We took measurements from fixed points and documented those measurements.

13. Based on the measurements taken at the scene, I prepared a diagram of the scene at 140 Alcor Avenue and 148 Alcor Avenue using crime scene diagramming software named ScenePD.

14. Attached to the Joint Appendix as **Exhibit 54** is a true and correct copy of the diagram I prepared.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15 day of April, 2026 at Santa Maria, California.

VERONICA AMEZOLA    *3949

**EXHIBIT 53**



**EXHIBIT 53-1**



**EXHIBIT 53-2**



**EXHIBIT 53-3**



**EXHIBIT 53-4**



COSB_WALLENTINE_000261

**EXHIBIT 53-5**



COSB_WALLENTINE_000262

**EXHIBIT 53-6**



**EXHIBIT 53-7**



**EXHIBIT 53-8**



**EXHIBIT 53-9**

COSB_WALLENTINE_000266



**EXHIBIT 53-10**



COSB_WALLENTINE_000267

**EXHIBIT 53-11**



COSB_WALLENTINE_000268

**EXHIBIT 53-12**



COSB_WALLENTINE_000269

**EXHIBIT 53-13**



COSB_WALLENTINE_000270

**EXHIBIT 53-14**



COSB-WALLENTINE_000271

**EXHIBIT 53-15**



**EXHIBIT 53-16**

COSB-WALLENTINE_000272



**EXHIBIT 53-17**



COSB-WALLENTINE_000274

EXHIBIT 53-18



**EXHIBIT 53-19**



**EXHIBIT 53-20**

COSB-WALLENTINE_000276



COSB-WALLENTINE_000277

**EXHIBIT 53-21**



**EXHIBIT 53-22**

COSB-WALLENTINE_000278



COSB-WALLENTINE_000279

**EXHIBIT 53-23**



COSB-WALLENTINE_000280

**EXHIBIT 53-24**



COSB-WALLENTINE_000281

**EXHIBIT 53-25**



COSB-WALLENTINE_000282

**EXHIBIT 53-26**



**EXHIBIT 53-27**



COSB-WALLENTINE 000284

**EXHIBIT 53-28**



COSB-WALLENTINE_000285

**EXHIBIT 53-29**



COSB_WALLENTINE_000286

**EXHIBIT 53-30**



**EXHIBIT 53-31**



COSB_WALLENTINE_000288

**EXHIBIT 53-32**



COSB_WALLENTINE_000289

**EXHIBIT 53-33**



COSB_WALLENTINE_000290

**EXHIBIT 53-34**



**EXHIBIT 53-35**



COSB_WALLENTINE_000292

**EXHIBIT 53-36**



**EXHIBIT 53-37**



**EXHIBIT 53-38**



COSB_WALLENTINE_000295

**EXHIBIT 53-39**



COSB_WALLENTINE_000296

**EXHIBIT 53-40**



**EXHIBIT 53-41**



COSB_WALLENTINE_000298

**EXHIBIT 53-42**



COSB_WALLENTINE_000299

**EXHIBIT 53-43**



COSB_WALLENTINE_000246

**EXHIBIT 53-44**

# EXHIBIT 54



**EXHIBIT 54**

RACHEL VAN MULLEM, COUNTY COUNSEL
MARY PAT BARRY, SR. DEPUTY (Bar No. 148354)
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA  93101
(805) 568-2950 / FAX: (805) 568-2982
E-mail: mpbarry@countyofsb.org

Attorneys for Defendants
COUNTY OF SANTA BARBARA,
DEPUTY CAMERON HOSSLI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| CLINTON CELLONA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SANTA BARBARA, DEPUTY CAMERON HOSSLI, and DOES 1-10 inclusive,<br><br>Defendants. | Case No: 2:25-cv-01503 AH (Ex)<br><br>**DECLARATION OF PARRIS WARD IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: June 3, 2026<br>Time: 1:30 p.m.<br><br>Judge: Hon. Anne Hwang<br>Courtroom: 9C, First St. Courthouse |

I, Parris Ward, hereby declare and say:

1.   I state the following facts from my personal knowledge and, if called as a witness, I could and would so competently testify thereto under oath.

2.   I am employed by Biodynamics Engineering, Inc.("BEI") and have been so employed since 1988. At BEI, I am responsible for the development of scientific visualization of injury events through computer animation and

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

1.

simulation. I also provide forensic analysis of audio and video recordings. I am a Certified Forensic Video Analyst.

3. Attached to the Joint Appendix of Evidence ("Joint Appendix") as **Exhibit 17** is a video from Deputy Hossli's Axon body worn camera ("BWC"). A copy of this video was provided to BEI by the County of Santa Barbara.

4. Attached as **Exhibit 15** to the Joint Appendix is the Forward-Looking Infrared ("FLIR") imager video from a helicopter. A copy of this video was provided to BEI by the County of Santa Barbara.

5. I downloaded and copied both videos to my workstation hard drive. The videos were analyzed using Amped FIVE forensic analysis software. Frame numbers were added to the video clips I produced using Amped FIVE.

6. The FLIR imager video was recorded with a device that registers heat images, so the images of Clinton Cellona and Deputy Hossli appear as bright silhouettes against a gray background. Radio transmission can be heard on the video's soundtrack.

7. Due to the location of the BWC on Deputy Hossli's chest, at the time that Deputy Hossli fired the beanbag round, the video view is of a fence. Even though Mr. Cellona and Deputy Hossli are not captured by the video, the audio from the recording is still useful in analyzing this event. The recording captured the sound of the shot, as well as Deputy Hossli's warnings and commands to Mr. Cellona immediately before Deputy Hossli fired. The sound of the shot allows the BWC video to be synchronized with the FLIR imager video.

8. The FLIR video shows when Mr. Cellona was hit with the beanbag but the camera view from the helicopter is not very stable. It moves around erratically at times and the image is sometimes zoomed in and out. The motion and zooming can make it difficult to focus on what Mr. Cellona was doing. Using Adobe AfterEffects, I was able to stabilize the video images and maintain constant image magnification, counteracting both the camera motion and

zooming. Stabilization is a process where the video image is moved around so that an object or person of interest stays in one place. Image stabilization allows the viewer to more closely analyze the actions of the individual on screen.

9.   The sound of the beanbag being fired can be heard on the BWC recording. The heat signature of the beanbag can be seen on the FLIR imager video as the beanbag traveled in Mr. Cellona's direction. This allows the two recordings to be synchronized. Once the recordings are synchronized, the audio portion of the BWC recording in which Deputy Hossli was giving commands and warnings can be heard in conjunction with the overhead helicopter view of events. I have prepared a stabilized clip of the FLIR video that has been matched to the audio from Deputy Hossli's BWC recording. Attached to the Joint Appendix as **Exhibit 55** is the FLIR Stabilized and Matched to BWC Audio clip that I prepared.

10.   The heat image of the beanbag round fired by Deputy Hossli can be seen traveling toward Mr. Cellona in video clip frames 13462, 13463, and 13464 (approximately 12 minutes and 45 seconds into the FLIR imager video). In the FLIR Stabilized and Matched to BWC Audio clip that I prepared, I added a yellow circle to identify where the heat image of the beanbag can be seen in each of these frames.

11.   I also prepared a video clip in which both the BWC and FLIR imager video recordings are synchronized on the same screen. Once the recordings are synchronized, the audio portion of the BWC recording in which Deputy Hossli was giving commands and warnings can be heard in conjunction with the overheard helicopter view of events. Attached to the Joint Appendix as **Exhibit 56** is the Synchronized video clip that I prepared.

///

///

///

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16 th day of April, 2026 at Phoenix, Arizona.

PARRIS WARD

4.

FLASH DRIVE:

Forward-Looking Infrared ("FLIR") Imager Video

(To be Lodged Manually)

# EXHIBIT 15

FLASH DRIVE:

Deputy Hossli's Axon Body Worn Camera video from August 6, 2022

(To be Lodged Manually)

**EXHIBIT 17**

FLASH DRIVE:

Clip of FLIR Stabilized and Matched to Body Worn Camera Audio

(To be Lodged Manually)

**EXHIBIT 55**

FLASH DRIVE:

Clip of Synchronized Body Worn Camera and FLIR Imager Videos

(To be Lodged Manually)

**EXHIBIT 56**

RACHEL VAN MULLEM, COUNTY COUNSEL
MARY PAT BARRY, SR. DEPUTY (Bar No. 148354)
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA 93101
(805) 568-2950 / FAX: (805) 568-2982
E-mail: mpbarry@countyofsb.org

Attorneys for Defendants
COUNTY OF SANTA BARBARA,
DEPUTY CAMERON HOSSLI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON CELLONA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SANTA BARBARA, DEPUTY CAMERON HOSSLI, and DOES 1-10 inclusive,<br><br>Defendants. | Case No: 2:25-cv-01503 AH (Ex)<br><br>**DECLARATION OF MICHAEL REYNOSO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: June 3, 2026<br>Time: 1:30 p.m.<br><br>Judge: Hon. Anne Hwang<br>Courtroom: 9C, First St. Courthouse |

I, Michael Reynoso, declare as follows:

1. I state the following facts from my personal knowledge and, if called as a witness, I could and would so competently testify thereto.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

1.

2. I am a deputy sheriff with the Santa Barbara County Sheriff's Office ("SBSO") and have been so employed for approximately nine years. My current assignment is school resource deputy at a high school in Santa Maria, California.

3. On August 6, 2022, I was assigned as a patrol deputy in SBSO's Santa Maria Station. I was wearing a SBSO uniform and duty belt. I was driving a SBSO marked black and white patrol vehicle. I was easily identifiable as a law enforcement officer.

4. On August 6, 2022, at approximately 1852 hours (6:52PM), I was on patrol and driving on State Highway 135 in Santa Maria when a Toyota Prius vehicle in front of me accelerated at a high rate of speed and began to swerve lanes in front of me.

5. Due to the actions of the vehicle's driver, I attempted to initiate a traffic stop with my overhead lights. When I did so, the driver of the vehicle, who was later identified as Clinton Cellona ("Cellona") immediately made an unsafe lane change and began to evade at a high rate of speed. I informed SBSO Dispatch of a failure to yield. SBSO Dispatch notified me that Cellona had an active felony no bail warrant for his arrest. Based on this information and Cellona's driving, including failing to stop for a posted stop sign, I activated my siren and advised Dispatch that I was in pursuit of the vehicle.

6. Additional SBSO patrol vehicles driven by Sr. Deputy Frawley, Deputy Cameron Hossli, and Deputy Davis joined the pursuit behind me.

7. During the pursuit, Deputy Davis notified me that Cellona was associated with a residence on Mizar Place in Lompoc and had a history of making threats against law enforcement.

8. During the pursuit, Cellona failed to stop at a stop light and failed to yield to four marked black-and-white SBSO patrol cars with activated overhead emergency lights and sounding sirens. Cellona fled recklessly for approximately 20 miles, at speeds in excess of 100 miles per hour, including running a red

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

2.

traffic light through a major intersection in front of Vandenberg Spece Force Base. When Cellona made an unsafe passing maneuver using the paved left shoulder on Highway 1, Sr. Deputy Frawley advised Dispatch that we were discontinuing the pursuit.

9.   Attached to the Joint Appendix of Exhibits ("Joint Appendix") as **Exhibit 23** is a true and correct copy of my patrol unit COBAN video on August 6, 2022 from time-stamp 18:50:54 to 19:29:32. Cellona's actions just prior to and during the pursuit until it was discontinued are depicted from time-stamp 18:51:12 to 19:05:25.

10.After the pursuit was discontinued, I and other SBSO deputies drove to the residence to which Cellona's vehicle was registered at 157 Mizar Place to attempt to locate the Toyota Prius.

11.The residence at 157 Mizar Place is located in a residential neighborhood of single family homes.

12.At 157 Mizar Place, I saw Cellona's vehicle parked on the driveway. I spoke to Cellona's sister, Claudia Moser, who informed me that her Cellona had arrived at her home in the subject vehicle and said that he was going to jail and to watch his car. Ms. Moser can be heard making this statement on **Exhibit 23** at time-stamp 19:10:12 to 19:10:24.

13.SBSO deputies believed that Cellona had fled on foot into the backyard of 157 Mizar Place and had jumped the fence from Ms. Moser's backyard into a neighbor's backyard at 148 Alcor Avenue.

14.SBSO deputies began to establish a perimeter in the area in an effort to locate Cellona. SBSO deputies conducted a lengthy search of the neighborhood for Cellona. The search included the assistance of a SBSO helicopter. In addition, Deputy Davis, who is a K9 handler, searched with his K9 partner "Thor." Cellona was not located.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

3.

15. Cellona's car was towed from the scene. Cellona's mother and sister said that they would contact law enforcement if Cellona returned to the residence.

16. Had Cellona been located, I would have arrested him for the following crimes:

(1) Driving in willful or wanton disregard for safety of persons or property while fleeing from a pursuing peace officer, a violation of California Vehicle Code section 2800.2(a), a felony;

(2) Resisting, delaying or obstructing a peace officer in violation of Penal Code section 148(a)(1), a misdemeanor; and

(3) disorderly conduct by loitering, prowling, or wandering upon the private property of another, a violation of Penal Code section 647(h), a misdemeanor. I also would have arrested him on the existing arrest warrants for Battery with serious bodily injury, a violation of Penal Code section 243(d), Possession of a Controlled Substance, a violation of Health and Safety Code section 11350(a), and Misuse of 911 line, a violation of Penal Code section 653x.

17. At approximately 2225 hours (10:25PM) on August 6, 2022, I responded back to 157 Mizar Place for a report that Cellona had returned to the address looking for his vehicle. While responding to the scene, Cellona was reported to be inside a shed in the yard of 151 Mizar Place.

18. Because Cellona had fled from SBSO deputies to evade arrest earlier that evening, SBSO deputies first gathered at the intersection of Aldebaran Avenue and Constellation Road to make a plan to approach Cellona. Our intent was to arrest Cellona for the offenses and arrest warrants listed above in paragraph 16.

19. Deputy Evert, Deputy Hernandez, Deputy Strange and I approached 151 Mizar Place on foot. A male on the porch of the residence pointed towards the fence line on the east side of his residence. He told me that he believed Cellona was in the yard of his residence and gave SBSO deputies permission to enter the yard.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

4.

20. I walked to the fence line at the east side of 151 Mizar Place. I looked over the fence and noticed an open metal shed on the other side of the fence. I also noticed a tall wooden fence along the northern side of the metal shed. The additional fence on the north side of the shed created a small area of the yard sectioned off from the rest of the backyard of the residence.

21. I used my flashlight to illuminate the area around the shed. Deputy Evert also stood at the fence line and shined his flashlight into the area. I then saw a male subject walking out of the shed. I recognized the male as Cellona.

22. I announced to Cellona that I was with the Sheriff's Office, and made the following commands: "Come out with your hands up right now. Come out this way. Come out this way."

23. Attached to the Joint Appendix as **Exhibit 29** is a true and correct copy of my patrol unit COBAN video on August 6, 2022 from time-stamp 22:50:11 to 23:36:43. My commands to Cellona are audible from time-stamp to 22:54:54 to 22:55:01.

24. Cellona did not respond or comply with my commands. Instead, Cellona briefly stood still and then turned away from me and began climbing over the fence on the northern side of the metal shed. I entered the yard thought the gate and began to chase after Cellona to place him under arrest. However, by the time I entered through the gate, Cellona had already jumped over the second fence and entered the rest of the backyard. I noticed that the second fence that Cellona had jumped over was not sturdy and I was able to push the fence over using my hands.

25. I entered the rest of the backyard but did not see Cellona in the yard. I believed Cellona had possibly jumped over the northern fence line of the 151 Mizar Place property into the backyard of 140 Alcor Avenue. I looked over the fence line into the backyard of 140 Alcor Avenue and noticed Cellona lying on his stomach in that backyard.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

5.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of April, 2026 at Santa Maria, California.

MICHAEL REYNOSO

COUNTY COUNSEL
County of Santa Bárbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

6.

FLASH DRIVE:

Deputy Reynoso's Patrol Unit COBAN video, Aug. 6, 2022

(To be Lodged Manually)

**EXHIBIT 23**

FLASH DRIVE:

Deputy Reynoso's Patrol Unit COBAN video, Aug. 6, 2022

(To be Lodged Manually)

**EXHIBIT 29**

RACHEL VAN MULLEM, COUNTY COUNSEL
MARY PAT BARRY, SR. DEPUTY (Bar No. 148354)
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA  93101
(805) 568-2950 / FAX: (805) 568-2982
E-mail: mpbarry@countyofsb.org

Attorneys for Defendants
COUNTY OF SANTA BARBARA,
DEPUTY CAMERON HOSSLI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON CELLONA,<br><br>             Plaintiff,<br><br>v.<br><br><br>COUNTY OF SANTA BARBARA,<br>DEPUTY CAMERON HOSSLI,<br>and DOES 1-10 inclusive,<br><br>             Defendants. | Case No: 2:25-cv-01503 AH (Ex)<br><br>**DECLARATION OF CAMERON HOSSLI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: June 3, 2026<br>Time: 1:30 p.m.<br><br>Judge: Hon. Anne Hwang<br>Courtroom: 9C, First St. Courthouse |

I, Cameron Hossli, declare as follows:

1.    I am a defendant in this lawsuit. I state the following facts from my personal knowledge and, if called as a witness, I could and would so competently testify thereto.

2.    I am a deputy sheriff with the Santa Barbara County Sheriff's Office ("SBSO"). My current assignment is Resident Deputy in SBSO's New Cuyama

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
 (805) 568-2950

1.

Valley Station. I started my employment with SBSO as a Sheriff's Deputy Trainee on July 8, 2019. I completed the Allan Hancock Basic Law Enforcement Academy on December 9, 2019, and promoted to Sheriff's Deputy on December 16, 2019. I have worked as a SBSO patrol deputy since 2019 December 2019. I was awarded the California Commission on Peace Officer Standards and Training ("P.O.S.T.") Basic Certificate on December 16, 2020.

3. On August 6, 2022, I was assigned as a patrol deputy in the Santa Maria Station. I was wearing a SBSO uniform and duty belt. I was equipped with a firearm, a baton, a Taser, and OC (Oleoresin Capsicum) spray. I had a flashlight. I was driving a SBSO marked black and white patrol vehicle. I was easily identifiable as a law enforcement officer.

4. I became aware of and joined a vehicle pursuit of a Toyota Prius. During the pursuit, SBSO Dispatch identified the registered owner of the vehicle as Clinton Cellona ("Cellona") and reported that Cellona had outstanding warrants for his arrest, including a felony warrant for aggravated battery.

5. During the pursuit, I heard a radio communication from Deputy Davis in which Deputy Davis advised that Cellona had a history of making threats towards law enforcement.

6. When I heard Deputy Davis's radio communication about Cellona's history, I recalled having previously received and reviewed an email from Deputy Davis regarding Cellona, to which there were three attachments.

7. The attachments to Deputy Davis's email were (1) a bulletin from the Pismo Beach Police Department entitled "Officer Safety – PC 422/PC 69 Warrant"[1] advising that Cellona had an active felony warrant for a case involving threats made against law enforcement; (2) a photo posted on Cellona's

---

[1] "PC 422" refers to California Penal Code section 422 – criminal threats; "PC 69" refers to California Penal Code section 69 – obstructing or resisting executive officer by means of threat or violence.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

2.

social media account (thegamesuperman) depicting Cellona with an assault style rifle over his shoulder; and (3) a clip of a video posted on Cellona's social media account showing Cellona swinging two katana swords.

8. Attached to the Joint Appendix of Exhibits ("Joint Appendix") as **Exhibit 58** is a true and correct copy of Deputy Davis's email dated September 28, 2021 with the subject line: UPDATE FOR CLINTON CELLONA BOL 69/422 PC.

9. Attached to the Joint Appendix as **Exhibit 59** is a true and correct copy of the bulletin from the Pismo Beach Police Department that was attached to Deputy Davis's email.

10. Attached to the Joint Appendix as **Exhibit 60** is a true and correct copy of the photo posted on Cellona's social media account that was attached to Deputy Davis's email.

11. Attached to the Joint Appendix as **Exhibit 61** is a true and correct copy of the clip of a video posted on Cellona's social media account that was attached to Deputy Davis's email.

12. Based on the information I knew regarding Cellona, I considered Cellona to be a violent felon, possibly armed and dangerous, and fleeing law enforcement.

13. The pursuit was terminated due to Cellona's dangerous driving. Deputies then went to a residence on Mizar Place where Cellona's car was located. Deputies were informed that Cellona's mother reported that Cellona had arrived in his car, said "I'm going to jail" and ran.

14. Deputy Davis then deployed his K9 "Thor" in an attempt to locate Cellona. I provided back up for Deputy Davis, which allowed Deputy Davis as the K9 handler to focus on Thor during the search. We searched the neighborhood area around Cellona's last known location.

15. Deputy Davis and I entered the backyard of 148 Alcor Avenue because Cellona reportedly had jumped the fence from 157 Mizar Place into the

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

3.

backyard of 148 Alcor Ave. It was my understanding that the residents of 148 Alcor Ave. were on vacation and someone had authorized our entry onto the property.

16. During the search, a SBSO helicopter flew above the area making announcements.

17. While we were searching on Alcor Avene, I noticed two children looking out the window of the residence at 140 Alcor Ave. This was the residence next-door to 148 Alcor Ave. Seeing the children in the residence at 140 Alcor Avenue indicated to me that a family lived at the residence and the family was in the home that evening.

18. After searching for about an hour, the track using the K9 was terminated and I returned to my patrol duties in Santa Maria.

19. Later the night of August 6, 2022, I responded back to Mizar Place based on a report that Cellona had returned to retrieve his vehicle (which was no longer there because it had been towed as evidence). When I arrived, I met with Deputy Reynoso, Deputy Davis, Deputy Evert, Deputy Hernandez, and Deputy Strange in the area of Constellation Road. We discussed an initial plan. Our plan was for Deputy Reynoso, Deputy Evert, Deputy Hernandez, and Deputy Strange to walk to the front of 151 Mizar. Deputy Davis and his canine partner Thor and I were assigned to position ourselves in the backyard of 148 Alcor in case Cellona tried to flee again. I carried a less lethal beanbag shotgun from my patrol vehicle.

20. On August 6, 2022 I was wearing an Axon body worn camera, which was mounted on my chest. I activated my body worn camera in the backyard of 148 Alcor Avenue and it recorded audio and video during the approximately 12-13 second incident with Cellona. A true and correct copy of the body worn camera video is part of the Joint Appendix as **Exhibit 17**. The video is approximately 11 minutes long and depicts my entry into the backyard of 148 Alcor Avenue.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

4.

When I entered, I walked to the back fence that separated 148 Alcor Avenue from Cellona's sister's house at 157 Mizar Place. At that location, I stepped up onto a large clay pot that was on its side and provided a large platform to stand on. The property at 148 Alcor Avenue had a slightly higher elevation than the residences on Mizar Place and I was able to see into the backyards of those homes.

21.   I heard over the radio that Cellona was running. As I listened, I suddenly saw Cellona running through the backyard of 151 Mizar Place towards the back fence.

22.   As Cellona ran toward the fence and attempted to jump the fence I gave him four verbal commands and three warnings. I used an expletive when making one command, which is indicated here without using the full expletive. The commands I made and warnings I gave, in the order I made and gave them were:

"Don't run"

"You're gonna get hit with a beanbag"

"Get on the ground"

"Get the f--- on the ground"

"You're gonna get hit with a beanbag"

"I'm gonna hit you with a beanbag."

"Get on the ground."

23.   Prior to giving the final warning and final command to get on the ground, I used my radio to announce "Hoppin' the back fence."

24.   Cellona did not comply with any of my commands.

25.   Cellona did not respond to my warnings.

26.   Cellona did not hesitate in his efforts to jump over the fence into the backyard of 140 Alcor Ave.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

5.

27. As Cellona continued to try to flee by jumping into the backyard of 140 Alcor Avenue, I was concerned for the safety of the family I had seen in that house earlier that evening.

28. As Cellona tried to jump the fence, I did not see any SBSO deputies behind him in the backyard.

29. The fence between my location and the backyard of 140 Alcor Avenue would have prevented me getting into the backyard of 140 Alcor Avenue to pursue Cellona if he jumped the fence.

30. The fence between 151 Mizar and 140 Alcor would have impeded any deputies chasing Cellona from the backyard of 151 Mizar if Cellona jumped the fence.

31. Due to the fences and the fact that I believed no SBSO deputies were positioned in the backyard of 140 Alcor or the neighboring property, I believed that Cellona would be able to reach the backyard of 140 Alcor.

32. As Cellona jumped the fence, I did not consider using my Taser because Cellona was beyond the maximum effective range of 25 feet.

33. As Cellona jumped the fence, I did not consider using OC spray because Cellona was beyond the maximum effective range of 12-15 feet.

34. As Cellona jumped the fence, Deputy Davis and his canine partner were no longer present with me in the backyard of 148 Alcor Ave. I therefore did not consider Deputy Davis and his canine partner to be a force option. Even if they had been present, the fence between 148 Alcor Ave. and 140 Alcor Ave. presented a barrier keeping them from entering the backyard that Cellona was attempting to jump into.

35. On August 6, 2022, I had no knowledge of any alleged mental health condition involving Cellona.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

6.

36. After using my radio to announce the Cellona was hopping the back fence, I gave Cellona one additional command to get on the ground and one additional warning that he was going to be hit with a beanbag.

37. I then used my flashlight to illuminate Cellona and the bead sight on my less lethal shotgun. When Cellona was up on the fence, I aimed at Cellona's upper left arm between the elbow and shoulder. I estimated that Cellona was over 30 feet away from me. Based on my training, my distance from Cellona and my target area of the upper arm were consistent with SBSO Policy 308 and the manufacturer's recommendations.

38. Based on the information I had that Cellona was a violent, potentially armed felon, that he had a history of being threatening and assaultive towards law enforcement, his disregard for public safety earlier that evening, and my fear that if Cellona was not stopped, he had the ability to threaten the safety of others by entering the residence at 140 Alcor and turning the situation into a barricade or hostage problem, I aimed at Cellona's upper left arm and I fired one beanbag at Cellona as he was jumping over the fence into 140 Alcor.

39. The video from my body worn camera, which is **Exhibit 17** to the Joint Appendix of Evidence shows that 12 seconds passed from my first command to Cellona ("Don't run."), which is audible at time-stamp T05:55:11Z, to my firing the less lethal shotgun, which is audible at time-stamp T0:55:23Z.

40. I then ran from 148 Alcor around to the front of 140 Alcor where Deputy Davis and I made entry into the backyard of 140 Alcor and located Cellona on the ground. I removed Cellona's hat and saw that the beanbag munition that I aimed at Cellona's upper left arm had struck him on the top left side of his head, causing an obvious injury. Deputies began rendering aid to Cellona.

41. As a SBSO Sheriff's Deputy, I am required to be familiar with and adhere to the rules and guidelines of the SBSO Policy Manual, including SBSO's Policy 300 regarding the Use of Force.

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

7.

42. As a SBSO Sheriff's Deputy, I am required to complete P.O.S.T. certified training. Prior to August 6, 2022, I completed P.O.S.T. certified training in many subject matter areas, including but not limited to, California's Use of Force Standards (1 hour course completed 01/27/2020); Tactical Communication (2-hour course completed 03/14/2020); Principles of De-Escalation (4-hour course completed 12/11/2020); Crisis Response Team First Responder (40-hour course completed 03/05/2021); and Arrest and Control (4-hour course completed 06/15/2021).

43. As a SBSO Sheriff's Deputy, I am required to qualify with my firearm every quarter and I have done so since December 2019.

44. As a SBSO Sheriff's Deputy, in order to be authorized to use kinetic energy projectiles, I was required to complete an approved training course. I completed that course in December 2019 and qualified to use SBSO's less-lethal shotgun on December 16, 2019. In order to remain authorized to use the less lethal shotgun, I am required to complete an annual recertification course. Prior to August 6, 2022, I was qualified for recertification on December 11, 2020 and on December 10, 2021. I also qualified for recertification on December 9, 2022 and I have qualified for recertification every year thereafter.

45. Prior to August 6, 2022, I had fired the less lethal shotgun during training only. I had not previously fired the less lethal shotgun in the line of duty.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19 day of April, 2026 at New Cuyama, California.

_____
CAMERON HOSSLI

COUNTY COUNSEL
County of Santa Barbara
105 East Anapamu Street
Santa Barbara, CA 93101
(805) 568-2950

8.

**EXHIBIT 58**

**Davis, Tyler**

| | |
|---|---|
| **From:** | Davis, Tyler |
| **Sent:** | Tuesday, September 28, 2021 4:28 AM |
| **To:** | ahernandez@pismobeach.org; Sworn Personnel |
| **Subject:** | UPDATE FOR  CLINTON CELLONA BOL 69/422 PC |
| **Attachments:** | IMG_1096.JPG; IMG_1097.MOV; ~apbnet00~50~95798136-0a43-48e6-8282-22fede8d4c90~Email.pdf |

Good Morning Crime Fighters.

This subject recently gained attention by local law enforcement by being less than courteous in contacts with Lompoc PD, Santa Barbara Sheriff's, and Pismo Beach Police. Pismo Beach has recently authored a warrant for his arrest for the charges of 422/69 PC. (9-22-2021)

UPDATE

On 9/23/2021 his vehicle was located on highway 1 near VAFB parked on the side of the road and unoccupied. The vehicle had a spare tire on it and significant damage to the front axle. The vehicle was tagged by CHP at that time. Later that day, Cellona retrieved the vehicle and posted about it being in the shop for now, but would be back soon.

On 9/27/2021 the suspect posted a photo under his social media account (thegamesuperman) depicting him with an AR style rifle over his shoulder (see attached photo) in this photo he calls it a "toy gun," however in other social media posts, he is seen shooting a similar rifle outfitted with an optic.

On 9/28/2021 the suspect posted a video that last approximately 40 seconds of him swinging two Katana's to "the Purge" theme music, in what seemed to be a semi practiced hobby for him. Ive only attached 10 seconds of the video do to the file limitations (see attached video)

During a record check, The subject was found to have two recent address in the LOMPOC AREA. One of which is in SBSO jurisdiction at 157 Mizar Pl in Vandenberg village. The other address is at 1613 W Lemon Pl in the city of Lompoc

The purpose of this email is to reinforce that this subject appears to be becoming more boisterous with his actions. It should also be noted that he is actively posting with these weapons and should be considered armed if contacted which is reinforced in the original email where he made references to having firearms in his vehicle.

As always, Stay Safe
T. Davis #4311
Tjd4311@sbsheriff.org
805-895-1778

1

CONFIDENTIAL
SBCIjdm3098 8/26/2024 4:27:23 PM

**EXHIBIT 58**                                    **COSB_WALLENTINE_000160**

# EXHIBIT 59

# Officer Safety - PC 422/PC 69 Warrant

Sent: 2021-09-22 @ 16:13          Case: 211669          Author: P093





| DMV photo 6/2019 | 2016 Toyota Prius (CA #DRCLINT) |
|---|---|

On 2/12/2021, PBPD Officer conducted a traffic stop on Uber driver Clinton Gumeaux Cellona driving the wrong way on a one-way street, in the above pictured 2016 gray Toyota Prius (CA Legacy plate #DRCLINT). During the traffic stop, Cellona became confrontational and hostile (non-physical).

On 7/7, Cellona posted messages to the PBPD social media account under profile names "thegamesuperman" and "clue_shhj", with a username "Brown Carter Clinton" indicating a desire to fight the officer, a stock photo of ballistic body armor (vest), and references to having guns in vehicles. On 7/13, a subject reported receiving threatening messages from Cellona indicating he wanted to find the officer and stand over his bed while he slept and taste his blood. On 7/17, Cellona, stated he was coming for the officer, "I'm going to get him", "...his kids too", and "I going to kill him". Cellona was unphased by the fact the phone call was being recorded.

UPDATE- Cellona has an active felony (citable) warrant for this case. Cellona has also made threats towards the Lompoc (CA) PD and its officers, from which a report was documented and sent to the SBDA's Office. Cellona was contacted during the Lompoc PD investigation and found to be working as an unarmed security officer. His employer was also contacted who may have terminated Cellona's employment. Cellona's social media (Facebook) profile shows a photograph of him with an AR-style rifle. Cellona has no firearms registered to him in AFS.

## Pismo Beach Police Department
### 805-773-2208

*This bulletin is CONFIDENTIAL unless designated otherwise within the bulletin.*    *Created with APBnet software vrs. 200119*

**EXHIBIT 59**                                        **COSB_WALLENTINE_000159**

**EXHIBIT 60**



**EXHIBIT 60**

FLASH DRIVE:

Video Clip of Clinton Cellona with Katana swords – attachment to Deputy Davis
Email
(To be Lodged Manually)

**EXHIBIT 61**

**SANGER, HANLEY, SANGER & AVILA, LLP.**
Robert M. Sanger, SBN 058214
Jeffrey S. Sanger, SBN 289779
Miguel A. Avila, SBN 319498
222 E. Carrillo Street, Suite 300
Santa Barbara, CA 93101
Tel.: (805) 962-4887
Fax: (805) 963-7311
Email:  team@sangerhanley.com
Attorneys for Plaintiff Clinton Cellona

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CLINTON CELLONA,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SANTA BARBARA, DEPUTY CAMERON HOSSLI, and DOES 1 through 10 inclusive,<br><br>Defendant. | Case No. 2:25-CV-01503-AH-E<br><br>**DECLARATION OF JEFFREY S. SANGER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>**Hearing Date: June 3, 2026**<br>**Time: 1:30 p.m.**<br>**Courtroom: 9C** |

I, Jeffrey S. Sanger, hereby declare:

1. I am an attorney at law duly licensed to practice before the United States District Court Central District of California. I am one of the attorneys of record for Plaintiff Clinton Cellona in the above-entitled matter. If called upon as a witness, I could and would competently testify to the matters set forth herein of my own personal knowledge.

2. Attached to the Joint Appendix as **Exhibit 67** are true and correct copies of the

1

DECLARATION OF JEFFREY S. SANGER

cover page, reporter's certificate and the relevant pages from the transcript of the deposition of Charles Strange which was conducted on March 19, 2026 by agreement of the parties.

3. Attached to the Joint Appendix as **Exhibit 24** is a true and correct copy of Deputy Reynoso's patrol unit COBAN video on August 6, 2022 from time stamp 19:28:40-21:29:39. This video was authenticated by Deputy Reynoso at his deposition on February 12, 2026. A conversation between Claudia Moser, Mirina Haro, and Deputy Reynoso can be heard from 20:11:08-20:11:40 hours. During this conversation, Ms. Mirina and Ms. Haro tell Deputy Reynoso that they had previously reported Mr. Cellona's mental health issues to SBSO and mental health, and Ms. Haro mentions bipolar disorder. A later conversation between Deputy Reynoso and Claudia Moser can be heard from 21:15:11 to 21:15:40 hours. During this conversation Ms. Moser relays that Mr. Cellona has mental issues.

4. Attached to the Joint Appendix as **Exhibit 20** is a true and correct copy of Reynoso's Police Report dated August 6, 2022, which he identified at his deposition on February 12, 2026. The report is stamped bates numbers CELLONA 000001- CELLONA 000010.

5. Attached to the Joint Appendix as **Exhibit 39** is a true and correct copy of 911 Call made by Claudia Moser on August 6, 2022. This call was authenticated by County Dispatch Supervisor Susan Farley at her deposition on February 17, 2026.

6. Attached to the Joint Appendix as **Exhibit 68** is a true and correct copy of Lieutenant Juan Manuel Camerana COBAN video on August 6, 2022, from time stamp 22:43:39 to 00:08:07. This video was relied upon by Kenneth Wallentine, the County's expert witness, in forming his opinions in this matter.

7. Attached to the Joint Appendix as **Exhibit 69** are true and correct copies of the cover page, reporter's certificate and the relevant pages from the transcript of the deposition of Chief Kenneth Wallentine which was conducted on April 1, 2026.

DECLARATION OF JEFFREY S. SANGER

8. Attached to the Joint Appendix as **Exhibit 13** is an Incident Detail Report from August 6, 2022 at 18:52 hours. This document was marked as Exhibit 13 at the deposition of Deputy Cameron Hossli.

9. Attached to the Joint Appendix as **Exhibit 70** are true and correct copies of the cover page, reporter's certificate and the relevant pages from the transcript of the deposition of Deputy Michael Reynoso which was conducted on February 12, 2026.

10. Attached to the Joint Appendix as **Exhibit 71** are true and correct copies of the cover page, reporter's certificate and the relevant pages from the transcript of the deposition of Deputy Cameron Hossli which was conducted on February 10, 2026.

11. Attached to the Joint Appendix as **Exhibit 72** is a true and correct copy of the relevant pages of Philip Delio, M.D.'s Rule 26(a)(2)(B) report dated December 8, 2025. Dr. Delio was retained by the defense in this matter.

12. Attached to the Joint Appendix as **Exhibit 73** is a true and correct copy of the relevant pages of Veronica Llamas, PhD's Rule 26(a)(2)(B) report. Dr. Llamas was retained by Plaintiff in this matter.

13. Attached to the Joint Appendix as **Exhibit 74** are true and correct copies of the cover page, reporter's certificate and the relevant pages from the transcript of the deposition of Clinton Cellona which was conducted on February 4, 2026.

14. On information and belief, after reviewing the entire file in this case, I did not see evidence of a firearm registered to Mr. Cellona.

15. Attached to the Joint Appendix as **Exhibit 75** are true and correct copies of the cover page, reporter's certificate and the relevant pages from the transcript of the deposition of Special Deputy Robert Baisa which was conducted on February 18, 2026.

16. Attached to the Joint Appendix as **Exhibit 21** is a true and correct copy of Reynoso's Police Report dated August 6, 2022, which he identified at his deposition on February 12, 2026. The report is stamped bates numbers 000033-

3

DECLARATION OF JEFFREY S. SANGER

000041.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and executed this 27th of April 2026, at Santa Barbara, California.

_____

Jeffrey S. Sanger

4

DECLARATION OF JEFFREY S. SANGER

**SANGER, HANLEY, SANGER & AVILA, LLP.**
Robert M. Sanger, SBN 058214
Jeffrey S. Sanger, SBN 289779
Miguel A. Avila, SBN 319498
222 E. Carrillo Street, Suite 300
Santa Barbara, CA 93101
Tel.: (805) 962-4887
Fax: (805) 963-7311
Email: team@sangerhanley.com
Attorneys for Plaintiff Clinton Cellona

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CLINTON CELLONA,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SANTA BARBARA, DEPUTY CAMERON HOSSLI, and DOES 1 through 10 inclusive,<br><br>Defendant. | Case No. 2:25-CV-01503-AH-E<br><br>**DECLARATION OF MIGUEL A. AVILA IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>**Hearing Date: June 3, 2026**<br>**Time: 1:30 p.m.**<br>**Courtroom: 9C** |

I, Miguel A. Avila, hereby declare:

1. I am an attorney at law duly licensed to practice before the United States District Court Central District of California. I am one of the attorneys of record for Plaintiff Clinton Cellona in the above-entitled matter. If called upon as a witness, I could and would competently testify to the matters set forth herein of my own personal knowledge.

2. On July 27, 2023, I made a public records act request to the County of Santa

1

DECLARATION OF JEFFREY S. SANGER

Barbara pursuant to government code sections 7920.00-7930.015 and Penal Code section 832.7. The request sought records related to Deputy Cameron Hossli, the defendant herein, and his involvement in the shooting of Plaintiff on August 6, 2022.

3. On or about August 28, 2023, I received a response indicating that "The County of Santa Barbara has reviewed its files and has located responsive records to your existing request (R007730-072723) and your prior submitted request (R007634-071723)."

4. I received four COBAN files in response to my public records request. The four files covered the following periods from August 6, 2022: (1) 18:44-20:36, (2) 22:35-22:36, (3) 22:38-22:39, and (4) 23:04-23:27.

5. Deputy Hossli shot Mr. Cellona at approximately 22:55. The County did not provide Deputy Hossli's COBAN file covering the time period on August 6, 2022, of 22:39-23:04.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and executed this 27th of April 2026, at Santa Barbara, California.

_____

Miguel A. Avila

2

DECLARATION OF JEFFREY S. SANGER

**EXHIBIT 67**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

CLINTON CELLONA,                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           ) Case No.
                                    ) 2:25-cv-01503-AH-(Ex)
COUNTY OF SANTA BARBARA,            )
DEPUTY CAMERON HOSSLI,              )
and DOES 1-10 inclusive,            )
                                    )
            Defendants.             )
                                    )
_____

**CERTIFIED TRANSCRIPT**

DEPOSITION OF

CHARLES G. STRANGE

THURSDAY, MARCH 19, 2026

Stenographically Reported By:

Chandler Alvino

CSR No. 14462, RPR

Thursday, March 19, 2026; Santa Barbara, California

10:33 a.m.

---

THE COURT REPORTER:  Good morning.  Chandler Alvino, CSR number 14462.

CHARLES G. STRANGE,

having first declared under penalty of perjury to tell the truth, was examined and testified as follows:

EXAMINATION

BY MR. SANGER:

Q.  Okay.  And, Deputy Strange, do you understand that even though we are in a law office and not a courtroom, you're under the same oath to tell the truth as if a -- a judge and jury were present?

A.  Yes.

Q.  And do you understand that your testimony today is given under penalty of perjury under the laws of the United States?

A.  Yes.

Q.  And will you give us verbal responses today, as in a clear "yes" or "no"?

A.  Yes.



r.

Q.   Was that Joseph Stetz?

A.   Yes.

Q.   And so you would have worked with Mr. Stetz at Lompoc Police; is that correct?

A.   Correct.

Q.   And on August 6th of 2022, was your patrol vehicle equipped with a Coban recording device?

A.   Yes.

Q.   Did you make any recordings on August 6th of 2022?

A.   I -- I can't remember if I did.  I can't remember if it was activated or not.  I'm assuming I -- I did, but I can't remember if my Coban was activated.

Q.   Okay.  So you -- you testified that you arrived at 157 Mizar approximately at the same time as

other deputies on the call.  Did you contact Ms. Moser at that time?

A.    Yes.  They were searching for Clinton, and they had asked that she vacate the residence, her and her mother, and I stood by with them in the front of the residence while the other deputies looked for Clinton.

Q.    Did you have a conversation with Claudia Moser?

A.    Yes, I did.



CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

* * * *

The undersigned Certified Shorthand Reporter of the State of California does hereby certify:

That the foregoing Proceeding was taken before me at the time and place therein set forth.

That the testimony and all objections made at the time of the Proceeding were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of the proceedings thereof.

In witness whereof, I have subscribed my name, this date:   April 2nd, 2026

_____

Chandler Alvino, CSR No. 14462, RPR

TO BE LODGE MANUALLY BY PLAINTIFF:

Deputy Reynoso's Patrol Unit COBAN video, Aug. 6, 2022

**EXHIBIT 24**

**EXHIBIT 20**

# Report of Offense
# Santa Barbara County Sheriff



4434 Calle Real

Santa Barbara, CA 93110-1002
Report Type
ALL OTHER

(805) 681-4100

**22-9155**

Supplement No
ORIG

Reported Date
08/06/2022

EXHIBIT 20
WIT: Reynoso
DATE: 2.12.26
Krisanne Caciola, CSR

Officer
REYNOSO II, M

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | Status |
|---|---|---|---|---|---|---|
| Santa Barbara County Sheriff | | 22-9155 | ORIG | 08/06/2022 | 18:52 | Offense |

| Report Type | Location | | | | | | |
|---|---|---|---|---|---|---|---|
| All Other Offenses | ▓▓▓▓▓ | | | | | | |

| City | ZIP Code | Rep Dist | Area | Beat | From Date | From Time | |
|---|---|---|---|---|---|---|---|
| ▓▓▓▓▓ | ▓▓▓▓▓ | SM70 | 2 | SM | 08/06/2022 | 18:52 | |

| Officer | Assignment | Entered by |
|---|---|---|
| 4988/REYNOSO II,M | SANTA MARIA STATION | 4988 |

| Assignment | RMS Transfer | Prop Trans Stat | Report Title |
|---|---|---|---|
| SANTA MARIA STATION | Successful | Successful | Report of Offense |

| Solvability | Score | Approving Officer | Approval Date |
|---|---|---|---|
| High level of solving case | 300 | 3875 | 08/09/2022 |

| Approval Time |
|---|
| 04:05:55 |

| Booking Form | CHP 180 Attached | Photograph(s) | Probable Cause form | COBAN |
|---|---|---|---|---|
| Yes | Yes | Yes | Yes | Yes |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | PC148(A)(1) | Obstruct/Resists Pub | |
| 2 | VC2800.2 | Evade PO w/disregard | |
| 3 | PC647(H) | Disorderly conduct/1 | |
| 4 | PC243D | Battery w/serious bo | |
| 5 | PC653X | Misuse of 911 line | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| OTH | 1 | I | MOSER, CLAUDIA | 190402 | F | F | ▓▓/1977 |
| OTH | 2 | I | ▓▓▓▓▓, | 1083585 | O | M | ▓▓2009 |
| PAR | 1 | I | HARO, MIRINA | 799841 | A | F | ▓▓1959 |
| SUS | 1 | I | CELLONA, CLINTON | 800603 | O | M | ▓▓/1993 |

## Vehicle Summary

| Invl | Type | License No | State | Lic Year | Year | Make | Model | Style | Color |
|---|---|---|---|---|---|---|---|---|---|
| TOW | 1 | ▓▓▓▓▓ | CA | 2022 | 2016 | TOYT | PRI | 4D | GRY |

## Summary Narrative

The driver of a grey colored Toyota Prius, later identified as Clinton Cellona, made an unsafe lane change, failed to stop at a stop light and then failed to yield to four marked black-and-white Sheriff's Office patrol cars, with activated overhead emergency lights and sounding sirens. Cellona fled recklessly for approximately 20 miles, at speeds in excess of 100 mph, running a red traffic light through a major intersection in front of Vandenberg Space Force Base, and passing several vehicles recklessly, one on the narrow-left shoulder of the highway between a concrete center barrier and a vehicle in the number one lane nearly causing a high-speed traffic collision. Cellona then fled from deputies on foot over his back fence into a neighbor's back yard. Cellona was not located in the area at this time. Offense report taken.

| Report Officer | Printed At | Page 1 of 6 |
|---|---|---|
| 4988/REYNOSO II,M | 08/09/2022 07:44 | |

# Report of Offense
## Santa Barbara County Sheriff

**22-9155**          Supplement No. ORIG

### Other 1: MOSER, CLAUDIA

| Involvement | Invl No | Type | Name | | | | | | MNI | Race |
|---|---|---|---|---|---|---|---|---|---|---|
| Other | 1 | Individual | MOSER, CLAUDIA | | | | | | 190402 | Filipino |

| Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN | |
|---|---|---|---|---|---|---|---|---|---|
| Female | ▮1977 | 44 | No | 5'07" | 125# | Brown | Brown | 1527094 | |

| Type | Address | | City | State |
|---|---|---|---|---|
| Home | ▮ | | Lompoc City | California |

| ZIP Code | Date |
|---|---|
| 93436 | 08/06/2022 |

| Type | | ID No | OLS | |
|---|---|---|---|---|
| Operator License | | ▮ | California | |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (805)717-8576 | 08/06/2022 |

### Other 2:

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| Other | 2 | Individual | ▮ | | 1083585 | Other | Male |

| DOB | Age | Juvenile? | PRN |
|---|---|---|---|
| ▮/2009 | 12 | Yes | 1527095 |

| Type | Address | City | State |
|---|---|---|---|
| Home | ▮ | Lompoc City | California |

| ZIP Code | Date |
|---|---|
| 93436 | 08/06/2022 |

### Parent 1: HARO, MIRINA

| Involvement | Invl No | Type | Name | | | | | | MNI | Race |
|---|---|---|---|---|---|---|---|---|---|---|
| Parent | 1 | Individual | HARO, MIRINA | | | | | | 799841 | Other Asian |

| Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN | |
|---|---|---|---|---|---|---|---|---|---|
| Female | ▮1959 | 63 | No | 5'09" | 150# | Black | Brown | 1527096 | |

| Type | Address | | City | State |
|---|---|---|---|---|
| Home | ▮ | | Lompoc City | California |

| ZIP Code | Date |
|---|---|
| 93436 | 08/06/2022 |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (805)717-8576 | 08/06/2022 |

### Suspect 1: CELLONA, CLINTON

| Involvement | Invl No | Type | Name | | | | | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Suspect | 1 | Individual | CELLONA, CLINTON | | | | | | 800603 | Other | Male |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN | |
|---|---|---|---|---|---|---|---|---|
| ▮1993 | 29 | No | 6'02" | 189# | Black | Brown | 1527097 | |

| Type | Address | | City | State |
|---|---|---|---|---|
| Home | ▮ | | Lompoc City | California |

| ZIP Code | Date |
|---|---|
| 93436 | 08/06/2022 |

| Type | | OLS | |
|---|---|---|---|
| Operator License | ▮ | California | |

### Vehicle: 8TGJ780

| Involvement | Type | | State | Lic Year | Lic Type |
|---|---|---|---|---|---|
| Towed | Auto | ▮ | California | 2022 | Regular Passenger Automobile Plates |

| Year | Make | Model | Style | Color |
|---|---|---|---|---|
| 2016 | Toyota/Toyota Motor Co., Ltd. | Prius | 4-door Automobile | Gray |

| VIN | Storage |
|---|---|
| ▮ | Smitty's Towing - LOM |

### Modus Operandi

Crime Code(s)
All others

### Narrative

**(A) Continuations:**

**Additional Law Enforcement Personnel:**
Santa Barbara Sheriff's Office Lieutenant J. Camarena #2819
Santa Barbara Sheriff's Office Senior Deputy D. Frawley #3875
Santa Barbara Sheriff's Office Deputy C. Hossli #4199
Santa Barbara Sheriff's Office Deputy T. Evert #5562

| Report Officer | Printed At | |
|---|---|---|
| 4988/REYNOSO II, M | 08/09/2022 07:44 | Page 2 of 6 |

# Report of Offense
# Santa Barbara County Sheriff

**22-9155**

Supplement No
ORIG

## Narrative

Santa Barbara Sheriff's Office Deputy C. Strange #5054

### Attachments:
-Copy of CHP 180 form

### Relationships:
-Clinton Cellona is the arrestee
-Mirina Haro is the mother of Clinton Cellona
-Claudia Moser is the sister of Clinton Cellona
- ▓▓▓▓▓▓▓▓▓▓ is the son of Claudia Moser

### (B) Evidence:
- Audio / video recordings of my contact with all involved parties were captured on Coban under username MSR4988 in patrol unit 6018.
- Audio recordings of my interviews with Mirina Haro and Claudia Moser have been recorded on a personal recording device, which have been copied to a CD and placed into an evidence locker at the SBSO Santa Maria station for storage.
- Several photographs were taken of the scene for documentation purposes. These photographs have been uploaded to Forensics for storage.

### (C) Narrative:
On Saturday, 8-6-2022, at approximately 1852 hours, I was patrolling the Santa Maria area in a marked SBSO patrol vehicle. I noticed a dark grey colored Toyota brand Prius (CA license plate ▓▓▓▓▓ traveling southbound on Highway 135 past the intersection of Skyway Drive. As this vehicle accelerated through the intersection of Highway 135 and Skyway Drive, I noticed a large amount of smoke being emitted from the Toyota Prius' tailpipe. As the vehicle the continued southbound on Highway 135 towards Foster Road, I also noticed the driver change lanes from the number one lane to the number two lane. However, the Toyota Prius continued outside to drive outside of the number two lane boundary line and onto the right-hand shoulder of Highway 135.

It should be noted, there were two vehicles directly ahead of the Toyota Prius. One of the vehicles was in the number one lane and the second vehicle was in the number two lane of Highway 135. The vehicle in the number two lane of Highway 135 was slightly ahead of the vehicle in the number one lane.

The driver of the Toyota Prius then changed lanes from the number two lane to the number one lane of Highway 135. The Toyota Prius then immediately began to change lanes back to the number two lane from the number one lane, almost driving outside of the number two lane boundary line and onto the right-hand shoulder again. The driver of the Toyota Prius then immediately changed lanes again from the number two lane of Highway 135 to the number one lane. The Toyota Prius was changing lanes so suddenly, it appeared to me the vehicle was swerving from lane to lane in an unsafe manner while traveling south on Highway 135. This is a violation of CVC 21658(a).

For this reason, I activated my overhead red and blue patrol vehicle lights in an attempt to conduct a traffic stop on the Toyota Prius as it approached the intersection of Highway 135 and Foster Road. I then witnessed the driver of the Toyota Prius accelerate the vehicle and change lanes from the number one lane of Highway 135 and into the number two lane. The driver of the Toyota Prius then straddled the number one and two lane on Highway 135, after passing a black colored sedan that was in the number one lane and approached the intersection of Highway 135 and Foster Road.

The driver of the Toyota Prius then immediately made a right-hand turn, in front of a grey colored sedan in the number two lane of Highway 135, onto Foster Road after straddling the number one and two lane of Highway 135. The driver of the Toyota Prius cut across the number two lane of Highway 135 and the right-hand turning lane of Highway 135 in order for him to turn westbound onto Foster Road. This abrupt turning motion is also a violation of CVC 21658(a).

I continued to follow the vehicle as it traveled westbound on Foster Road towards the intersection of South Blosser Road at approximately 95 miles per hour. The vehicle then slowed down to approximately 30 miles per hour and failed to stop at the intersection at Foster Road and South Blosser Road. This is a violation of CVC 22450(a). The driver of the Toyota Prius proceeded to turn southbound on South Blosser Road and accelerate the

| Report Officer | Printed At | |
|---|---|---|
| 4988/REYNOSO II,M | 08/09/2022 07:44 | Page 3 of 6 |

000003

# Report of Offense
# Santa Barbara County Sheriff

**22-9155**

Supplement No
ORIG

## Narrative

vehicle away from me.

SBSO Dispatch then notified me the registered owner of the Toyota Prius, identified as Clinton Cellona, had an active felony no bail warrant for his arrest. Based on this information, coupled with the driving pattern displayed by the driver of the Toyota Prius, I informed SBSO Dispatch personnel I was now in pursuit of this vehicle. I then activated my siren installed on the patrol vehicle and continued to follow the vehicle southbound on South Blosser Road as it approached the intersection of Union Valley Parkway.

I then witnessed the Toyota Prius slowed down to approximately 27 miles per hour as it continued turn eastbound through the intersection of South Blosser Road and Union Valley Parkway without stopping. As the Toyota Prius turned eastbound on Union Valley Parkway, I noticed the driver of the vehicle applied the brakes while turning to the left, to what appeared to be an effort to avoid colliding with the southern curb line of Union Valley Parkway.

The vehicle then continued eastbound on Union Valley Parkway towards the intersection of California Boulevard at approximately 67 miles per hour. The vehicle then briefly slowed down as it approached the intersection of Union Valley Parkway and California Boulevard. However, the Toyota Prius continued eastbound through the intersection at a high rate of speed without stopping at the intersection. The driver of the Toyota Prius then proceeded eastbound on Union Valley Parkway and crossed over the solid double yellow center line of Union Valley Parkway while passing a white colored Chevrolet truck in single eastbound lane of Union Valley Parkway. This is a violation of CVC 21460(a).

The driver of the Toyota Prius then continued eastbound on Union Valley Parkway towards the intersection of Highway 135. The driver of the Toyota Prius then turned soouthbound at the intersection of Highway 135 and Union Valley Parkway at a high rate of speed while a solid red signal was displayed towards the eastbound traffic on Union Valley Parkway. This is a violation of CVC 21453(a).

I continued to follow the Toyota Prius as it proceeded southbound on Highway 135 at a high rate of speed. At one point, the driver of the Prius straddled the dividing line of the number one and two lane of Highway 135 as he was approaching the Clark Avenue offramp. The driver of the Toyota Prius then continued southbound on Highway 135 towards the merging intersection of Highway 1 at speeds around 100 miles per hour (MPH).

The Toyota Prius continued southbound in the number two lane of Highway 135 towards the Highway 1 offramp. The Toyota Prius then merged into the number one lane of Highway 1 and proceeded to driver west on Highway 1 at a high rate of speed.

At this time, I was notified by SBSO K9 Handler Davis via radio, the registered owner of the vehicle, identified as Clinton Cellona, was associated with a residence located on Mizar Place in Lompoc and has a history of threats against law enforcement. Please refer to K9 Handler Davis' follow up report for the complete documentation of his prior contact with Cellona.

As we approached the intersection of Highway 1 and San Antonio West, the driver of the Toyota Prius then changed lanes into the number two lane, passed a SUV style vehicle which was in the number one lane of Highway 1, abruptly changed lanes back into the number one lane of Highway 1 and continued westbound.

As the vehicle continued westbound on Highway 1 towards the intersection of California Boulevard. It should be noted, this intersection is controlled by traffic signals in four directions. As we approached the intersection, the driver of the Toyota Prius continued to turn southbound on Highway 1 at a high rate of speed while the traffic signal was solid red.

I continued to follow the vehicle as it proceeded to drive southbound on Highway 1 at approximately 100 MPH. As we passed the intersection of Timer Lane and Highway 1, the driver of the Toyota Prius changed lanes into the number two lane of Highway 1 in order to pass a silver-colored sedan, which was in the number one lane of Highway 1. The vehicle then proceeded to drive southbound on Highway 1 at a high rate of speed.

At approximately one-half mile north of the Constellation Road offramp on Highway 1, I noticed two vehicles traveling side by side in both the number one and two lanes of Highway 1. There was a silver-colored SUV in the number one lane and a white colored bus in the number two lane.

Report Officer
4988/REYNOSO II,M

Printed At
08/09/2022 07:44

Page 4 of 6

000004

# Report of Offense
## Santa Barbara County Sheriff

**22-9155**

Supplement No
ORIG

### Narrative

As the Toyota Prius approached these two vehicles, I witnessed the driver of the Toyota Prius merge out of the number one lane, enter the left-hand shoulder of Highway 1 and attempt to pass the silver-colored sedan in the number one lane. The driver of the Toyota Prius passed the silver-colored sedan on the left-hand shoulder and merged back into the number one lane of Highway 1.

At this point, SBSO Senior Deputy D. Frawley terminated the pursuit and I de-activated overhead lights and siren on the patrol vehicle prior to the Constellation Road offramp. I witnessed the driver of the Toyota Prius exit Highway 1 via the Constellation Road offramp and turn northbound on Constellation Road against a solid red traffic signal. I then lost sight of the Toyota Prius as it continued northbound on Constellation Road.

Based on the information K9 Handler Davis provided earlier in the pursuit, SBSO Deputies continued towards ███████ ████████ o attempt to locate the Toyota Prius. Upon arrival, I was notified the same Toyota Prius involved was now parked in the driveway of ████████████.

I then approached the residence along with SBSO Deputy C. Hossli, Senior Deputy Frawley and K9 Handler Davis. At this time, I noticed two female adult subjects who were standing in the driveway of the residence. These two subjects were later identified as Mirnia Haro and Claudia Moser. I instructed Haro and Moser to walk away from the residence and to walk towards me.

As Haro walked towards me, she said, "Don't hurt him. Don't kill him." I then briefly spoke with Moser who told me the subject who was driving the Toyota Prius, later identified as Clinton Cellona, told her he was going to jail and to watch over his vehicle.

Moser and Haro explained Cellona was believed to be somewhere on the property. For this reason, SBSO Deputies entered the backyard of the residence through a gate on the west side of the property. I then noticed three fence boards on the northern side of the property were broken. Cellona was not located in the backyard of ████████████ and was believed to have jumped over the northern fence line into the backyard of ███████ ████████.

For this reason, SBSO Deputies began to establish a perimeter in the area in an effort to locate Cellona. With the assistance of the SBSO airship, a perimeter was established and K9 announcements were made prior to K9 Handler Davis utilized his K9 partner to search for Cellona. Please refer to K9 Handler Davis' follow up report for the complete documentation of the deployment of his K9 partner. While I was on perimeter, a records search of Cellona for prior booking photographs was conducted and located. I later used this prior booking photograph of Cellona to assit in the confirming the identity of Cellona with Haro and Moser.

At the conclusion of the K9 Handler Davis' search, I responded back to ███████████ to contact Moser and Haro. I then spoke with Haro who told me the following:

On Saturday, 8-6-2022, at approximately 1907 hours, she was sitting on the couch with Moser in the living room of the residence. She then heard someone knocking loud on the front door of the residence. She opened the front door of the residence and noticed her son, Cellona, was the subject who was knocking on the front door of the residence. Cellona told her he was going to jail and to watch over his vehicle for him. She then heard and saw SBSO Deputies arrive on scene in front of the residence. Cellona then ran into the backyard of the residence. She did not see Cellona after he ran into the backyard of the residence.

I then spoke with Moser who told me the following:

On Saturday, 8-6-2022, earlier in the night, she heard a loud knock on the front door of her residence. Haro answered the front door of the property and Cellona was the subject who had knocked on the door. Cellona then ran past the front window of the residence, and she did not see Cellona after that.

Both Moser and Haro led me towards a picture frame in the living room of the residence. Haro stated the male subject depicted in the picture was her son, Cellona. I took a picture of this photograph for documentation purposes.

Based on this picture, coupled with the SBSO booking photograph of the Cellona, I believed the registered owner of the Toyota Prius I was pursuing earlier in the day was Cellona. For this reason, I believed Cellona to be in

| Report Officer | Printed At | |
|---|---|---|
| 4988/REYNOSO II,M | 08/09/2022 07:44 | Page 5 of 6 |

000005

## Report of Offense
## Santa Barbara County Sheriff

22-9155

Supplement No
ORIG

### Narrative

violation of CVC 2800.2.

I noticed Moser had several security cameras installed on the property. Moser began to check her security cameras for any recordings of the contact with Cellona. However, Moser informed me her security cameras did not have a playback or recording feature on them. Moser also advised me her Ring brand doorbell camera was powered off and did not capture any contacts with Cellona.

Prior to leaving the scene, Cellona's grey colored Toyota Prius was towed from the scene per CVC 23109.2 by Smitty's Towing. Haro and Moser stated they would contact law enforcement if Cellona returned to the residence. I provided my contact information and a case number to Moser for her reference.

### (D) Disposition:

Offense report taken. Follow up to be conducted

| Report Officer | Printed At | |
|---|---|---|
| 4988/REYNOSO II,M | 08/09/2022 07:44 | Page 6 of 6 |

000006

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**VEHICLE REPORT**

CHP 180 (Rev. 4-16) OPI 061

NOTE: CHP 180 IS FURNISHED TO ALL PEACE
OFFICERS BY THE CALIFORNIA HIGHWAY PATROL

| REPORTING DEPARTMENT | LOCATION CODE | DATE / TIME OF REPORT | NOTICE OF STORED VEHICLE DELIVERED PERSONALLY ☐ | FILE NO. |
|---|---|---|---|---|
| S1350 | 4200 | 8/6/22 @ 1852 | | 22-9155 |

LOCATION TOWED / STOLEN FROM ▮▮▮▮▮▮▮

ODOMETER READING

VIN CLEAR IN SVS? ☒ YES ☐ NO
LIC. CLEAR IN SVS? ☒ YES ☐ NO

DATE / TIME DISPATCH NOTIFIED: 8/6/22 @ 2055 | LOG NO.

| 2016 | TOYOTA | PRIUS | BODY TYPE 4 DOOR | COLOR GRY | ▮▮▮▮ | ☐ ONE ☒ TWO | MONTH / YEAR 8/2022 | STATE CA. |

VEHICLE IDENTIFICATION NO. ▮▮▮▮▮▮▮    ENGINE NO. ▮▮▮▮

VALUATION BY ☒ OFFICER ☐ OWNER
☐ 0-500  ☐ 501-4000  ☒ 4001+  ☐ S

| REGISTERED OWNER | | LEGAL OWNER |
|---|---|---|
| CLINTON CELIONA | ☐ SAME AS R/O | TOYOTA MTR. Co |
| LOMPOC, CA. | | ATLANTA GA. 30348 |

☒ STORED    ☐ IMPOUNDED    ☐ RELEASED    ☐ RECOVERED - VEHICLE / COMPONENT

TOWING / STORAGE CONCERN (NAME, ADDRESS, PHONE)
SMITTYS TOWING

STORAGE AUTHORITY / REASON
CVC 23109.2

REASON FOR STOP
CVC 21658(a) / CVC 21453(a)

AIRBAG? ☐ YES ☒ NO   ☐ 1 ☐ 2
DRIVEABLE? ☒ YES ☐ NO  ☐ JUNK ☐ UNK
VIN SWITCHED? ☐ YES ☒ NO

| CONDITION | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | TIRES / WHEELS | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WRECKED | | X | SEAT (FRONT) | X | | REGISTRATION | | | CAMPER | | X | LEFT FRONT | GOOD |
| BURNED HULK per 431(c) CVC | | X | SEAT (REAR) | X | | ALT. / GENERATOR | X | | VESSEL AS LOAD | | X | RIGHT FRONT | |
| VANDALIZED | | X | RADIO | X | | BATTERY | X | | FIREARMS | | X | LEFT REAR | |
| ENG. / TRANS. STRIP | | X | TAPE DECK | X | | DIFFERENTIAL | X | | OTHER | | X | RIGHT REAR | |
| MISC. PARTS STRIP | | X | TAPES | | | TRANSMISSION | X | | | | | SPARE | |
| BODY METAL STRIP | | X | OTHER RADIO | X | | AUTOMATIC | | | | | | HUB CAPS | |
| SURGICAL STRIP per 431(b) CVC | | X | IGNITION KEY | | X | MANUAL | | | | | | SPECIAL WHEELS | |

RELEASE VEHICLE TO: ☒ R/O OR AGENT ☐ AGENCY HOLD ☐ 22850.3 CVC
CONTACT SB50 IF RO CONTACTED

GARAGE PRINCIPAL / AGENT STORING VEHICLE (SIGNATURE)
Victor Montoya

DATE / TIME 2130  8-6-22

NAME OF PERSON / AGENCY AUTHORIZING RELEASE    I.D. NO.    DATE

CERTIFICATION: I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT I AM LEGALLY AUTHORIZED AND ENTITLED TO TAKE POSSESSION OF THE ABOVE DESCRIBED VEHICLE.

SIGNATURE OF PERSON AUTHORIZING RELEASE

SIGNATURE OF PERSON TAKING POSSESSION

☐ STOLEN VEHICLE / COMPONENT    ☐ EMBEZZLED VEHICLE    ☐ PLATE(S) REPORT

| DATE / TIME OF OCCURRENCE | DATE / TIME REPORTED | NAME OF REPORTING PARTY (R/P) | DRIVER LICENSE NO. / STATE |
|---|---|---|---|
| LAST DRIVER OF VEHICLE | DATE / TIME | ADDRESS OF R/P | TELEPHONE OF R/P ( ) |

I CERTIFY OR DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

SIGNATURE OF PERSON MAKING REPORT

**REMARKS**
(LIST PROPERTY, TOOLS, VEHICLE DAMAGE, ARRESTS)

| DRIVER'S NAME | ARRESTED / SECTION? ☐ YES ☒ NO | REPORTED BY M. Reynoso 4488 | CARGO / TYPE? ☐ YES ☒ NO | VALUE $ |
|---|---|---|---|---|

☐ BILL OF LADING ATTACHED

DRIVER FAILED TO YIELD TO DEPUTIES ATTEMPTING TO STOP VEHICLE, VEHICLE PURSUED TO 157 MIZAR, LOMPOC VEHICLE LOCKED AND CONTAINS MISC. PERSONAL PROPERTY, BODY DAMAGE RIGHT FRONT AND NUMEROUS SCRATCHES ON PAINT.

FRONT    LEFT SIDE    RIGHT SIDE    REAR    TOP

| SIGNATURE OF OFFICER TAKING REPORT | I.D. NO. 4488 | SUPERVISOR | REQUIRED NOTICES SENT TO REGISTERED ☒ YES AND LEGAL OWNERS PER 22852 CVC? ☐ NO | DATE NOTIFIED 8-8-22 |
|---|---|---|---|---|

*An Internationally Accredited Agency*

Chp180_0416.pdf

000007

4BUUV.IV

DATE: 08/08/22 TIME: 08:51
INSURANCE INFORMATION ON FILE
POSSIBLE FILE CODES: A ██████████████
REG VALID FROM: 08/10/21 TO 08/10/22
LIC#: ██████YRMD:16 MAKE:TOYT BTM :HB VIN :████████████
R/O :CELLONA CLINTON G, ███████████████    CITY:LOMPOC C.C.:42
ZIP#:93436
SOLD:00/00/16 RCID:01/20/22 OCID:08/16/16 LOCD:8
L/O :TOYOTA MTR CRDT CORP, ████████████ATLANTA CITY:GA ZIP :30348
LPT :W63160817
TYPE:11 POWR:Q VEH :12 BODY:0 CLAS:FJ
REC STATUS:
05/18/2022 NC RENEWAL NOTICE EXTRACTED
08/12/21 SMOG DUE 08/10/24

PAPERLESS TITLE

01/20/22 PREV LIC     ███████████

CLEARANCE INFORMATION RECORDS:

| OFFICE | WORK DATE | TECH/ID | SEQ # | VALUE | FICHE DATE | TTC |
|--------|-----------|---------|-------|-------|------------|-----|
| 636 | 08/10/17 | 36 | 0105 | 00285.00 | 00/00/00 | H00 |
| 692 | 03/27/18 | 11 | 0005 | 00021.00 | 00/00/00 | H00 |
| RJ1 | 08/13/18 | 30 | 7025 | 00323.00 | 00/00/00 | POT |
| RJ6 | 08/01/19 | 42 | 7535 | 00311.00 | 00/00/00 | POT |
| RJ2 | 08/05/20 | 71 | 0140 | 00303.00 | 00/00/00 | POT |
| 692 | 04/15/21 | 14 | 7015 | 00023.00 | 04/17/21 | H00 |
| 692 | 08/10/21 | 12 | 7024 | 00292.00 | 08/12/21 | H05 |
| 692 | 01/20/22 | 08 | 0022 | 00000.00 | 00/00/00 | H00 |

08/09/2016-ODOMETER:        11 MILES   ACTUAL MILEAGE

END

000008

```
4BUUV.IA
 QV.CA0420000.LIC/██████████


INQUIRY MATCH ON LIC/████████
TOWED/STORED VEHICLE
REF/SMITTYS TOWING 805 683 8982
LIC/████████ LIS/CA LIY/2022 LIT/PC
2016 TOYT PRI SW GRY VIN/████████████████
ORI/CA0420000 OCA/22-9155 FCN/5082221803376
DOT/20220806
NOA/N
ENT/ON CALIF FILE ONLY
IMMEDIATELY CONFIRM WITH ORI/CA0420000 SANTA BARBARA CO SO MNE/SBB0
TELEPHONE 805 681-4180 IF NO ANSWER CALL TELEPHONE 805 681-4100

*********   END OF SVS MESSAGE   **********

NO VEHICLE HIT IN WPS
*********   END OF WPS MESSAGE   **********
```

000009

Printed for: PS209375847                                          Tue Aug 09 07:14:13 2022

```
4BUUV.ID

DATE:08-09-22*TIME:07:13*

DMV RECORD FOR LAW ENFORCEMENT USE ONLY

DL/NO:███████*B/D:██████████*NAME:CELLONA CLINTON GUMEAUX*
MAIL ADDR AS OF 06-14-19:███████████LOMPOC 93436*
OTH/ADDR AS OF 04-24-18:████████████LOMPOC *

IDENTIFYING INFORMATION:

SEX:MALE*HAIR:BLACK*EYES:BRN*HT:6-02*WT:189*

LIC/ISS:01-31-19*EXPIRES:02-03-24*CLASS:C NON-COMMERCIAL*
ENDORSEMENTS:NONE*
ORIGINAL DL ISSUE DATE:10-11-13*

LATEST APP:


DL TYPE:CORRECTION*ISS/DATE: 06-14-19*OFFICE: LOC*BATES:LIS*


RESTR:MUST WEAR CORRECTIVE LENSES WHEN DRIVING,

LICENSE STATUS:
   VALID*

DEPARTMENTAL ACTIONS:

NONE

CONVICTIONS:
NONE

FAILURES TO APPEAR:
NONE

ACCIDENTS:
NONE

END
```

Page 1

000010

TO BE LODGE MANUALLY BY PLAINTIFF:

911 Call audio, Aug. 6, 2022

**EXHIBIT 39**

TO BE LODGE MANUALLY BY PLAINTIFF:

Lieutenant Camarena's Patrol Unit COBAN video, Aug. 6, 2022

**EXHIBIT 68**

**EXHIBIT 69**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

\* \* \*

CLINTON CELLONA,                    )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )    CASE NO. 2:25-cv-01503
                                    )             -AH-(Ex)
COUNTY OF SANTA BARBARA,             )
DEPUTY CAMERON HOSSLI, and           )
DOES 1-10, inclusive,               )
                                    )
                Defendants.         )
_____)

**CERTIFIED TRANSCRIPT**

DEPOSITION OF KENNETH R. WALLENTINE

Via Zoom Videoconferencing

WEDNESDAY, APRIL 1, 2026

10:08 A.M. - 12:51 P.M.

REPORTED BY CAROLYNN E. SPERE, CSR #10091

THE REPORTER:  We are on the record.  My name is Carolynn Spere.  I'm a California Certified Court Reporter, CSR license number 10091.  Today's date is April 1, 2026.  This deposition is being held via videoconference equipment.  The witness and reporter are not in the same room.  The witness will be sworn remotely.

Would the witness, please, raise their right hand.

KENNETH R. WALLENTINE,

A WITNESS HEREIN, BEING FIRST DULY SWORN, WAS

EXAMINED AND TESTIFIED AS FOLLOWS:

(Technical difficulties.)

(Break taken.)

EXAMINATION

BY MR. SANGER:

Q.  We have done the oath.  Should I refer to you as Chief Wallentine or Mr. Wallentine?

A.  I've been a chief for over 20 years, so that's what most people call me but whatever is convenient, comfortable to you, Mr. Sanger.

Q.  I want to be respectful and acknowledge your

illustrious career.

Q.  Okay.  Do you understand that even though we are in a law office and not a courtroom and we are in different states, that you are under the same oath to tell the truth as if a judge and a jury was present?

A.  I do.

Q.  You understand that your testimony today is given under penalty of perjury under the laws of the United States?

A.  I do.

Q.  And do you understand that we require verbal responses like a clear yes or no?

A.  Yes, sir.

Q.  And to ensure that we get a clean transcript of today's proceedings, will you agree to wait until I finish my entire question before you begin your question?

A.  I will do my best.

Q.  And I will do the same.  If at any time you would like to take a break, please just let us know and that's okay.  The only thing that I would ask is that we not take a break during a pending question.  Do you understand that?

Q.  West Jordan.  Are you aware of what the demographic is for West Jordan with regard to people of color as a percentage of the population?

A.  I am generally aware, yes.

Q.  Okay.  We might be getting pretty close here.  I think in the statements long after the fact that you reviewed in drafting your report, there was mention of a family being present earlier in the day at 140 Alcor.  Do you recall that?

A.  I do.

Q.  And was that one of the factors that you considered in forming your opinion that this shooting was reasonable?

A.  Yes, it was.

Q.  So what specific -- we call that third-party danger.  Well, strike that.



Q.   And I think you said this.  At no time did officers observe Mr. Cellona in possession of any weapons; is that correct?

A.   Not on August 6th, 2022.

Q.   So other than the September 2021 social media post with him holding a BB gun, there is no evidence that he had any weapons at all in this case, correct?

A.   No, that's not true.

Q.   What weapons did Mr. Cellona possess with regard to this case?

A.   I don't know what he possessed.  I would disagree that there was not evidence other than the pictures.  There had been some very direct threats to harm or kill an officer and/or the officer's family.  After the events unfolded, there was a very peculiar knife that was found near where Plaintiff had been.  The knife, known has a Karambit -- Ms. Spere, that's K-A-R-A-M-B-I-T -- which looks like a large talon, if you can imagine a saber-toothed tiger talon.  It is unmistakably a deadly, offensive weapon.  I don't know that he possessed that,

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

*   *   *   *   *

I, THE UNDERSIGNED CERTIFIED SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

THAT, THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT THE TIME AND PLACE HEREIN SET FORTH; THAT ANY WITNESSES IN THE FOREGOING PROCEEDINGS, PRIOR TO TESTIFYING, WERE DULY SWORN; THAT A RECORD OF THE PROCEEDINGS WAS MADE BY ME USING MACHINE SHORTHAND, WHICH WAS THEREAFTER TRANSCRIBED UNDER MY DIRECTION; THAT THE FOREGOING IS A TRUE RECORD OF THE TESTIMONY GIVEN.

FURTHER, THAT IF THE FOREGOING PERTAINS TO THE ORIGINAL TRANSCRIPT OF A DEPOSITION IN A FEDERAL CASE, BEFORE COMPLETION OF THE PROCEEDINGS, REVIEW OF THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.

THE DISMANTLING, UNSEALING OR UNBINDING OF THE ORIGINAL TRANSCRIPT WILL RENDER THE REPORTER'S CERTIFICATE NULL AND VOID.

IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON THIS DATE:  APRIL 14, 2026.

_____

CSR NO. 10091

**EXHIBIT 13**

10/3/22 2:46 PM                              Inform Browser: 21.102.245.11 - Reports - Incident Report

# Incident Detail Report

Data Source: **Data Warehouse**
Incident Status: **Closed**
Incident number: PSAP220071720
Case Numbers: 220009155
Incident Date: 8/6/2022 18:52:23
Report Generated: 10/3/2022 14:46:00

| | | | |
|---|---|---|---|
| Incident Type: | Penn | Alarm Level: | |
| Priority: | F | Problem: | TRAFFIC STOP |
| Determinant: | | Agency: | Law |
| Base Response#: | 08062022-0009075 | Jurisdiction: | PSAP |
| Confirmation#: | | Division: | PSAP |
| Taken By: | Hargreaves, Kristen | Battalion: | S.MRA |
| Response Area: | Santa Maria | Response Plan: | |
| Disposition: | Report to Follow RTF | Command Ch: | |
| Cancel Reason: | | Primary TAC: | |
| Incident Status: | Closed | Secondary TAC: | |
| Certification: | Patrol | Delay Reason (if any): | |
| Longitude: | 120436646 | Latitude: | 34863085 |

| | | |
|---|---|---|
| Location Name: | | County: |
| Address: | | Location Type: |
| Apartment: | | Cross Street: |
| Building: | | Map Reference: |
| City, State, Zip: | | |

| | |
|---|---|
| Caller Name: | Call Back Phone: |
| Method Received: | Caller Location: |
| Caller Type: | Caller Location Phone: |
| Caller Address: | Caller Apartment: |
| Caller Building: | Caller County: |
| Caller City, State, Zip: | |

| Description | Date | Time | User | Description | Time |
|---|---|---|---|---|---|
| Phone Pickup | 8/6/2022 | 18:52:23 | | | |
| 1st Key Stroke | 8/6/2022 | 18:52:23 | | Received to In Queue | 00:00:00 |
| In Waiting Queue | 8/6/2022 | 18:52:23 | | Call Taking | 00:00:00 |
| Call Taking Complete | 8/6/2022 | 18:52:23 | Hargreaves, Kristen | In Queue to 1st Assign | 00:00:00 |
| 1st Unit Assigned | 8/6/2022 | 18:52:23 | | Call Received to 1st Assign | 00:00:00 |
| 1st Unit Enroute | 8/6/2022 | 18:52:23 | | Assigned to 1st Enroute | 00:00:00 |
| 1st Unit Arrived | 8/6/2022 | 18:52:23 | | Enroute to 1st Arrived | 00:00:00 |
| Closed | 8/6/2022 | 21:47:06 | Hargreaves, Kristen | Incident Duration | 02:54:43 |

| Unit | Primary Flag | Assigned | Disposition | Enroute | Staged | Arrived | At Patient | Delay Avail | Complete | Odm. Enroute | Odm. Arrived | Cancel Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3231 | Y | 18:52:23 | Report to Follow RTF | 18:52:23 | | 18:52:23 | | | 21:47:05 | | | |
| K93 | N | 18:53:19 | | | | | | | 21:26:24 | | | |
| 32X4 | N | 18:54:57 | Report to Follow RTF | | | | | | 21:47:06 | | | |
| 3233 | N | 18:55:08 | | | | | | | 20:51:47 | | | |
| COP2 | N | 18:56:20 | | 19:01:03 | | 19:37:29 | | | 21:09:41 | | | |
| 3435 | N | 19:02:18 | | | | | | | 20:19:44 | | | |
| 3434 | N | 19:07:55 | | | | | | | 21:14:30 | | | |
| CHR | N | 19:17:46 | | | | | | | 20:34:56 | | | |
| 3655 | N | 19:25:13 | | | | | | | 21:13:16 | | | |
| 54M1 | N | 19:27:11 | | | | | | | 20:34:52 | | | |
| K93 | N | 21:37:11 | | | | | | | 21:47:06 | | | |

| Unit | Name |
|---|---|
| 3231 | Reynoso, Michael (P4988) |
| K93 | Davis, Tyler (P4311) - Patrol (Sworn) |
| 32X4 | Frawley, David C (P36751 - Patrol (Sworn) |
| 3233 | Hossli, Cameron (P4199) - Patrol (Sworn) |
| 3435 | Evert, Tyler (P5562) - Patrol (Sworn) |
| 3434 | Strange, Charles (P6054) - Patrol (Sworn) |
| 3655 | Camarena, Juan Manuel (P2819) - Patrol (Sworn) |
| K93 | Davis, Tyler (P4311) - Patrol (Sworn) |

No Caution Notes found

https://cadbrowser.sosheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=344-286&d=ra



EXHIBIT
13
Hossli

1/22
000053

# EXHIBIT 13

10/5/22, 2:46 PM                                    Inform Browser - 21.102.245.17 - Reports - Incident Report

No Pre-Scheduled Information

No Transports Information

No Transports Information

| Date | Time | User | Type | Conf. | Comments |
|------|------|------|------|-------|----------|
| 8/6/2022 | 18:52:24 | KAH5005 | Response | Y | (Query) 3231 Vehicle By Plate: C.8TGJ780,CA,PC [Return] Request Date/Time:08/06/2022 18:52:23Response Date/Time:08/06/2022 18:52:26Requested By:Reynoso Michael,Operator:Hargreaves, Kristen,Unit:3231Incident #:PSAP220071720Transaction Type:Vehicle CheckTotal Results:2Return for query [Plate Check] sent to [ConnectCIC]: 4A2XW00HNPS.!A QV.CA0420000,LIC/8TGJ780,LIS/C NO HITS IN SVS NEAR MISS IN SVS ON 8TGJ780 8MGJ780 CA LOST/STOLEN PLATES FCN/2742203404061 ********* END OF SVS MESSAGE ********* NO VEHICLE HIT IN WPS ********* END OF WPS MESSAGE ********* Return for query [Plate Check] sent to [ConnectCIC]: 4A2XW00HNPU.IV DATE: 08/06/22 TIME: 18:52 INSURANCE INFORMATION ON FILE REG VALID FROM: 08/10/21 TO 08/10/22 LIC# 8TGJ780 YRMD:16 MAKE:TOYT BTM :HB VIN :JTDKBRFU9G3524502 |
| 8/6/2022 | 18:52:36 | KAH5005 | Response | Y | R/O :CELLONA CLINTON G, ▮▮▮▮▮▮ SOLD 00/00/16 NCID:01/20/22 OCID:08/15/16 LOCD:8 L/O TOYOTA MTR CRDT CORP, PO BX 105386, ATLANTA CITY,GA ZIP :30348 LPT :W83160817 TYPE:11 POWR:Q VEH :12 BODY:0 CLAS:FJ REC STATUS 05/18/2022 NC RENEWAL NOTICE EXTRACTED 08/12/21 SMOG DUE 08/10/24 PAPERLESS TITLE 01/20/22 PREV LIC DRCLINT CLEARANCE INFORMATION RECORDS: OFFICE WORK DATE TECH/ID SEQ # VALUE FICHE DATE ITC 636 08/10/17 36 0105 00265.00 00/00/00 H00 692 03/27/18 11 0005 00021.00 00/00/00 H00 RJ1 06/13/18 30 7025 00323.00 00/00/00 POT RJ6 08/01/19 42 7535 00311.00 00/00/00 POT RJ2 06/05/20 71 6140 00303.00 00/00/00 POT 692 04/15/21 14 7015 00023.00 04/17/21 H00 692 08/10/21 12 7024 00292.00 08/12/21 H05 692 01/20/22 08 0022 00000.00 00/00/00 H00 08/09/2016-ODOMETER: 11 MILES ACTUAL MILEAGE END |
| 8/6/2022 | 18:52:54 | KAH5005 | Response | Y | 3231 ▮▮▮▮▮▮▮▮▮▮▮ SANTA BARBARA COUNTY WARRANT SEARCH. This workstation can view ACTIVE WARRANTS only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 8/6/2022 | 18:53:08 | JAW5089 | Response | Y | 52% *-THIS IS NOT AN ABSTRACT-* ▮▮▮▮▮▮▮▮▮▮▮▮▮ 52% *-THIS IS NOT AN ABSTRACT-* |
| 8/6/2022 | 18:53:19 | KAH5005 | Response | Y | Backed up 3231 with K93 |
| 8/6/2022 | 18:53:34 | KAH5005 | Response | Y | 3231 ▮▮▮▮▮▮▮▮▮ FROM ▮▮▮▮▮ / PURSUIT |
| 8/6/2022 | 18:53:49 | KAH5005 | Response | Y | 3231 ONE TCING BEHIND ME / APPROACHING ▮▮▮▮▮▮ |

# EXHIBIT 13

10/3/22, 2:40 PM                                                          Inform Browser : 21.102.245.11 – Reports – Incident Report

| Date | Time | Unit | Type | | Description |
|---|---|---|---|---|---|
| | | | | | AND ▓▓▓▓▓▓ |
| 8/6/2022 | 18:53:55 | KAH5005 | Response | Y | CODE 33 ISSUED |
| 8/6/2022 | 18:54:05 | JAW5090 | Response | Y | [Notification] [Law]-1 CHP UNIT INVOLV / STARTING ADDITIONAL |
| 8/6/2022 | 18:54:10 | KAH5005 | Response | Y | 3231 CONT EB ON ▓▓▓▓▓ APPROACHING ▓▓▓ |
| 8/6/2022 | 18:54:34 | KAH5005 | Response | Y | 3231 75 MPH ▓ |
| 8/6/2022 | 18:54:49 | KAH5005 | Response | Y | 32X4 NUMBER AND 33 IS NUMBER 4 BEHIND ME / NUMBER 1 SB APPROACHING ▓▓▓ AT 100 |
| 8/6/2022 | 18:54:57 | KAH5005 | Response | Y | Backed up 3231 with 32X4 |
| 8/6/2022 | 18:55:08 | KAH5005 | Response | Y | Backed up K93 with 3233 |
| 8/6/2022 | 18:55:14 | KAH5005 | Response | Y | 32X4 92 PASSING CLARN CONT SB |
| 8/6/2022 | 18:55:26 | KAH5005 | Response | Y | 32X4 PASSED CHP AT UNION VALLEY SEE IF THEY CAN TAKE OVER |
| 8/6/2022 | 18:55:39 | KAH5005 | Response | Y | K93 WNT ME TO BUMP UP? 32X4 NEG FOR NOW |
| 8/6/2022 | 18:55:50 | KAH5005 | Response | Y | 32X4 100 MPH / IN THE NUMBER 2 LANE |
| 8/6/2022 | 18:56:06 | KAH5005 | Response | Y | 32X4 SEE IF WE CAN GET AN AIRSHIP |
| 8/6/2022 | 18:56:20 | KAH5005 | Response | Y | Backed up 3233 with COP2 |
| 8/6/2022 | 18:56:25 | KAH5005 | Response | Y | SENDING AVIATION MANAGEMENT PAGE NOW |
| 8/6/2022 | 18:56:46 | KAH5005 | Response | Y | 32X4 PASSED MC'S AND 2 OTHER VEHS BUT STILL SB APPROACHING ▓▓▓ AT 95 |
| 8/6/2022 | 18:57:05 | KAH5005 | Response | Y | 32X4 OG WANTY 3231 UNSAFE LANE CHANGES AND FAILURE TO STOP AT RED |
| 8/6/2022 | 18:57:22 | KAH5005 | Response | Y | [Notification] [Law]-32X4 LATE MODEL GREY TOY PRIUS OR SIMILAR |
| 8/6/2022 | 18:57:52 | KAH5005 | Response | Y | 3235 THAT UNIT WENT EB CLARK HES NOT RESPONDING FOR CHP |
| 8/6/2022 | 18:58:10 | KAH5005 | Response | Y | 32X4 TAKING CUT OFF TOWARDS VAFB |
| 8/6/2022 | 18:58:22 | KAH5005 | Response | Y | [Notification] [Law]-K93 ADV 34 UNITS SUBJS PARENTS LIVE ON MAISAR IN THE 34 AREA HE MIGHT BE ER THERE |
| 8/6/2022 | 18:58:29 | RMO5204 | Response | Y | [Notification] [Law] CHP UNIT NOT ABLE TO TAKE OVER - 1 UNIT BROKE DOWN - NEXT CLOSEST IS FROM BRADLEY/PATTERSON AND OTHER IN BUELLTON |
| 8/6/2022 | 18:58:36 | RMO5204 | Response | Y | [Notification] [Law]-THEY WERE GIVEN ALL UPDATED AND INFO |
| 8/6/2022 | 18:58:38 | KAH5005 | Response | Y | 3231 UNK AMOUNT OF OCCPANTS IN THE VEH |
| 8/6/2022 | 18:58:49 | KAH5005 | Response | Y | 32X4 CONT VAFB / 79 / NUMBER 1 LANE / WE HAVE PASSED 3 VEHS |
| 8/6/2022 | 18:58:58 | KAH5005 | Response | Y | 3239 TRAILING AND CAN TRAFF BREAK IF NEEDED |
| 8/6/2022 | 18:59:20 | KAH5005 | Response | Y | K93 ALSO HAS A HX OF THREATS TOWARDS LE |
| 8/6/2022 | 18:59:35 | KAH5005 | Response | Y | 32X4 CONT TOWARDS VAFB / TRAFF LIGHT BACK UP TO 100 |
| 8/6/2022 | 18:59:52 | KAH5005 | Response | Y | 32X4 LET VAFB KNOW WE ARE COMING |
| 8/6/2022 | 18:59:59 | KAQ4004 | Response | Y | [Notification] [Law]-VAFB ADVISED |
| 8/6/2022 | 19:00:07 | KAH5005 | Response | Y | [Notification] [Law]-32X4 AT THE BASE OF THE GRADE COMING UP ON SAN ANTONIO NOW |
| 8/6/2022 | 19:00:25 | JAW5090 | Response | Y | RO IS 1036F / 1036M / HX OF CO PROB FOR 243(D) / VALID S / REST TO CORR LENSES / ACTIVE CO PROB OUT OF SLO FOR 69 / REST SUBJ IN 7 ROS |
| 8/6/2022 | 19:01:00 | KAH5005 | Response | Y | 32X4 SUSP VEH GOING UP THE GRADE |
| 8/6/2022 | 19:01:16 | SMM4067 | Response | Y | [Notification] [Law]-NEXT CHP UNIT IS ENRT FROM 136/JSO N Y /// ADVISES IF WE KNOW WHO THE DRIVE IS IT'S UNLIKELY THEY WILL TAKE OVER THE PURSUIT |
| 8/6/2022 | 19:01:21 | KAH5005 | Response | Y | 32X4 ONE UNSAFE PASS INTO THE NUMBER 2 AND AROUND |
| 8/6/2022 | 19:02:18 | JAW5090 | Response | Y | Backed up 3231 with 3435 |
| 8/6/2022 | 19:02:21 | KAH5005 | Response | Y | 32X4 COMING TO THE STOP AT VAFB |
| 8/6/2022 | 19:02:29 | JAW5090 | Response | Y | Secondary Location for 3435: ▓▓▓▓▓▓▓ |
| 8/6/2022 | 19:02:35 | JAW5090 | Response | Y | 3435 ▓▓▓▓▓ |
| 8/6/2022 | 19:02:41 | JAW5099 | Response | Y | Active Address: ▓▓▓▓▓▓ |
| 8/6/2022 | 19:02:46 | KAH5005 | Response | Y | 32X4 BLEW THE RED MAKING A LEFT / CONFIRMING SUSP IS KNOWN? |
| 8/6/2022 | 19:03:55 | KAH5005 | Response | Y | 32X4 CONT TOWARDS ▓▓▓ |
| 8/6/2022 | 19:04:55 | KAH5005 | Response | Y | 32X4 PASSING ▓▓▓▓▓ HEADING TOWARDS THE ▓▓▓ AT 100 NUMBER 1 LANE |
| 8/6/2022 | 19:05:10 | KAH5005 | Response | Y | 32X4 PASSING ON THE LEFT SHOULDER / DISCONTINUE |
| 8/6/2022 | 19:05:26 | KAH5005 | Response | Y | 3635 COPIED |
| 8/6/2022 | 19:05:33 | KAH5005 | Response | Y | 32X4 EXITED 2 11 TO ▓▓▓ |
| 8/6/2022 | 19:05:35 | KAH5005 | Response | Y | TURNING EB |
| 8/6/2022 | 19:06:50 | KAH5005 | Response | Y | 32X4 ER TO CHECK ADDRESS |
| 8/6/2022 | 19:07:12 | KAH5005 | Response | Y | K93 TO 3434 CAN YOU HOLD ▓▓▓ |
| 8/6/2022 | 19:07:15 | KAH5005 | Response | Y | 3434 AFFIRM |
| 8/6/2022 | 19:07:31 | SMM4067 | Response | Y | [Notification] [Law]-CHP SANTA MARIA UNITS HAVE DROPPED OUT OF PURSUIT 2 CHP BUELL UNITS HEADING TO ▓▓▓ |
| 8/6/2022 | 19:07:55 | KAH5005 | Response | Y | Backed up 32X4 with 3434 |
| 8/6/2022 | 19:07:57 | KAH5005 | Response | Y | Secondary Location for 3434: ▓▓▓▓▓ |
| 8/6/2022 | 19:08:03 | KAH5005 | Response | Y | Secondary Location for 32X4: ▓▓▓▓ |
| 8/6/2022 | 19:08:17 | KAH5005 | Response | Y | 32X4 VEH IN THE DRIVEWAY |

# EXHIBIT 13

10/3/22, 7:46 PM
Inform Browser  21.102.245.11 - Reports - Incident Report

| Date | Time | ID | Type | | Content |
|---|---|---|---|---|---|
| 8/6/2022 | 19:08:36 | KAH5005 | Response | Y | Secondary Location for 3435 ███████ |
| 8/6/2022 | 19:08:54 | KAH5005 | Response | Y | K93 NEED A UNIT TO THE BACK SOUNDS LIKE HE MAY BE HEADING NORTH |
| 8/6/2022 | 19:08:58 | KAH5005 | Response | Y | 3435 ER TO THE BACK |
| 8/6/2022 | 19:09:24 | KAH5005 | Response | Y | 32X4 MOVING INTO THE BACKYARD |
| 8/6/2022 | 19:09:41 | KAH5005 | Response | Y | 32X4 WE NEED A UNIT TO THE FRONT OF THE STREET / 31 ER |
| 8/6/2022 | 19:10:00 | KAH5005 | Response | Y | COP2 ETA 15 MIN |
| 8/6/2022 | 19:10:11 | SMM1087 | Response | Y | (Notification) [Law]-CHP BUELLTON UNITS CONTINUING IN |
| 8/6/2022 | 19:10:40 | KAH5005 | Response | Y | 3435 IM ON ALCOR |
| 8/6/2022 | 19:11:04 | KAH5005 | Response | Y | 32X4 BROKEN FENCE LEADING NB IN THE AREA TO 140-148 |
| 8/6/2022 | 19:11:17 | KAH5005 | Response | Y | 32X4 2 STORY TAN HOUSE IS ONE W BROKEN FENCE |
| 8/6/2022 | 19:11:31 | KAH5005 | Response | Y | 3434 DESC? 32X4 NEG |
| 8/6/2022 | 19:11:40 | KAH5005 | Response | Y | K93 DARK COMPLEX 602/603 ABOUT 195 LBS |
| 8/6/2022 | 19:11:42 | KAQ4064 | Response | Y | (Notification) [Law]-PRIOR AT ███████ 07/18/2022 - CLINTON CELONA - THREATENED FINANCIAL SERVICES THAT HE WOULD COME TO THE OFFICE AND MURDER SOMEONE IF ANYONE SHOWED UP TO REPOSSESS HIS VEH |
| 8/6/2022 | 19:12:14 | KAH5005 | Response | Y | 3435 SUBJ RUNNING AWAY FROM ME ON ALCOR |
| 8/6/2022 | 19:12:26 | KAH5005 | Response | Y | 3435 EB ALCOR |
| 8/6/2022 | 19:12:33 | KAH5005 | Response | Y | 32X4 GET A PERIM ON THE E END OF THE STREET |
| 8/6/2022 | 19:13:05 | KAH5005 | Response | Y | 32X4 WE NEED A UNIT AT ███████ |
| 8/6/2022 | 19:13:19 | KAH5005 | Response | Y | 32X4 NEED ONE AT ███████ / SET PERIM AND WE WILL DEPLOY K9 |
| 8/6/2022 | 19:13:57 | JAW5099 | Response | Y | CHP TO HANDLE PERIMETER SPOTS |
| 8/6/2022 | 19:14:00 | KAH5005 | Response | Y | NEED A UNIT VAN/FALCON |
| 8/6/2022 | 19:14:08 | KAH5005 | Response | Y | Secondary Location for 3231 ███████ |
| 8/6/2022 | 19:14:21 | KAH5005 | Response | Y | K93 UNIT ON ███████ STAY THERE |
| 8/6/2022 | 19:14:35 | KAH5005 | Response | Y | 32X4 HAVE UNITS TURN OVERHEADS ON |
| 8/6/2022 | 19:15:25 | KAH5005 | Response | Y | Secondary Location for 3231 ███████ |
| 8/6/2022 | 19:16:14 | KAH5005 | Response | Y | CALLING 54 FOR PERIM SPOT AT ███████ |
| 8/6/2022 | 19:16:44 | JAW5099 | Response | Y | CALLING 54 TO HANDLE PERIMTER SPOT |
| 8/6/2022 | 19:17:32 | KAH5005 | Response | Y | 3231 CHPJ AT ███████ |
| 8/6/2022 | 19:17:46 | KAH5005 | Response | Y | Secondary Location for CHPJ ███████ |
| 8/6/2022 | 19:17:47 | KAH5005 | Response | Y | Backed up 32X4 with CHPJ |
| 8/6/2022 | 19:18:03 | KAH5005 | Response | Y | 32X4 SEE IF WE CAN A BOOKING PHOTO ATTACHED |
| 8/6/2022 | 19:18:34 | KAH5005 | Response | Y | 3233 POSS DESC BB CAP GLASSES BUTTON UP SHIRT AND BLUE JEANS |
| 8/6/2022 | 19:19:21 | KAH5005 | Response | Y | K93 34 UNIT SAW THE SUBJ ON ███████ NOT ON ███████ |
| 8/6/2022 | 19:19:41 | JAW5099 | Response | Y | Attachment BOOKING PHOT - CELLONA added |
| 8/6/2022 | 19:20:54 | KAH5005 | Response | Y | 3435 INFO I SAW RUNNING DID HAVE A BLACK BEARD ███████ |
| 8/6/2022 | 19:22:38 | KAH5005 | Response | Y | 32X4 POSS SUSP MAY BE DOWN IN THE YARD IN THE ███████ |
| 8/6/2022 | 19:23:05 | KAH5005 | Response | Y | REVERSE 911 FOR 6 BLOCK AREA |
| 8/6/2022 | 19:23:27 | KAH5005 | Response | Y | 3233 ███████ |
| 8/6/2022 | 19:23:37 | KAH5005 | Response | Y | 3231 ███████ |
| 8/6/2022 | 19:23:55 | KAH5005 | Response | Y | 32X4 ███████ |
| 8/6/2022 | 19:24:06 | KAH5005 | Response | Y | 3434 ███████ TO THE FRONT W THE HOMEOWNER |
| 8/6/2022 | 19:24:15 | KAH5005 | Response | Y | 3434 ███████ |
| 8/6/2022 | 19:24:24 | KAH5005 | Response | Y | K93 ███████ |
| 8/6/2022 | 19:24:34 | KAH5005 | Response | Y | Secondary Location for K93 ███████ |
| 8/6/2022 | 19:24:46 | KAH5005 | Response | Y | Secondary Location for 3435 ███████ |
| 8/6/2022 | 19:24:52 | KAH5005 | Response | Y | Secondary Location for 3434 ███████ |
| 8/6/2022 | 19:25:05 | KAH5005 | Response | Y | Secondary Location for 32X4 ███████ |
| 8/6/2022 | 19:25:13 | KAH5005 | Response | Y | Secondary Location for 36S5 ███████ |
| 8/6/2022 | 19:25:13 | KAH5005 | Response | Y | Backed up 32X4 with 36S5 |
| 8/6/2022 | 19:25:23 | KAH5005 | Response | Y | Secondary Location for 3233 ███████ |
| 8/6/2022 | 19:25:39 | KAH5005 | Response | Y | K93 TO COP2 / IF YOU HAVE ABILITY TO MAKE K9 ANNOUCNENTS / COP2 AFFIRM |
| 8/6/2022 | 19:26:04 | KAH5005 | Response | Y | Secondary Location for 36S5 ███████ |
| 8/6/2022 | 19:26:04 | KAH5005 | Response | Y | Secondary Location for 32X4 ███████ |
| 8/6/2022 | 19:26:37 | KAH5005 | Response | Y | 32X4 SEE IF 54 HAS A COUPLE UNITS |
| 8/6/2022 | 19:26:51 | KAH5005 | Response | Y | 54M1 COMING INTO ███████ NOW AND IM THE ONLY UNIT AVAIL |
| 8/6/2022 | 19:27:04 | JAW5099 | Response | Y | 54 ADVD OF REQ |
| 8/6/2022 | 19:27:11 | KAH5005 | Response | Y | Secondary Location for 54M1 ███████ |
| 8/6/2022 | 19:27:11 | KAH5005 | Response | Y | Backed up 32X4 with 54M1 |
| 8/6/2022 | 19:31:53 | KAH5005 | Response | Y | K93 RE-POSITIONING TO X / 31 HOLDING WHERE I WAS |

https://cadbrowser.sbsheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=1444256&dsm

4/22

000056

# EXHIBIT 13

10/3/22  2:46 PM                                      Inform Browser - 21.102.245.11 - Reports - Incident Report

| Date | Time | Unit | Type | | Text |
|---|---|---|---|---|---|
| 8/6/2022 | 19:32:02 | KAH5005 | Response | Y | Secondary Location for K93 ██████ |
| 8/6/2022 | 19:32:08 | KAH5005 | Response | Y | 3434 OUT FRONT W MOTHER AND SISTER AT THE RESD |
| 9/6/2022 | 19:32:20 | KAH5005 | Response | Y | 3434 HE DOESNT LIVE HERE HE JUST RAN HERE |
| 8/6/2022 | 19:33:09 | KAH5005 | Response | Y | 32X4 ██████ |
| 8/6/2022 | 19:33:22 | KAH5005 | Response | Y | 54 UNIT TOOK MY POSITION / 36S5 K9 AND I ARE AT |
| 8/6/2022 | 19:33:29 | KAH5005 | Response | Y | Secondary Location for K93 ██████ |
| 8/6/2022 | 19:33:29 | KAH5005 | Response | Y | Secondary Location for 36S5 ██████ |
| 8/6/2022 | 19:33:29 | KAH5005 | Response | Y | Secondary Location for 32X4 ██████ |
| 8/6/2022 | 19:37:11 | KAH5005 | Response | Y | 32X4 INFO FROM 54 / SUBJ MAY BE ASSOC W SOMEONE AT |
| 8/6/2022 | 19:37:36 | KAH5005 | Response | Y | COP2 CHECKING |
| 8/6/2022 | 19:38:47 | KAH5005 | Response | Y | 3434 TO 32X4 HAS THE HOUSE BEEN CLEARED? 32X4 NEG WE HEARD THE FENCE BREAKING AND FRESH SIGNS OF BREAK OUT THE BACK |
| 8/6/2022 | 19:39:43 | KAH5005 | Response | Y | 32X4 ADV OF CAUTION NOTE ON ██████ |
| 8/6/2022 | 19:40:31 | KAH5005 | Response | Y | COP2 FRONT GATE OF ██████ IS SLIGHTLY AJAR WITH IS ALIGN WHERE THE BACK FENCE IS OPEN / HE PROB CONT N3 ACROSS |
| 8/6/2022 | 19:41:09 | KAH5005 | Response | Y | 32X4 TO COP2 / WE HAVE NOT CONFIRMED IF ITS RELATED / ONE OF THE UNITS SAW A SUBJ RUNNING EB ██████ BUT HE DID HAVE A BEARD / COP2 CHECING / 32X4 GOING TO GO THROUGH ██████ BACKYARD AND START A TRACK |
| 8/6/2022 | 19:41:25 | KAH5005 | Response | Y | K93 MOM SAID SHE SAW HIM / CAN YOU GET AN EXACT DESC |
| 8/6/2022 | 19:41:29 | KAH5005 | Response | Y | 3434 MOM SAID HE HAD A LIGHT BEARD |
| 8/6/2022 | 19:41:46 | KAH5005 | Response | Y | 32X4 CAN YOU ATTEMPT TO GIVE K9 ANNOUNCEMENTS |
| 8/6/2022 | 19:46:25 | KAH5005 | Response | Y | COP2 TO K93 LET ME KNOW WHEN YOU START / K93 WE ARE STARTING |
| 8/6/2022 | 19:46:50 | KAH5005 | Response | Y | K93 PASSING ██████ NOW |
| 8/6/2022 | 19:51:15 | RMO5204 | Response | Y | [Notification] [Law]-MARIA @ ██████ HEARD WHAT SOUNDED LIKE SOMEONE OUTSIDE RUNNING TWDS HER FRONT DOOR, 5 AGO |
| 8/6/2022 | 19:51:21 | RMO5204 | Response | Y | [Notification] [Law]-DOG WAS ALSO BARKING |
| 8/6/2022 | 19:51:31 | RMO5204 | Response | Y | [Notification] [Law]-NO DESC NO VISUAL, RP I NHER BEDROOM |
| 8/6/2022 | 19:51:31 | KAH5005 | Response | Y | 32X4 TO 31 / BRING YOUR UNIT TO MY POSITION |
| 8/6/2022 | 19:51:44 | KAH5005 | Response | Y | 32X4 GOING TO HAVE 31 RELOCATE TO ██████ |
| 8/6/2022 | 19:51:48 | KAH5005 | Response | Y | Secondary Location for 3231 ██████ |
| 8/6/2022 | 19:51:55 | RMO5204 | Response | Y | [Notification] [Law]-PRIOR TO THAT SAW A WHITE SEDAN PARKING IFO HER OCC BY A MALE, NEVER SEEN BEFORE |
| 8/6/2022 | 19:52:33 | RMO5204 | Response | Y | [Notification] [Law]-NO CLOTHING DESC ON VEH OCCUPANT DRK HAIR POSS FACIAL HAIR |
| 8/6/2022 | 19:53:12 | RMO5204 | Response | Y | DIDNT HEAR ANYMORE FOOTSTEPS AFTER IT SOUNDED LIKE HE REACHED THE FRONT DOOR AREA |
| 8/6/2022 | 19:54:06 | RMO5204 | Response | Y | MARIA ██████ // WOULD LIKE CONTACT AT SOME POINT |
| 8/6/2022 | 19:54:18 | KAH5005 | Response | Y | 32X4 ADV |
| 8/6/2022 | 19:54:40 | KAH5005 | Response | Y | COP2 CHEKING ██████ |
| 8/6/2022 | 19:55:01 | KAH5005 | Response | Y | 32X4 TO 3434 WHERE DID YOU LOSE SIGHT OF THE SUBJ RUNNING EB? LOST SIGHT WHEN HE TURNED LEFT ONTO ██████ |
| 8/6/2022 | 19:55:07 | KAH5005 | Response | Y | 3435' |
| 8/6/2022 | 19:56:49 | SMM4067 | Response | Y | [Notification] [Law]-RP AT ██████ ADV 30 AGO 2 MALES IN GRAY PICK UP WEARING MASKS DROVE INTO SCHOOL PARKING LOT , THEY THEN LEFT TOWARD ██████ THEY WERE LOOKING UP AT THE COPTER WERE DRIVING ERRATICALLY/FAST |
| 8/6/2022 | 19:57:05 | SMM4067 | Response | Y | [Notification] [Law] |
| 8/6/2022 | 19:57:26 | SMM4067 | Response | Y | [Notification] [Law]-UNK 28 ON THE GRAY PICK UP, L'S UP TOWARD COUNTRY CLUB AREA |
| 8/6/2022 | 19:57:27 | KAH5005 | Response | Y | COP2 UTL ANYTHING ON |
| 8/6/2022 | 19:58:41 | KAH5005 | Response | Y | 32X4 INFO 34 JUST GOT INFO FROM NEIGHBOR THAT HOUSE AT ██████ S UNOCC'D AND UNLOCKED UNK IF SUBJ IS INSIDE |
| 8/6/2022 | 20:01:13 | KAH5005 | Response | Y | 3434 TO K93 / OWNER SAID SLIDER IS OPEN / NO NEED TO FORCE ENTRY |
| 8/6/2022 | 20:02:38 | KAH5005 | Response | Y | 32X4 TO 3231 / MOVE UP TO WHERE WE ARE |
| 8/6/2022 | 20:02:56 | KAH5005 | Response | Y | Secondary Location for K93 ██████ |
| 8/6/2022 | 20:02:56 | KAH5005 | Response | Y | Secondary Location for 36S5 ██████ |
| 8/6/2022 | 20:02:56 | KAH5005 | Response | Y | Secondary Location for 32X4 ██████ |
| 8/6/2022 | 20:03:14 | KAH5005 | Response | Y | 3434 TAKING 31 PERIM SPOT |
| 8/6/2022 | 20:03:21 | KAH5005 | Response | Y | Secondary Location for 3434 ██████ |

# EXHIBIT 13

10/3/22, 2:46 PM                                        Inform Browser - 21.102.245.11 - Reports - Incident Report

| Date | Time | Unit | Type | | Text |
|------|------|------|------|---|------|
| 8/6/2022 | 20:03:31 | KAH5005 | Response | Y | Secondary Location for 3231: ███████ |
| 8/6/2022 | 20:09:52 | KAH5005 | Response | Y | 32X4 ENTERING THE BACKYARD |
| 8/6/2022 | 20:10:16 | KAH5005 | Response | Y | COP2 WHEN YOU COME AROUND THE 3 SIDE THERE IS A SMALL KIDS PLAYHOUSE / I DONT SEE ANY HEAT SIGS BUT USE CAUTION / ALSO CANT SEE UNDER THE TRAMPOLINE |
| 8/6/2022 | 20:10:29 | KAH5005 | Response | Y | 3231 ███████ |
| 8/6/2022 | 20:10:35 | KAH5005 | Response | Y | Secondary Location for 3231: ███████ |
| 8/6/2022 | 20:12:54 | KAH5005 | Response | Y | K93 HOMEOWNER STATED BACK SLIDER IS OPEN BUT ITS LOCKED AND SHUT RP FROM ███████ - ███████ SHES WAITING AT THE END OF ALCOR WHERE DEPUTY TOLD HER TO WAIT. SAYS THERE IS A SHED IN HER BACKYARD WHERE SOMEONE COULD HIDE - SHE CAN UNLOCK THE GATES TO THE BACKYARD IF NEEDED |
| 8/6/2022 | 20:14:08 | RMC5204 | Response | Y | |
| 8/6/2022 | 20:14:45 | KAH5005 | Response | Y | 32X4 ADV |
| 8/6/2022 | 20:15:10 | KAH5005 | Response | Y | 32X4 TO 36S5 WHEN UNITS ARE FINISHED THERE IF ABLE RETURN TO OUR LOCATION |
| 8/6/2022 | 20:15:49 | KAH5005 | Response | Y | 32X4 INFO WE JUST GOT INFO ONE OF THE NEIGHBORS SECURED THE DOOR AT ███████ |
| 8/6/2022 | 20:18:47 | KAH5005 | Response | Y | K93 STARTING TRACKS FROM ███████ |
| 8/6/2022 | 20:19:41 | KAH5005 | Response | Y | 36S5 TO 3435 CAN YOU CLEAR AND RESPOND TO ███████ |
| 8/6/2022 | 20:20:21 | KAH5005 | Response | Y | COP2 T K9 CODE 20 FOLLOWING YOU ON THE STREET |
| 8/6/2022 | 20:23:02 | KAH5005 | Response | Y | COP2 TO K93 BACKYARD WHERE PARTNER SNOWING HAS A COVERED HOT TUB |
| 8/6/2022 | 20:23:39 | KAH5005 | Response | Y | 32X4 MAKING CONTACT W RESD AT ███████ |
| 8/6/2022 | 20:23:44 | KAH5005 | Response | Y | Secondary Location for 32X4: |
| 8/6/2022 | 20:24:17 | KAH5005 | Response | Y | 32X4 ENTERING THE BACK YARD HOMEOWNER GAVE CONSENT |
| 8/6/2022 | 20:24:46 | KAH5005 | Response | Y | COP2 HOTTUB IS IN 3-4 CORNER OF BACKYARD |
| 8/6/2022 | 20:24:55 | KAH5005 | Response | Y | 32X4 SUBJ HITTING PRETTY HARD ON THE SCENT TO THE WEST |
| 8/6/2022 | 20:25:00 | KAH5005 | Response | Y | PARTNER HITTING HARD* |
| 8/6/2022 | 20:27:17 | KAH5005 | Response | Y | COP2 TO K9 / OPEN SHED ON THE OTHER SIDE OF THE FENCE / HOUSE TO EAST JUST ON THE OTHER SIDE OF THE FENCE |
| 8/6/2022 | 20:29:51 | KAH5005 | Response | Y | 32X4 CHECKING BACKYARD AT ███████ |
| 8/6/2022 | 20:30:02 | KAH5005 | Response | Y | Secondary Location for K93: ███████ |
| 8/6/2022 | 20:30:02 | KAH5005 | Response | Y | Secondary Location for 36S5: ███████ |
| 8/6/2022 | 20:30:02 | KAH5005 | Response | Y | Secondary Location for 32X4: ███████ |
| 8/6/2022 | 20:31:19 | KAH5005 | Response | Y | COP2 NO HEAT SOURCES IN THAT YARD |
| 8/6/2022 | 20:32:00 | KAH5005 | Response | Y | K93 TERMINATING TRACK AT ███████ |
| 8/6/2022 | 20:32:07 | KAH5005 | Response | Y | 32X4 CODE 34 / RELEASE PERIM UNITS |
| 8/6/2022 | 20:32:23 | KAH5005 | Response | Y | CODE 33 LIFTED |
| 8/6/2022 | 20:32:25 | KAH5005 | Response | Y | Requested Case Number(s) issued for Incident # [PSAP220071720], Jurisdiction: PSAP. Case Number(s): 220009155, requested by 3231. |
| 8/6/2022 | 20:34:17 | KAH5005 | Response | Y | Secondary Location for COP2: SYA. |
| 8/6/2022 | 20:34:40 | KAH5005 | Response | Y | CHP ADV TO RELEASE UNITS |
| 8/6/2022 | 20:37:18 | KAH5005 | Response | Y | Secondary Location for 3253: SMSO. |
| 8/6/2022 | 20:38:04 | KAH5005 | Response | Y | Secondary Location for 32X4: ███████ |
| 8/6/2022 | 20:40:04 | KAH5005 | Response | Y | Secondary Location for COP2: SBA. |
| 8/6/2022 | 20:49:52 | JAW5099 | Response | Y | 3434 1185 ███████ |
| 8/6/2022 | 20:50:23 | JAW5099 | Response | Y | 3434 2016 TOYT GRY / LOCKED NO KEYS |
| 8/6/2022 | 20:51:48 | JAW5099 | Response | Y | SMITTYS ENRT / DRIVE TIME FROM LOMPOC UA SVS ENTRY TOWED/STORED VEHICLE REF/SMITTYS TOWING 805 683 8982 |
| 8/6/2022 | 20:54:25 | JAW5099 | Response | Y | LIC/8TGJ780 LIS/CA LIY/2022 LIT/PC 2016 TOYT PRI SW GRY VIN/JTDKBRFU9G3524502 OR#/CA0420000 OCA/22-9155 FCN/5082221803376 DOT/20220806 NOA/N ENT/ON CALIF FILE ONLY |
| 8/6/2022 | 20:54:35 | JAW5099 | Response | Y | INQUIRY MATCH ON LIC/8TGJ780 TOWED/STORED VEHICLE REF/SMITTYS TOWING ███████ LIC/8TGJ780 LIS/CA LIY/2022 LIT/PC 2016 TOYT PRI SW GRY VIN/JTDKBRFU9G3524502 OR#/CA0420000 OCA/22-9155 FCN/5082221803376 DOT/20220806 NOA/N ENT/ON CALIF FILE ONLY |

https://casbrowse.sbsheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=3444256&ds=u

EXHIBIT 13



7/22
000059

# EXHIBIT 13

10/3/22, 2:48 PM

Inform Browser - 24.102.245.11 - Reports - Incident Report



EXHIBIT 13

10/3/22, 2:40 PM

Inform Browser: 21.102.245.11 - Reports - Incident Report

https://cadbrowser.sbsheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=3444256&ds=a

9/22

000061

EXHIBIT 13

10/3/22, 2:46 PM

Inform Browser: 21.10.2.245.11 – Reports – Incident Report



https://cadbrowser.sbsheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=3444258&d=c

10/22

000062

## EXHIBIT 13

10/3/22, 2:46 PM                                    Inform Browser  21.102.245.11 - Reports - Incident Report



11/22

**000063**

# EXHIBIT 13



EXHIBIT 13

10/3/22, 2:46 PM                          Inform Browser : 71.102.245.11 - Reports - Incident Report



| Date | Time | Radio | Activity | | Log Entry |
|------|------|-------|----------|--|-----------|
| 8/6/2022 | 21:23:15 | SMM4087 | Response | Y | [Notification] [Law]-RP AT 4174 ▓ CALLING TO ADVISE APPROX 1 HOUR AGO SHE SAW SOMEONE WEARING A DARK HOODIE IN THE BACKYARD OF |
| 8/6/2022 | 21:34:16 | RMO5204 | Response | Y | [Notification] [Law]-ADDTL RP REPORTING SEEING SUBJ – AT 2045 HRS, ON ▓ ▓ MATCHES PHOTO POSTED TO FB |
| 8/6/2022 | 21:34:58 | RMO5204 | Response | Y | [Notification] [Law]-HE WAS WALKING ON THE EAST SIDE OF |
| 8/6/2022 | 21:35:06 | RMO5204 | Response | Y | |
| 8/6/2022 | 21:37:11 | KAH5005 | Response | Y | Secondary Location for K93 |
| 8/6/2022 | 21:37:11 | KAH5005 | Response | Y | Backed up 32X4 with K93 |
| 8/6/2022 | 21:37:14 | KAH5005 | Response | Y | K93 GOING TO CHECK THAT AREA |
| 8/6/2022 | 21:37:59 | KAH5005 | Response | Y | Secondary Location for K93 |
| 8/6/2022 | 21:39:52 | KAH5005 | Response | Y | K93 NOT THE SUSP |

**No Address Changes**

**No Priority Changes**

**No Alarm Level Changes**

| Date | Time | Radio | Activity | Location | Log Entry | User |
|------|------|-------|----------|----------|-----------|------|
| 8/6/2022 | 18:52:23 | | Incident in Waiting Queue | | | |
| 8/6/2022 | 18:52:24 | 3231 | [Query] | | [Query] Vehicle By Plate C▓▓▓A,PC, | KAH5005 |
| 8/6/2022 | 18:52:24 | | Waiting Pending Incident Time Warning | | Waiting Pending Incident Time Warning timer expired | |
| 8/6/2022 | 18:52:24 | | Incident Timer Clear | | Incident Timer Cleared | |
| 8/6/2022 | 18:52:24 | 3231 | At Scene | | | KAH5005 |
| 8/6/2022 | 18:52:24 | | License Plate | | Plate Number ▓▓▓ s been added. | KAH5005 |
| 8/6/2022 | 18:52:24 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 18:52:54 | | Read Comment | | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 18:52:54 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 18:53:06 | | Read Comment | | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 18:53:06 | | Read Comment | | Comment for Incident 256 was Marked as Read. | SMM4067 |
| 8/6/2022 | 18:53:06 | | Read Comment | | Comment for Incident 256 was marked as read. | JAW5099 |
| 8/6/2022 | 18:53:19 | K93 | Disp- | | Number: 08062022-0009076; | KAH5005 |
| 8/6/2022 | 18:53:19 | K93 | Update Sector | | From Sector SMSO to PSAP | KAH5005 |
| 8/6/2022 | 18:53:19 | 3231 | Unit Backed up | | Backed up with K93 | KAH5005 |
| 8/6/2022 | 18:53:19 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 18:53:51 | | Read Comment | | Comment for Incident 256 was Marked | KAH5005 |

https://cadbrowser.sbsheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=3444256&ds=a

13/22

000065

# EXHIBIT 13

10/3/22  2:46 PM      Inform Browser : 21.102.245.11 – Reports – Incident Report

| Date | Time | Unit | Action | Description | User |
|---|---|---|---|---|---|
| | | | | as Road. | |
| 8/6/2022 | 18:53:55 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 18:54:05 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 18:54:57 | 32X4 | Disp | Hwy 135 / Foster Rd; Response Number: 08062022-0009077; | KAH5005 |
| 8/6/2022 | 18:54:57 | 32X4 | Update Sector | From Sector SMSO to PSAP | KAH5005 |
| 8/6/2022 | 18:54:57 | 3231 | Unit Backed up | Backed up with 32X4 | KAH5005 |
| 8/6/2022 | 18:55:08 | 3233 | Disp | Hwy 135 / Foster Rd; Response Number: 08062022-0009078; | KAH5005 |
| 8/6/2022 | 18:55:08 | 3233 | Update Sector | From Sector SMSO to PSAP | KAH5005 |
| 8/6/2022 | 18:55:08 | K93 | Unit Backed up | Backed up with 3233 | KAH5005 |
| 8/6/2022 | 18:56:20 | COP2 | Disp | Hwy 135 / Foster Rd; Response Number: 08062022-0009079; | KAH5005 |
| 8/6/2022 | 18:56:20 | COP2 | Update Sector | From Sector ADMIN to PSAP | KAH5005 |
| 8/6/2022 | 18:56:20 | 3233 | Unit Backed up | Backed up with COP2 | KAH5005 |
| 8/6/2022 | 18:57:22 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 18:58:22 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 18:58:29 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 18:58:36 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 18:58:47 | | UserAction | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 18:59:59 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:00:06 | | Read Comment | Comment for Incident 256 was Marked as Read. | SMM4067 |
| 8/6/2022 | 19:00:07 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:00:07 | | Read Comment | Comment for Incident 256 was marked as read. | KAH6006 |
| 8/6/2022 | 19:00:53 | | UserAction | User clicked Exit/Save | JAW5088 |
| 8/6/2022 | 19:00:59 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:01:09 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:01:18 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:01:33 | COP2 | Enrt | Responding From = 4810 Foothill Rd [CARPINTERIA HIGH SCHOOL]. | KAH5005 |
| 8/6/2022 | 19:01:34 | | UserAction | User clicked Exit/Save | KAQ4064 |
| 8/6/2022 | 19:02:18 | 3435 | Disp | Hwy 135 / Foster Rd; Response Number: 08062022-0009080; | JAW5099 |
| 8/6/2022 | 19:02:18 | 3435 | Update Sector | From Sector LOSO to PSAP | JAW5099 |
| 8/6/2022 | 19:02:18 | 3231 | Unit Backed up | Backed up with 3435 | JAW5099 |
| 8/6/2022 | 19:02:29 | 3435 | At Scene 2nd | Incident ID = 3444256, 34701056, 120471209, | JAW5099 |
| 8/6/2022 | 19:02:37 | | UserAction | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 19:02:44 | | Read Comment | Comment for Incident 256 was Marked as Read. | KAQ4064 |
| 8/6/2022 | 19:02:45 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:03:12 | | Read Comment | Comment for Incident 256 was Marked as Read. | SMM4067 |
| 8/6/2022 | 19:03:17 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:03:55 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:04:27 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:04:55 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:05:52 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:06:17 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:06:30 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:07:08 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:07:13 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:07:15 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:07:31 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:07:55 | 3434 | Disp | Hwy 135 / Foster Rd; Response Number: 08062022-0009081; | KAH5005 |
| 8/6/2022 | 19:07:55 | 3434 | Update Sector | From Sector LOSO to PSAP | KAH5005 |
| 8/6/2022 | 19:07:55 | 32X4 | Unit Backed up | Backed up with 3434 | KAH5005 |
| 8/6/2022 | 19:07:57 | 3434 | At Scene 2nd | Incident ID = 3444256, 34710681, 120464619, | KAH5005 |
| 8/6/2022 | 19:08:03 | 32X4 | At Scene 2nd | Incident ID = 3444256, 34709934, 120466379, | KAH5005 |
| 8/6/2022 | 19:08:25 | | UserAction | User clicked Exit/Save | RMO5204 |

https://cadbrowser.sbsheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=3444256&dk=a

14/22

EXHIBIT 13

10/3/22, 2:40 PM                  Inform Browser : 21.102.245.11 - Reports - Incident Report

| Date | Time | Unit | Action | Detail | User |
|---|---|---|---|---|---|
| 8/6/2022 | 19:08:36 | 3435 | At Scene 2nd | Incident ID = 3444256, 34710091, 120464619, | KAH5005 |
| 8/6/2022 | 19:09:10 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:09:47 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 19:09:46 | | Read Comment | Comment for Incident 256 was Marked as Read. | KAH5005 |
| 8/6/2022 | 19:10:00 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:10:02 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:10:11 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:10:11 | | Read Comment | Comment for Incident 256 was marked as read. | SMM4067 |
| 8/6/2022 | 19:10:19 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:10:19 | | Premise History Access | Premise History Viewed | SMM4067 |
| 8/6/2022 | 19:10:26 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:10:40 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:11:42 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:12:23 | | Read Comment | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 19:12:26 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:12:52 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 19:13:02 | | Read Comment | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 19:13:05 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:14:05 | 3231 | At Scene 2nd | Incident ID = 3444256, 34714979, 120487527, | KAH5005 |
| 8/6/2022 | 19:15:18 | | UserAction | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 19:15:25 | 3231 | At Scene 2nd | Incident ID = 3444256, 34712203, 120467145, | KAH5005 |
| 8/6/2022 | 19:15:34 | | Read Comment | Comment for Incident 256 was Marked as Read. | SMM4067 |
| 8/6/2022 | 19:16:14 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:17:46 | CHP | Disp | Hwy 135 / Foster Rd; Response Number: 08062022-0009082; | KAH5005 |
| 8/6/2022 | 19:17:46 | CHP | At Scene 2nd | Incident ID = 3444256, 34.709934, -120.486379, , | KAH5005 |
| 8/6/2022 | 19:17:47 | 32X4 | Unit Backed up | Backed up with CHP | KAH5005 |
| 8/6/2022 | 19:18:45 | | Read Comment | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 19:19:21 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:19:23 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:19:26 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:19:41 | | Attachment Added | BOOKING PHOT - CELLONA added by JAW5099 | JAW5099 |
| 8/6/2022 | 19:19:42 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:19:42 | | Read Comment | Comment for Incident 256 was marked as read. | JAW5099 |
| 8/6/2022 | 19:19:53 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:20:42 | | UserAction | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 19:20:44 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:20:54 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:20:59 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:21:17 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:21:44 | | UserAction | User clicked Exit/Save | KAQ4064 |
| 8/6/2022 | 19:22:36 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:24:34 | K93 | At Scene 2nd | Incident ID = 3444256, 34712203, 120467145, | KAH5005 |
| 8/6/2022 | 19:24:43 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 19:24:46 | 3435 | At Scene 2nd | Incident ID = 3444256, 34713488, 120467020, | KAH5005 |
| 8/6/2022 | 19:24:52 | 3434 | At Scene 2nd | Incident ID = 3444256, 34709934, 120466379, | KAH5005 |
| 8/6/2022 | 19:24:57 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:25:05 | 32X4 | At Scene 2nd | Incident ID = 3444256, 34709934, 120466379, | KAH5005 |
| 8/6/2022 | 19:25:13 | 36S5 | Disp | Hwy 135 / Foster Rd; Response Number: 08062022-0009083; | KAH5005 |
| 8/6/2022 | 19:25:13 | 36S5 | Update Sector | From Sector SYVS to PSAP | KAH5005 |
| 8/6/2022 | 19:25:13 | 36S5 | At Scene 2nd | Incident ID = 3444256, 34.709934, | KAH5005 |

https://cadbrowser.sbcheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=34442/&&ds=a

15/22

000067

# EXHIBIT 13

10/3/22, 2:40 PM

Inform Browser : 21.102.245.11 - Reports - Incident Report

| Date | Time | Unit | Action | ████ | Detail | User |
|------|------|------|--------|------|--------|------|
| | | | | | -120.466379, , | |
| 8/6/2022 | 19:25:13 | 32X4 | Unit Backed up | | Backed up with 36S5 | KAH5005 |
| 8/6/2022 | 19:25:23 | | Read Comment | | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 19:25:24 | 3233 | At Scene 2nd | | Incident ID = 3444256, 34711289, 120466581, | KAH5005 |
| 8/6/2022 | 19:25:24 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:25:42 | | Read Comment | | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:26:04 | 36S5 | At Scene 2nd | | Incident ID = 3444256, 34710671, 120463958, | KAH5005 |
| 8/6/2022 | 19:26:04 | 32X4 | At Scene 2nd | | Incident ID = 3444256, 34710671, 120463958, | KAH5005 |
| 8/6/2022 | 19:26:04 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:26:36 | | Read Comment | | Comment for Incident 256 was Marked as Read. | KAQ4084 |
| 8/6/2022 | 19:26:37 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:27:10 | | Read Comment | | Comment for Incident 256 was Marked as Read. | SMM4067 |
| 8/6/2022 | 19:27:11 | 54M1 | Disp | | Hwy 135 / Foster Rd. Response Number: 08062022-0009084; | KAH5005 |
| 8/6/2022 | 19:27:11 | 54M1 | At Scene 2nd | | Incident ID = 3444256, 34.710671, -120.463958, , | KAH5005 |
| 8/6/2022 | 19:27:11 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:27:11 | 32X4 | Unit Backed up | | Backed up with 54M1 | KAH5005 |
| 8/6/2022 | 19:27:38 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:28:07 | | Read Comment | | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:28:10 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:30:21 | | UserAction | | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 19:31:53 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:31:56 | | Read Comment | | Comment for Incident 256 was Marked as Read. | SMM4067 |
| 8/6/2022 | 19:32:02 | K93 | At Scene 2nd | | Incident ID = 3444256, 34710671, 120463958 | KAH5005 |
| 8/6/2022 | 19:32:02 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:32:21 | | Read Comment | | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:33:09 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:33:29 | K93 | At Scene 2nd | | Incident ID = 3444256, 34710033, 120467767, | KAH5005 |
| 8/6/2022 | 19:33:29 | 36S5 | At Scene 2nd | | Incident ID = 3444256, 34710033, 120467767, | KAH5005 |
| 8/6/2022 | 19:33:29 | 32X4 | At Scene 2nd | | Incident ID = 3444256, 34710033, 120467767, | KAH5005 |
| 8/6/2022 | 19:37:35 | COP2 | At Scene | | | KAH5005 |
| 8/6/2022 | 19:39:38 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:39:50 | | Read Comment | | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 19:40:31 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:43:17 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:44:42 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 19:47:02 | | Read Comment | | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 19:49:51 | | UserAction | | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 19:51:15 | | Notify Comment | | (Response Viewer) | RMO5204 |
| 8/6/2022 | 19:51:15 | | Read Comment | | Comment for Incident 256 was marked as read. | JAW5099 |
| 8/6/2022 | 19:51:18 | | Read Comment | | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 19:51:21 | | Notify Comment | | (Response Viewer) | RMO5204 |
| 8/6/2022 | 19:51:21 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:51:31 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 19:51:48 | 3231 | At Scene 2nd | | Incident ID = 3444256, 34711065, 120466032 | KAH5005 |
| 8/6/2022 | 19:51:55 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 19:52:11 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 19:52:39 | | Notify Comment | | (Response Viewer) | |
| 8/6/2022 | 19:54:42 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 19:54:57 | | Read Comment | | Comment for Incident 256 was Marked as Read. | RMO5204 |

https://cadbrowser.sbsheriff.org/VisiNetBrowser/SearchIncidentReport.aspx?id=3444256&date

16/22

000068

# EXHIBIT 13

10/3/22, 2:46 PM                    Inform Browser - 71.102.245.11 - Reports - Incident Report

| Date | Time | Unit | Action | Detail | User |
|---|---|---|---|---|---|
| 8/6/2022 | 18:56:01 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:56:48 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:57:05 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:57:26 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 19:58:03 | | UserAction | User clicked Exit/Save | KAO4064 |
| 8/6/2022 | 19:58:07 | | Read Comment | Comment for Incident 256 was Marked as Read. | KAO4064 |
| 8/6/2022 | 19:58:43 | | UserAction | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 19:59:41 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 19:59:47 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 20:00:16 | | Read Comment | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 20:00:22 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 20:01:13 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:02:29 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 20:02:38 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:02:56 | 32X4 | At Scene 2nd | Incident ID = 3444256, 34710441, 120467035, | KAH5005 |
| 8/6/2022 | 20:02:56 | K93 | At Scene 2nd | Incident ID = 3444256, 34710441, 120467035, | KAH5005 |
| 8/6/2022 | 20:02:56 | 36S5 | At Scene 2nd | Incident ID = 3444256, 34710441, 120467035, | KAH5005 |
| 8/6/2022 | 20:03:21 | 3434 | At Scene 2nd | Incident ID = 3444256, 34711065, 120468032, | KAH5005 |
| 8/6/2022 | 20:03:23 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 20:03:31 | 3231 | At Scene 2nd | Incident ID = 3444256, 34710441, 120467035, | KAH5005 |
| 8/6/2022 | 20:04:55 | | Read Comment | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 20:09:52 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:09:58 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 20:10:00 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 20:10:16 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:10:35 | 3231 | At Scene 2nd | Incident ID = 3444256, 34709934, 120468379, | KAH5005 |
| 8/6/2022 | 20:18:27 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 20:19:31 | | Read Comment | Comment for Incident 256 was Marked as Read. | KAH5005 |
| 8/6/2022 | 20:19:41 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:19:44 | 3436 | Available | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 20:20:48 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 20:22:48 | | Read Comment | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 20:23:02 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:23:44 | 32X4 | At Scene 2nd | Incident ID = 3444256, 34711780, 120467988, | KAH5005 |
| 8/6/2022 | 20:24:16 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 20:24:21 | | Read Comment | Comment for Incident 256 was Marked as Read. | KAH5005 |
| 8/6/2022 | 20:24:46 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:29:36 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 20:30:02 | 32X4 | At Scene 2nd | Incident ID = 3444256, 34711638, 120468142, | KAH5005 |
| 8/6/2022 | 20:30:02 | 36S5 | At Scene 2nd | Incident ID = 3444256, 34711638, 120468142, | KAH5005 |
| 8/6/2022 | 20:30:02 | K93 | At Scene 2nd | Incident ID = 3444256, 34711638, 120468142, | KAH5005 |
| 8/6/2022 | 20:32:25 | 3231 | Requested Case Number | Requested Case Number(s) Issued for Incident #[PSAP220071720]. Jurisdiction. PSAP, Case Number(s) 220069155. | KAH5005 |
| 8/6/2022 | 20:32:28 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:32:38 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 20:34:17 | COP2 | End 2nd | Incident ID = 3444256, 0, 0, | KAH5005 |
| 8/6/2022 | 20:34:17 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:34:27 | | Read Comment | Comment for Incident 256 was Marked as Read. | KAH5005 |

https://cadbrowser.sosheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=3444256&ds=a

17/22

000069

# EXHIBIT 13

10/3/22, 2:46 PM                                        Inform Browser : 21.102.245.11 - Reports - Incident Report

| Date | Time | Unit | Action | Comment | User |
|---|---|---|---|---|---|
| 8/6/2022 | 20:34:40 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:34:46 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 20:34:52 | 54M1 | Available | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 20:34:56 | CHP | Available | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 20:37:10 | 3233 | Enrt 2nd | Incident ID = 3444256, 0, 0. | KAH5005 |
| 8/6/2022 | 20:37:43 | | Read Comment | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 20:38:04 | 32X4 | At Scene 2nd | Incident ID = 3444256, 34709934, 120466379. | KAH5005 |
| 8/6/2022 | 20:38:04 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:38:06 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 20:38:28 | | Read Comment | Comment for Incident 256 was Marked as Read. | KAH5005 |
| 8/6/2022 | 20:38:30 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 20:40:04 | COP2 | Enrt 2nd | Incident ID = 3444256, 0, 0. | KAH5005 |
| 8/6/2022 | 20:40:04 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 20:44:16 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 20:44:19 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 20:45:33 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 20:49:43 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 20:49:52 | | Read Comment | Comment for Incident 256 was marked as read. | JAW5099 |
| 8/6/2022 | 20:51:47 | 3233 | Available | Unit Cleared From Incident PSAP220071720 | 3233 |
| 8/6/2022 | 20:57:32 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 20:57:34 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 21:00:41 | COP2 | Available | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 21:03:56 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 21:06:12 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 21:10:33 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 21:12:59 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 21:13:16 | 36S5 | Available | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 21:13:24 | | Read Comment | Comment for Incident 206 was marked as read. | KAH5005 |
| 8/6/2022 | 21:13:54 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 21:14:25 | | Read Comment | Comment for Incident 256 was Marked as Read. | JAW5099 |
| 8/6/2022 | 21:14:32 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 21:14:38 | 3434 | Available | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 21:15:52 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 21:18:59 | | UserAction | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 21:22:25 | | Read Comment | Comment for Incident 256 was Marked as Read. | SMM4067 |
| 8/6/2022 | 21:23:14 | | UserAction | User clicked Exit/Save (Response Viewer) | KAH5005 |
| 8/6/2022 | 21:23:15 | | Notify Comment | | |
| 8/6/2022 | 21:23:15 | | Read Comment | Comment for Incident 256 was marked as read. | SMM4067 |
| 8/6/2022 | 21:23:16 | | UserAction | User clicked Exit/Save | SMM4067 |
| 8/6/2022 | 21:25:24 | K93 | Available | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 21:30:49 | | Read Comment | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 21:30:56 | | UserAction | User clicked Exit/Save (Response Viewer) | RMO5204 |
| 8/6/2022 | 21:34:16 | | Notify Comment | | |
| 8/6/2022 | 21:34:16 | | Read Comment | Comment for Incident 256 was marked as read. | RMO5204 |
| 8/6/2022 | 21:34:58 | | Notify Comment | (Response Viewer) | |
| 8/6/2022 | 21:36:10 | | Read Comment | Comment for Incident 256 was Marked as Read. | KAH5005 |
| 8/6/2022 | 21:36:13 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 21:36:38 | | UserAction | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 21:37:07 | | UserAction | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 21:37:11 | K93 | Disp | N35 / Foster Rd; Response Number: 08062022-0008086; | KAH5005 |
| 8/6/2022 | 21:37:11 | K93 | Update Sector | From Sector LOSO to PSAP | KAH5005 |
| 8/6/2022 | 21:37:11 | K93 | Disp 2nd | Incident ID = 3444256, 34.709934, -120.466379, . | KAH5005 |
| 8/6/2022 | 21:37:11 | | Read Comment | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 21:37:11 | 32X4 | Unit Backed up | Backed up with K93 | KAH5005 |

https://cadbrowser.sbsheriff.org/VisiNetBrowser/Search/IncidentReport.aspx?id=3444256&ds=a

18/22

000070

# EXHIBIT 13

10/3/22, 2:48 PM      Inform Browser . 21.102.345.11 - Reports - Incident Report

| Date | Time | | Action | | Description | User |
|------|------|------|--------|------|------|------|
| 8/6/2022 | 21:37:23 | | Read Comment | | Comment for Incident 256 was Marked as Read. | KAH5005 |
| 8/6/2022 | 21:37:59 | K93 | Enrt 2nd | | Incident ID = 3444256, 0, 0, | KAH5005 |
| 8/6/2022 | 21:37:59 | | Read Comment | | Comment for Incident 256 was marked as read. | KAH5005 |
| 8/6/2022 | 21:38:01 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 21:43:50 | | Read Comment | | Comment for Incident 256 was Marked as Read. | RMO5204 |
| 8/6/2022 | 21:44:21 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/6/2022 | 21:44:48 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/6/2022 | 21:47:06 | 3231 | Available | | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 21:47:06 | 32X4 | Available | | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 21:47:06 | K93 | Available | | Unit Cleared From Incident PSAP220071720 | KAH5005 |
| 8/6/2022 | 21:47:06 | K93 | Response Closed | | Response Disposition: Report to Follow RTF | KAH5005 |
| 8/6/2022 | 21:47:11 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 22:30:51 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/6/2022 | 23:55:04 | | UserAction | | User clicked Exit/Save | KAH5005 |
| 8/7/2022 | 00:10:31 | | UserAction | | User clicked Exit/Save | KAQ4064 |
| 8/7/2022 | 00:48:56 | | UserAction | | User clicked Exit/Save | RMO5204 |
| 8/7/2022 | 07:53:19 | | UserAction | | User clicked Exit/Save | JMS4144 |
| 8/8/2022 | 01:52:12 | | UserAction | | User clicked Exit/Save | JAW5099 |
| 8/8/2022 | 06:24:59 | | UserAction | | User clicked Exit/Save | GOH5055 |

Edit Log

| Date | Time | Field | Changed From | Changed To | Reason | Table | WorkstationUser |
|------|------|-------|--------------|------------|--------|-------|-----------------|
| 8/6/2022 | 18:52:23 | Pickup_Map_Info | | 10SGD3463 | | Response_Transports | CADDSP03 KAH5005 |
| 8/6/2022 | 18:52:23 | Map_Info | | 10SGD3463 | | Response_Master_Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 18:52:24 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 18:52:54 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 18:52:54 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 18:53:05 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 18:53:08 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 SMM4067 |
| 8/6/2022 | 18:53:08 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 18:53:19 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 18:53:51 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 18:53:55 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:00:06 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 SMM4067 |
| 8/6/2022 | 19:00:07 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:00:59 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:01:09 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:02:44 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 KAQ4064 |
| 8/6/2022 | 19:02:45 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:03:12 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 SMM4067 |
| 8/6/2022 | 19:03:55 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:04:27 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:04:55 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:06:17 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:06:30 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:07:13 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:07:15 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:09:48 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:10:00 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |

000071

# EXHIBIT 13

10/3/22, 2:46 PM                                   Inform Browser | 21.102.245.11 - Reports - Incident Report

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8/6/2022 | 19:10:02 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:10:11 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP05 SMM4067 |
| 8/6/2022 | 19:10:26 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:10:40 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:12:23 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 19:12:26 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:13:02 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 19:13:05 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:15:34 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 SMM4067 |
| 8/6/2022 | 19:16:14 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:18:49 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 19:19:21 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:19:26 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:19:42 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:19:42 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:20:54 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:20:59 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:22:38 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:25:23 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 19:25:24 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:25:42 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:26:04 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:26:36 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 KAQ4064 |
| 8/6/2022 | 19:26:37 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:27:10 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 SMM4067 |
| 8/6/2022 | 19:27:11 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:28:07 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:31:53 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:31:56 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 SMM4067 |
| 8/6/2022 | 19:32:02 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:32:21 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:33:09 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:39:50 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:40:31 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:47:02 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 19:51:15 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 19:51:18 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 JAW5099 |
| 8/6/2022 | 19:51:21 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 19:54:57 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 RMO5204 |
| 8/6/2022 | 19:56:01 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 KAH5005 |
| 8/6/2022 | 19:56:07 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP08 KAQ4064 |

https://cadbrowser.sbsheriff.org/MiniNetBrowser/Search/IncidentReport.aspx?id=G444266&ds=a

20/22

000072

# EXHIBIT 13

10/3/22  2:46 PM

Inform Browser  21.102.245.11 - Reports   Incident Report

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Viewer) | | | |
| 8/6/2022 | 19:59:41 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 9/6/2022 | 20:00:16 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 20:01:13 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:02:29 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 20:02:38 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:04:55 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 20:05:52 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:05:58 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 20:10:16 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:19:31 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:19:41 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:22:46 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 20:23:02 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:24:21 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:24:46 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:32:28 | Unread Comment | True | False | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:32:38 | Field_Data | | RTF | WhiteBox | Response_User_Data_Fields | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:34:17 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:34:27 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:34:40 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:37:43 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 20:38:04 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:38:28 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:40:04 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 20:44:16 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 20:49:52 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP09 | JAW5099 |
| 9/6/2022 | 20:57:32 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 21:13:24 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 21:14:25 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP09 | JAW5099 |
| 8/6/2022 | 21:14:32 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 9/6/2022 | 21:22:25 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP05 | SMM4087 |
| 8/6/2022 | 21:23:15 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP05 | SMM4087 |
| 8/6/2022 | 21:30:49 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 21:34:16 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP10 | RMO5204 |
| 8/6/2022 | 21:36:10 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 21:37:11 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 21:37:23 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 21:37:59 | Unread Comment | False | True | (Response Viewer) | Incident | CADDSP03 | KAH5005 |
| 8/6/2022 | 21:43:50 | Read Comment | False | True | (Response Viewer) | Response_Master_Incident | CADDSP10 | RMO5204 |

No Custom Time Stamps

21/22

000073

EXHIBIT 13

10/3/22, 2:46 PM                        Inform Browser : 21.102.245.11 - Reports - Incident Report

Description                                                    Data            User
WhiteBox                                                       RTF             KAH5005

Description              Date
                        8/6/2022 19 19:41

# EXHIBIT 13

# EXHIBIT 70

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CLINTON CELLONA,                        )
                                        )
              Plaintiff,                )
                                        )
  vs.                                   )   Case No.   2:25-cv-01503
                                        )              AH-(Ex)
COUNTY OF SANTA BARBARA, DEPUTY         )
CAMERON HOSSLI, and DOES 1-10,          )
Inclusive,                              )
                                        )
              Defendants.               )
_____ )

**CERTIFIED TRANSCRIPT**

DEPOSITION OF DEPUTY MICHAEL REYNOSO

THURSDAY, FEBRUARY 12, 2026

JOB NO.: #79208

REPORTED BY:  KRISANNE CACIOLA, CSR 6617

SANTA BARBARA, CALIFORNIA, THURSDAY, FEBRUARY 12, 2026

2:00 P.M.

DEPUTY MICHAEL REYNOSO,

having been first duly sworn by the reporter, was examined

and testified as follows:

THE REPORTER:  My name is Krisanne Caciola, CSR

license number 6617.

MR. SANGER:  So my name is Jeff Sanger, and I'm

appearing -- or representing the plaintiff in this matter,

Clinton Cellona.

MR. AVILA:  Miguel Avila, also for Plaintiff Cellona.

MS. BARRY:  Mary Pat Barry, present and on behalf of

Defendants County of Santa Barbara and Deputy Cameron

Hossli.

EXAMINATION

BY MR. SANGER:

Q.   Now, Deputy Reynoso, do you understand that even



that.

Do you recall if your CIT training was before or after August 6th of 2022?

A.   I do not recall.

Q.   Okay.

So moving forward to the events of August 6th of 2022, do you recall where you were at approximately 6:52 P.M. on August 6, 2022?

A.   Yes.

Q.   Where was that?

A.   I was in Santa Maria on patrol at the time.

Q.   Was Santa Maria your regular station?

A.   Yes.

Q.   Was this a regularly scheduled patrol?

A.   Yes.

Q.   And would this have been the 6:00 P.M. to 6:00 A.M. shift that you would have been working that day?

A.   I don't remember.

Q.   Do you recall on that day, had you just come on to your shift or were you working overtime?

A.   I really don't know.  I don't remember that day.

Q.



Q.    Okay.

I think at this point, what I'd like to do is enter as exhibits separately the COBAN videos and just do the housekeeping now, if we could introduce --

Were you aware -- strike that.

With regard to this incident, I believe we have five separate COBAN videos from your vehicle.  Does that sound accurate to you?

A.    I don't know for sure how many.

Q.    We'll start with what would be Exhibit 22.

THE REPORTER:  23.

MR. SANGER:  23.

CELLONA vs HOSSLI
REYNOSO, MICHAEL on 02/12/2026                                    Page 103



Q.    Do you recall any details about a deputy-involved shooting with a bean bag round that caused an injury?

A.    Specific details, no.

Q.    Do you recall whether or not the incident would have happened before August 6 of 2022?

A.    I don't believe so.

Q.    And are you aware of any deputy being suspended or fired after an injury related to deployment of a bean bag round?

A.    No, not to my knowledge.

Q.    Are you aware, subsequent to August 6th of 2022, a change by the department in the bean bag munitions used with the less-lethal shotguns?

A.    Yes.

Q.    Do you know what that change in munitions was?

A.    Yes.

Q.    Can you tell me.

A.    Yes.  They have since removed the bean bag rounds specifically and changed over to what essentially is like a rubber ball now being dispersed as a less-lethal

REPORTER'S CERTIFICATE

I, KRISANNE CACIOLA, C.S.R. #6617, a Certified Shorthand Reporter in and for the State of California, do hereby certify that the deponent was by me first duly sworn and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of said proceedings.

I further certify that I am neither counsel for nor related to any party to said action nor in any way interested in the outcome of the cause in said action.

The dismantling, unsealing, unbinding of or tampering with the original transcript will render this reporter's certificate null and void.

IN WITNESS WHEREOF, I have hereunto subscribed my name this ___ day of _____, 2026.

[x] Reading and Signing was requested.

[ ] Reading and Signing was waived.

[ ] Reading and Signing was not requested.

_Krisanne Caciola_
KRISANNE CACIOLA
Certified Shorthand Reporter No. 6617

CELLONA vs HOSSLI
REYNOSO, MICHAEL on 02/12/2026                                      Page 110

STATE OF CALIFORNIA                    )
                                       )
COUNTY OF SANTA BARBARA                )


        I, the undersigned, say that I have read the foregoing

deposition and hereby declare under penalty of perjury the

foregoing is true and correct.

        Executed this _23rd_ day of _March_, 2026, at

_Santa Maria_, California.




                                _____
                                            DECLARANT

McDaniel Reporting  (805) 544-3363 | 1302 Osos Street, San Luis Obispo, Ca 93401

# EXHIBIT 71

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CLINTON CELLONA,                        )
                                        )
          PLAINTIFF,                    )
                                        )
     vs.                                )   Case No.
                                        )   2:25-cv-01503-AH-
COUNTY OF SANTA BARBARA, DEPUTY)            (Ex)
CAMERON HOSSLI, AND DOES 1-10  )
INCLUSIVE,                     )
                                        )
          DEFENDANTS.                   )
_____)

**CERTIFIED TRANSCRIPT**


DEPOSITION OF DEPUTY CAMERON JAMES HOSSLI

TUESDAY, FEBRUARY 10, 2026, 9:00 A.M.

SANTA BARBARA, CALIFORNIA


Reported by:  Brittany Badger
              CSR No. 13970
Job No.:      79181

TUESDAY, FEBRUARY 10, 2026, 9:00 A.M.

SANTA BARBARA, CALIFORNIA


THE REPORTER:  Good morning.  My name is Brittany Badger.  I am a certified shorthand reporter and the deposition officer for today's deposition.  My CSR license number is 13970.


DEPUTY CAMERON JAMES HOSSLI, having been first duly sworn by the reporter, testifies as follows:


MR. SANGER:  Okay.  I need to introduce everybody who's here at the table, I suppose.

MS. BARRY:  Yeah.  We can state appearances. Mary Pat Barry present on behalf of Defendant County of Santa Barbara and Defendant Cameron Hossli.

MR. SANGER:  Jeffrey Sanger on behalf of Plaintiff Clinton Cellona.

MR. AVILA:  Miguel Avila for Plaintiff as well.

THE WITNESS:  Deputy Cameron Hossli.

EXAMINATION

BY MR. SANGER:

Q

Q    So, Deputy Hossli, you understand that even though we're here in a law office, that you're under the same oath that you would be in a courtroom and your obligations are the same to tell the truth?

A    I do.

Q    And you understand that your testimony today is given under the penalty of perjury under the laws of the United States?

A    I do.

Q    So a few, kind of, housekeeping things to start with.

Our court reporter can't record nods, gestures.

Would you agree to provide a clear and verbal yes or no or clear verbal answer for the record?

A    Yes.

Q    And to ensure that we have a clean transcript of today's testimony, will you agree to wait until I finish my entire question before you begin to answer?

A    Yes.

Q    And I will try to do the same for you.  I will let you finish your answer without talking over you.

If I ask any questions -- and this may happen

Q    Did you review anybody else's Coban video?

A    The aviation unit's video.

Q    The helicopter?

A    Yes.

Q    Okay.  So you were represented by an attorney when you gave a statement to the administrative investigations team on September 2, 2022.

Did you meet with that attorney in preparation for your testimony today?

A    No.



Q    Is that standard policy with the sheriff's department?

MS. BARRY:  Objection.  Vague and ambiguous.

BY MR. SANGER:

Q    You can answer, if you understand.

Let me back up.  I'll try and rephrase it.

Is it Santa Barbara sheriff's department policy for an officer involved in a use-of-force incident to not write a report subsequent to the incident?

A    That would only take place during any time where there's either an officer-involved shooting or, like,

some serious GBI to the suspect.

Q   So if there's a shooting or GBI, it's policy to not write a report?

A   It's not policy but it was based on the attorneys at the time for our legal representation.

Q   And that was the attorney that represented you with the administrative investigations team --

A   Yes.

Q   -- advised you not to write a report?

MS. BARRY:  Objection.  That calls for attorney-client privilege communications.

MR. SANGER:  I withdraw that question.  I apologize.

Q   So getting back on track here.  After your testimony today, you're going to have an opportunity to review the transcript, and you can make changes to your answers.

However, do you understand that if you change a substantive answer, I can comment on that change at trial

CELLONA vs HOSSLI
HOSSLI, CAMERON on 02/10/2026                                      Page 82

couldn't --

Q    So it could have been that the department would allow you to bring your personal AR-15-type rifle on duty with you?

A    Yes, if it's signed off and approved by our training bureau.

Q    So at some point, you brought your own AR-15-type rifle as your duty rifle?

A    Yes, I do have one now.

Q    Okay.  At some point, we were discussing earlier, the airship arrived.

Did the helicopter, did it hover in that same area over the house at 157 Mizar?

A    I do not know what the flight pattern was for the airship.  I was busy dealing with my stuff.  I wasn't watching that helicopter.

Q    Did the helicopter deploy a loudspeaker?

A    I believe they were using the audible PA on the helicopter.

Q    And do you recall what information was coming over the PA --

practice that you do both.

Q    Do you recall the nature of the announcement coming over the helicopter?

A    I don't recall, no.

Q    And what did that entail?

A    Originally we started by, I believe, clearing a backyard that was one that was just north of 157 Mizar, which is, I believe, 148 Alcor -- or no.  It's the Alcor residence just north of Mizar.  So we cleared that backyard.  From there I remember leaving that residence, the neighboring house that was just to the east of that -- or yes.  Just to the east of that.

There was two young kids that were looking outside of the window at us while we were walking past, and then I remember proceeding down from the road there

A    Yes.

Q    And you appear to be just to the left of where it's marked S on the screen; is that correct?

A    Yes.

Q    So at this point, you've moved into the very corner of that yard at 140 Alcor; is that correct?

A    No.

Q    No.  148 Alcor?

A    The address is correct.  Where I'm positioned is not.  No.

Q    That is not the corner of the yard?

A    That's not the corner of the yard.  No.

Q    Okay.

A    I'm approximately 15 feet west of the corner of that yard.  I'm not in the corner.



Q     Okay.  And from that position, could you view over the fences to the east of you?

A     Yes.  I could view down the fence line to the east of me.  I couldn't directly see parts of the backyard of 141 Alcor -- 140 Alcor.

Q     So you're located standing on this pot at the fence between 157 Mizar, and is it 140 or 148 Alcor?

A     So I'm in the back of 148 Alcor.

Q     Okay.  And 157, as we've established, was where the mother and I believe sister of Mr. Cellona lived; is that correct?

A     I believe so.

Q     And from this point, if you're looking to the east from Mizar, that would be the neighbor's backyard; correct?

A     151 Mizar.  Yes.

Q     And did you have a clear field of vision of 151 Mizar?

A     From that elevated position, I could see down into 151 Mizar, the house is lower.  There were lights on in the backyard which illuminated sections closer to the house.

to indicate close to 40 feet if you add them up along the top between the black planter box and where Mr. Cellona was located.

Is it your testimony that you were at an even greater distance?

A    Yes.

Q    And just to be clear, you didn't take any part in preparing this document?

A    No, I did not.

Q    But you've seen it before?

A    Yes.

Q    When did you see this document before?

A    Yesterday.

Q    Okay.  At the moment you fired the 12-gauge beanbag round, what was your intended point of aim on the client's body -- on Mr. Cellona's body?

A    I was aiming at his left extremity between his elbow and shoulder.

Q    So approximately his left bicep would be fair to say?

A    Yes.

Q    And going back to Exhibit 16, which we determined was taken after you had fired the beanbag round --

MS. BARRY:  16-1?

MR. SANGER:  16-1.

BY MR. SANGER:

Q    On 16-1, before we took a break, we were talking about the tree canopy that seems to be depicted in this picture; is that correct?

A    Yes.

Q    And that tree canopy extended -- did that extend over the fence into the Alcor side of the backyards?

A    I do not believe so.  No.

Q    And approximately what height would you say that the tree canopy was cut back or elevated above the ground?

A    I don't know.

Q    Now, in the video that we were just watching, could you hear the sound of helicopter flying around overhead?

A    I don't recollect if we did at the time.

sorry.  Was it Lieutenant Camarena?

A    Yes.

Q    Other than that brief interaction that we saw on the video, did you have any other conversations with the lieutenant that evening?

A    I do not recall after the fact.



Q    And prior to making that statement, had you gone over your statement with any other person other than your attorney?

A    No.

Q    Okay.  Do you, at this point, wish to change or correct any of the answers that you've given me today regarding your training with the Santa Barbara sheriff

policies or specific events leading up to the moment you squeezed the trigger?

A    No.

Q    If you could give me a second to confer with my co-counsel here.



Q    According to your earlier testimony, the department approved -- and forgive me.  I have it somewhere here -- sorry.

What was the ammunition used again, the beanbag round that you used?

A    It's a defense tech Super-Sock.

Q    And were there other instances that you're aware of, would that have also been with the Super-Sock?

REPORTER'S CERTIFICATION

I, Brittany Badger, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name on this date:

*Brittany Badger*
_____

Brittany Badger, CSR No.  13970

**EXHIBIT 72**

# NEUROLOGY ASSOCIATES OF SANTA BARBARA

Philip R. Delio, M.D.   Michael G. Gibbs, M.D.

███████████████   Santa Barbara, CA 93105

(805) 682-8153 • Fax: (805) 682-5585

**Dec 8, 2025**

## NEUROLOGICAL MEDICAL EVALUATION/RECORD REVIEW

**Name: Clinton Cellona**
**D.O.B. ████ 1993**
**DATE OF LOSS: 08/06/2022**

I was asked to review medical records on Clinton Cellona. By way of introduction, I am a practicing neurologist where I have been in private practice for the past 20 years, as well as directing the neuro-hospitalist and stroke program at Santa Barbara Cottage Hospital, where I am past Chief-of-Staff and past Department Chair. I did my medical school training at Georgetown University School of Medicine and my neurology and residency training at Stanford University where I was chief resident. I see all types of neurologic conditions, including traumatic brain injury, so feel qualified to render a medical opinion regarding Mr. Cellona's injuries. My impressions and opinions are rendered with reasonable medical certainty but are subject to change if more information or records regarding Mr. Cellona are made available to me.

As a summary, Clinton Cellona was 29 years of age when during an encounter with police from the Santa Barbara County Sherif's office, he was struck in the head by a bean bag round fired from the shotgun of an officer as he was fleeing the scene of an arrest. His complaint alleges that he was bleeding from his head and unconscious because of this event. He was attended to by Sheriff deputies before being airlifted to Santa Barbara Cottage Hospital. He reports cognitive deficits, impaired memory, and headaches because of this injury.

Due to agitated behavior during transportation from the field to Cottage Hospital, he was treated with midazolam IM and ketamine and intubated en route. At the time of his emergency department arrival, his examination showed a large laceration to the left parietal scalp, with a foreign body in place (the bean bag) without visualization of brain matter. It was embedded about 5cm into the head. He arrived intubated with diminished breath sounds. He was unresponsive with a GCS (Glascow coma score) of 3, but had been agitated prior to being medically sedated. His left pupil was 4mm and his right was 3mm and both were reactive to light. Blood pressure on presentation was 127/111, 96% oxygen saturation, heart rate 119. He developed transient hypotension with systolic blood pressure in the 70s that resolved with epinephrine administration. At Cottage Hospital he was diagnosed with a left temporal bone skull fracture, multiple left temporal contusions and bone fragments in the temporal lobe, and diffuse brain swelling.

A head CT/CTA on presentation on 08/07/2022 at 00:36 showed:

CONCLUSION:
1. Comminuted left temporal bone fractures with medial displacement. Left sphenoid sinus fractures extending to the left carotid canal. No evidence of associated left carotid artery injury.
2. Hyper attenuating regions of the left lateral convexity concerning for temporal lobe intraparenchymal hematoma, left lateral convexity epidural hematoma, and subdural hematoma that tracks along the left tentorium.
3. Large left lateral convexity scalp delayed hematoma.
4. No cervical or intracranial vascular dissection, aneurysm, or occlusion

I reviewed these films personally.

A CT of the cervical spine 08/07/2022 showed no acute fracture or traumatic malalignment

A CT of the chest, abdomen and pelvis showed a comminuted left anterior 1st rib fracture near the sternal junction

FAST Ultrasound showed no other acute findings in the heart, chest or abdomen.

Neurosurgery was consulted and Dr. Alois Zauner took Mr. Cellona urgently to the operating room for evacuation or debris and surgical repair via a decompressive craniectomy.

A post operative CT of the head on 08/07/2022 at 08:25 was performed when some pupil asymmetry was noted.  This showed:

 Interval left pterion craniectomy with hematoma evacuation.  Mild decrease in left-to-right midline shift measures approximately 7 mm, this previously measured 9mm.  Postsurgical pneumocephalus, packing material, and blood products within the resection cavity. Extra-axial soft tissue swelling with blood products and drain in place. Stable subdural hemorrhage along the posterior falx and right tentorium. Small amount of subarachnoid hemorrhage along the right parietal sulci likely redistribution of blood products.
SKULL: Left pterion craniectomy.

He was treated with mannitol for cerebral edema and fentanyl and versed for sedation post operatively.  He was followed by the trauma service in the surgical intensive care unit for left traumatic hemorrhages, left subdural hematoma, left temporal contusions, and cerebral edema.

He was extubated on 08/09/2022, and he improved to being conversant with a non-focal exam. After several weeks in the ICU, by 08/26/22 he underwent a left cranioplasty, with resolved cerebral edema.

He was agitated at times and treated with Precedex for sedation during his hospital stay. Therapy services noted ongoing functional improvements throughout their sessions with him.

A follow-up head CT on 08/27 showed interval replacement of the left cerebral convexity bone flap with cranioplasty changes. There was extra-axial postsurgical fluid along the left cerebral convexity causing mild left-to-right midline shift of 4mm. There is resolution of the blood products seen along the falx and tentorium. I reviewed this study and there is a contusion of the left anterior temporal lobe that appears improved compared to his prior imaging, with some persistent air present.

During his clinical course in the hospital, he was noted to refuse most oral meds, labs, injections, and presented challenges to compliance with his treatment and care. He required continual cueing and redirection. He was noted to be agitated often and required medication for sedation as stated.

Mr. Cellona was ultimately discharged on 09/01/2022, as he was felt to be too high level of performance for transfer to an acute inpatient rehabilitation facility, and was transferred back to jail custody at discharge. He was noted to be perseverating neurologically, but was alert and oriented to person, place, and date and had an otherwise non-focal neurological examination.

After discharge from Cottage Hospital and transfer to jail, he was then seen for medical complaints by Sally Davis, a physician assistant. During an assessment on 09/06/22 for complaints of right arm pain, he is noted to have a normal neurological exam as follows:

"non-focal exam with no obvious deficits, follows commands, normal gait and mentation. Mental status alert and oriented X4, clear and fluent speech without paraphasia. Answers questions and follows commands appropriately. Cranial nerves-extraocular movement intact, facial sensation preserved. Face symmetrical with facial movements preserved. Hearing grossly intact, palate raise symmetrical, shoulder shrug/SCM 5/5, tongue midline. Motor exam-normal bulk and tone, no pronator drift, strength 5/5 throughout. Reflexes-deferred. Sensation-normal to light touch throughout. Cerebellar function-no dysmetria on finger to nose or heel to shin. Fine motor movement and rapid alternating movement normal. Gait and station-Normal casual gait using walker.

On 10/19/22, he was noted to be continually repeating information. "There is someone trying to throw wood from pencils into my mouth." He is seen washing his medication as he feels it is "dirty." On 01/03/23 he requests a walker or wheelchair for when he goes to court, but his exam at that time showed a steady gait with no weakness noted. On 02/02/2023 he asked to be excused from physical therapy as he felt he did not need it.

While in jail, he reports several additional head injuries: On 10/09/2022 he reports being hit on the left side of his face, with no treatment deemed necessary. On 01/07/2023 a mop bucket is dumped on his head causing an abrasion, but he denies any neuro deficiencies at that time. On 02/04/2023 he was involved in an altercation with lacerations under his left eye and his nose. Reports "I was on the phone and then he attacked me out of nowhere."

Of note, Mr., Cellona has a complex behavioral/psychiatric history prior to his injury. On August 16, 2021, he allegedly placed unlawful 911 calls in reference to what he perceived as misconduct by the Lompoc Police Department. He was subsequently involved in a battery incident that he perpetrated on another individual 09/11/2021 This occurred in a shopping center parking lot, where Mr. Cellona had been acting strangely prior to the battery. He was allegedly in possession of cocaine at the time of the incident.

According to a witness, Mr. Cellona confronted and struck a jogger. This victim fell and hit his head, resulting in loss of consciousness and a hematoma. This victim knew Mr. Cellona and greeted him before the assault, but apparently Mr. Cellona was quite agitated over the idea laser pointers were being used in the area, and claimed not to know the victim and threatened to punch him.

A neuropsychological and competency evaluation was performed by Carolyn Murphy, Ph.D., July 8, 2022, as month before his traumatic head injury, to determine his ability to stand trial for his prior offenses. During that assessment he was reportedly alert and oriented to person, place, time and situation. He presented with paranoia regarding law enforcement officers (believing they are harassing him and caused him to lose his job). He also believes the individual he assaulted accosted him and that Mr. Cellona hit him in self-defense.

He had refused to come to court for his hearing, and displayed paranoid behavior regarding the courthouse. Notably during his interview with Dr. Murphy, his paranoia could be pushed aside at times in order to meet a greater need, which argued against him having fixed delusions. When he was faced with a negative consequence, he was able to shift his mindset and do what he was asked or told to do. This also argues against a fixed paranoid delusional thought process.

Based on her assessment it was felt Mr. Cellona was able to understand the nature and purpose of the proceedings being taken against him. He fully appreciated the court process and was aware of the allegations against him. He did not accurately perceive how his conduct was erratic and irrational on the dates of the offenses, but he did fully appreciate the court process. He was felt to be competent to stand trial.

Dr. Murphy performs a second evaluation two months later 09/19/2022, a month after his traumatic head injury. She notes that in the interim since his initial evaluation, in August of 2022 he attempted to evade police after an encounter, and was shot in the head with a non-lethal projectile. This required neurosurgery for removal, from which he was still recovering at that time. At that time, his thoughts were noted to be more disorganized, and it was difficult to keep him focused on a single train of thought. He was perseverative but not particularly paranoid or guarded. Linear conversations were difficult for him. His memory was impaired, and he struggled to complete mental status exam questions. He had 1 out of 3 recall at five minutes, could not perform serial 7's or serial 3's. He could recall details of his four arrest cases. Significant disorganization was noted in speaking with Mr. Cellona, but with some prompting and cueing, he could come up with responses to questions and could concede points that were made. Dr. Murphy did not find him to be so disorganized or delusional that he could not engage in reasonable conversation. There were concerns about his memory, his ability to organize information and the need to prompt and redirect him. Dr. Murphy ultimately felt that Mr.

Cellona was able to understand the nature and purpose of the proceedings being taken against him. Following his brain injury, he was actually improved in some ways: he was far less paranoid and guarded, was more chatty and cheerful, and was positive about his legal counsel, compared to his prior pessimism about his representation. Dr. Murphy recommended a full neuropsychological workup of his memory and executive functioning to determine his competency to move forward with his legal proceedings.

Dr. Murphy then does a third assessment of Mr. Cellona on 12/30/2022, three months later, and four months after his head injury. There was reported continued improvement since his prior 09/2022 evaluation, and her evaluation was requested in lieu of a formal neuropsychological examination. Linear conversation was noted to still be challenging at times, but he was responsive to prompts and redirection. Memory appeared impaired, characterized by word finding difficulty. He had 1 out of 3-word recall, but could now count backwards by 3's. He was more oriented today, date and time. There was some ongoing paranoia about law enforcement. He was far less disorganized in his thinking than prior, but does wander during conversation. It was felt he was able to understand the nature of proceedings being taken against him, and did have the capacity to assist counsel in his own defense. Mr. Cellona was deemed competent to stand trial at that time.

As a result of the head injury, Mr. Cellona reports the following injuries and damages: skull fracture including open fracture of the parietal bone, cerebral edema, acute respiratory failure, brain contusion, permanent disfigurement, significant cognitive deficits, impaired memory, headaches, and loss of wages and earning capacity.

**IMPRESSION:**

1. Traumatic brain injury as a result of a nonlethal projective striking him in the head when he was attempting to evade police officers on 08/06/2022
2. This injury resulted in a left sided skull fracture with contusions to the left temporal lobe of the brain
3. Immediate neurosurgery was required with removal of the bony fragments, and to allow brain swelling through a section of skull that was removed. This is standard practice in neuro-trauma to allow an injured brain to swell and expand out of an opening in the skull rather than being compressed inside a fixed, restricted space inside the skull
4. This injury resulted in a contusion to the left temporal lobe with some swelling and bleeding in that location noted at the time of injury.
5. Injuries to the anterior temporal lobe are generally well tolerated, although injuries to this location can affect memory, cognition, and language function. The presence of abnormalities on imaging does not necessarily correlate with fixed or persistent neurological injury as recovery from brain injury can occur.
6. Mr. Cellona had fairly minimal cognitive changes after his accident. Having worked closely with Cottage Hospital and the trauma program for over 20 years, I can attest that the Hospital makes concerted efforts to get patients with traumatic brain injury and significant neurological or cognitive deficits to their affiliated Rehabilitation Center (Cottage Rehabilitation Hospital). Mr. Cellona was specifically assessed and denied transfer to that rehab facility as he was felt to be functioning at "too high a level" for

transfer. Similarly, it does not appear he is referred for outpatient recovery programs such as speech therapy or cognitive rehabilitation. One would have expected those referrals to be made if he was felt to have significant cognitive issues.

7. He does have some cognitive deficits notes by Carolyn Murphy on 12/30/22. She has a reasonable standard of reference as she performed evaluations prior to his injury on 07/08/22, a month after his injury on 09/19/22, and a third time on 12/30/22. There is progressive improvement over that time period, although she notes some ongoing memory and word finding difficulty. However, she does not perform formal testing to quantify the degree of deficiencies noted in terms of percentile scoring. Furthermore, given that recovery from traumatic brain injury can take months to years, her assessment of Mr. Cellona 4 months after his accident should not be considered representative of his neurological outcome and residual impairment. Once would expect continued improvement over time.

8. Mr. Cellona demonstrated neuropsychiatric symptoms even prior to head injury. I suspect he has either bipolar disorder with psychotic features, or a schizoaffective disorder with paranoid/delusional features. These neuropsychiatric tendencies were noted by Dr. Murphy in her initial assessment of Mr. Cellona who noted paranoia during her interview. This behavior also resulted in his 08/2021 and 09/2021 arrests with law enforcement. In the presence of what is likely a preexisting psychiatric history, it will be difficult to apportion with certainly fixed neurological deficits from his 08/2022 head injury versus possible psychiatric disease. Similarly, formal neuropsychological testing may not clearly distinguish cognitive limitations related to a psychiatric disease from trauma-induced deficits.

9. Mr. Cellona has sustained several additional head injuries while in jail, and those could be significant contributors to any ongoing neurological symptoms or deficits.

In summary, Mr. Cellona did experience traumatic brain injury from his 08/06/22 injury when he was struck in the head by a nonlethal projectile. The medical records available to review do not reflect significant residual neurological deficits other than a competency assessment performed by Carolyn Murphy 4 months after his trauma where she reports some memory deficits and word finding features, although notably reports improvement in other areas compared to her prior assessments. She notes him to be competent to stand trial at that time. One would expect continued ongoing improvement after this sort of injury for up to a year or longer. If there are ongoing issues with memory, cognition, or neurobehavior, these symptoms could be addressed and improved to some degree via a host of therapeutic interventions such as cognitive and speech therapy, medication for mood and behavior control, and medication for neuromodulation. He likely had some pre-existing neuropsychiatric disease based on his pre-injury behavior and history.

The opinions cited above a provided with reasonable medical certainly, but are subject to change if more information regarding Mr. Cellona is made available.

Philip R. Delio, M.D.

**SUMMARY OF RECORDS REVIEWED:**

1. Dr. Carolyn Murphy evaluation reports
2. Santa Barbara County Jail records
3. EMR report/ Cottage Hospital Records
4. Cottage Health Detail billing
5. Plaintiff complaint for damages

References:

Wilkins TE, Beers SR, Borrasso AJ, et al. Favorable Functional Recovery in Severe Traumatic Brain Injury Survivors beyond Six Months. *Journal of Neurotrauma.* 2019;36(22):3158-3163. doi:10.1089/neu.2018.6153

Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR)

Frank Netter Atlas of Human Anatomy

Localization in Clinical Neurology; ; Author(s) : Paul W. Brazis ,Joseph C. Masdeu MD, PhD,Jose Biller MD, FACP, FAAN, FAHA, FA
ISBN/ISSN:
9781975160241
Publication Date:
September 27, 2021

**EXHIBIT 73**

*Veronica C. Llamas, PhD*
Licensed Clinical Psychologist (PSY 28916)
25745 Barton Rd. #253
Loma Linda, CA 92354
Email: vllamas@drvllamas.com

## NEUROPSYCHOLOGICAL & PSYCHOLOGICAL EVALUATION

**Retaining Counsel:**
Jeffrey Sanger
Miguel Avila
Attorneys
Sanger, Hanley, Sanger, & Avila, LLP

| | |
|---|---|
| **Examinee Name:** | Clinton Cellona |
| **Date of Birth:** | 02/13/1993 |
| **Age:** | 33 |
| **Gender:** | Male |
| **Marital Status:** | Single |
| **Years of Education:** | 13 years (approximate) |
| **Handedness:** | Right-handed |
| **Collateral:** | Claudia Moser (sister) |
| **Date of Evaluation:** | 02/26/2026 |
| **Location of Evaluation:** | Virtual |
| **Case No:** | 2:25-cv-01503-AH-E |

### <u>NOTICE OF CONFIDENTIALITY</u>

Prior to beginning the examination, Mr. Cellona was informed that this evaluation was being conducted exclusively in connection with his legal suit with the intent to inform the trier of fact. The respondent was also informed that any communication between us is not privileged (no doctor-patient confidentiality) and that any information provided, as well as the results of the neuropsychological testing and my conclusions regarding the results of this evaluation, would be included in a report that may be read by people involved in his case. Prior to the evaluation, Mr. Cellona was advised of the right to ask questions and the right to end the evaluation at any point. However, he was also informed that ending the evaluation may also impact his case and was recommended to consult with his attorney should he choose to discontinue the evaluation. This report belongs to the party or parties requesting the evaluation. This report is meant for the use of qualified professionals only and those with the need to know by law. Persons breaching the confidential nature of this report are acting against medical advice and assume any and all risks and liabilities of doing so.

1

## REASON FOR REFERRAL

Clinton Cellona was referred for a comprehensive neuropsychological and psychological evaluation by his attorneys, Jeffrey Sanger and Miguel Avila, to address the following items that served to guide the nature of this evaluation:

1. *Evaluate the extent and nature of the injury incurred by Mr. Cellona.*
2. *Describe Mr. Cellona's mental health history and current condition.*
3. *Did the injury Mr. Cellona incurred exacerbate his mental health condition in anyway?*

## SOURCES OF INFORMATION

- Clinical interview with Mr. Cellona
- Interview with Claudia Moser, Mr. Cellona's sister
- Behavioral observations
- Medical records
  o Wellpath Medical Records (9/1/2022 – 2/16/2023)
  o Cottage Hospital Medical Records, including neuroimaging studies (8/6/2022 – 8/31/2022)
- Assessment measures
  o Personality Assessment Inventory (PAI)
  o Montreal Cognitive Assessment –blind version (MoCA-BLIND)

*Important note: Mr. Cellona presented as tangential, perseverative, and sometimes circumstantial. Therefore, the following history reported by him was limited by this presentation.*

## HISTORY OF TRAUMATIC BRAIN INJURY (TBI)

According to available medical records, on 8/6/2022, Mr. Cellona was shot in the head with a non-lethal bean bag by law enforcement. He was reported to be agitated and combative causing emergency services to sedate and intubate him for air ambulance to Cottage Health. His Glasgow Coma Scale (GCS) score was documented as 3 in the emergency department (ED) documents. CT of the brain completed while in the ED demonstrated, "hyper attenuating regions of the left lateral convexity concerning for temporal lobe intraparenchymal hematoma, left lateral convexity epidural hematoma, and subdural hematoma that tracks along the left tentorium." Follow-up CT of the brain conducted on 8/7/2022 also demonstrated "6mm of left-to-right midline shift with subfalcine herniation and significant mass effect on the left lateral ventricle with near total effacement of the occipital horn." He was immediately taken for surgical intervention of a left hemicraniectomy with hematoma evacuation. On 8/8/2022, his GCS was documented as 7, and intermittent following of commands was noted. Mr. Cellona remained sedated until extubation on 8/9/2022, at which point his GCS = 13 and language was noted as "nonsensical." Difficulty with orientation was documented on 8/11/2022 with orientation to self and date of birth, but inconsistent with location. Expressive aphasia and inability to name objects was documented on this date as well. On 8/17/2022, notes documented that he was participating in therapies, fully oriented, but required cueing and continual redirection. He was status post left cranioplasty on 8/26/2022. Days prior to discharge (8/27/2022), CT was noted as stable, neuro exam was nonfocal, and he was noted to be alert, oriented to self, location, but perseverative,

2

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

with fluent speech, and intact confrontation naming, and a GCS of 15. Throughout his hospital course he was treated prophylactically for seizures and provided a 30-day supply for transfer to jail.

When Mr. Cellona was asked what he remembers about his TBI event he stated, "running away for safety cause people are always playing games with me. People are trying to bother me."

## CURRENT COGNITIVE COMPLAINTS

To evaluate the presence of a neurocognitive disorder, Mr. Cellona was asked about his subjective cognitive experiences. He primarily reported fluctuating difficulty with short and long-term memory. More specifically, he expressed that he sometimes cannot remember what he said to people, or details of recent events. He also noted being unable to remember recipes or the names of people he used to know from his past. Mr. Cellona endorsed occasional difficulty with distractibility and when asked what distracts him, he indicated that his internal thoughts tend to interfere with focus because "people mess with me. Different people like to bother me. They play all sorts of games." Regarding language abilities, Mr. Cellona was asked whether he ever experiences difficulty articulating his thoughts. He responded by rubbing his head and asked to come back to this question at a later time. He was then asked to share what was happening for him at that moment to which he stated, "I'm thinking of my past and things about people bothering me." He then shared about his allergy to second-hand smoke (see below for more detail). Lastly, Mr. Cellona was asked whether he ever gets lost or forgets how to get to familiar places. He denied and shared that, "lately, I can remember how to get to places without GPS." When asked about the onset of these symptoms he stated, "that's hard to question because of certain reasons." After asking him to elaborate on what he meant by that statement he verbalized, "my mind goes all over the place. I've been through a lot. People bother me. I go far away from the church and people try to bother me and the air gets weird," further indicating it impacts his memory. He also noted that his memory got worse after his TBI, but added that "in some ways it's better, because I couldn't walk or talk before." Additionally, at another point in the clinical interview he reported believing he has an allergy to second-hand smoke (of any kind) that causes him to experience temporary memory loss (among other symptoms that can be reviewed in the current psychological symptoms section below).

## CURRENT PHYSICAL SYMPTOMS

Mr. Cellona reported difficulty with walking and talking that began immediately after his TBI in 2022. However, he noted that his balance is "better now." He also verbalized having "certain vibes in my hands" after his injury, but he could not elaborate further. Review of his Cottage Health medical records confirmed that he required physical therapy and use of an assistive device for walking until he declined physical therapy while incarcerated as he felt it was no longer needed. Mr. Cellona also shared that, "the doctors say I'm healthy, but my tummy is bothering me." He described that the left side of his abdomen had a small area that felt hard with a visible scar. Notably, his Cottage Health medical records document that his left abdomen was used for bone flap placement status post his decompressive craniectomy prior to his cranioplasty. Mr. Cellona reported head sensitivity to extreme heat and cold that causes him pain and began after his TBI. He denied the presence or history of tremors, stroke, seizures, or recent falls.

3

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

## DAILY FUNCTIONING

Mr. Cellona denied any difficulty with performing basic (e.g., bathing, grooming, hygiene, etc.) or instrumental activities of daily living (ADLs). However, his ability to perform said activities is complicated by his chronic homelessness despite his level of independence. For example, he explained that he is able to successfully use money to purchase food when he needs it or has a girlfriend who makes him food, but at times, when he has too many physical items to carry on his person, he is unable to seek out food.

## CURRENT PSYCHOLOGICAL SYMPTOMS

Mr. Cellona described his mood at the time of the clinical interview as "kinda down," explaining that he has many life struggles. When he was asked to explain the types of struggles he is experiencing he reported that he is homeless sometimes and at other times people help him. He added that he was homeless at the time of this evaluation, but was getting help. He shared that the type of help he was getting at that time was related to "people mak[ing] me food, but I don't trust her food sometimes or people because sometimes I feel weird after eating food." When he was overtly asked about feelings of depression he responded, "I love life. I want to live a long time" and adamantly denied depression, thoughts of suicide, self-harm, or homicidal ideation.

Mr. Cellona disclosed a history of physical abuse from a previous babysitter while living in Guam though he was reluctant to discuss it further and merely stated, "it doesn't really matter, we don't have to talk about it." When asked whether the memories of this abuse continue to bother him to this day, he responded, " some of it. Certain things yes and certain things no," but he politely declined to continue discussing the topic.

He denied overt symptoms of anxiety and mania/hypomania. However, he explained that he typically has "a lot of energy," but denied excessive amounts of energy or a reduced need for sleep.

Regarding psychotic symptoms, Mr. Cellona denied visual hallucinations. When asked about auditory hallucinations, he expressed reticence to share and inquired about the possibility of being "locked up" if he endorsed having heard voices. After reassuring him, he disclosed isolated events of hearing voices that began after his TBI, sharing, "I don't go to the shelter because of second hand smoke and I think it affects me more now because of my injury. I started hearing voices and I was like, 'what the heck!?' are they doing something to the food at the shelter? It happened after my injury, but is it the injury or the second-hand smoke?" When asked how many times he has heard voices, he answered, "two times at the art center at the college and two times at class at college, and one to two times at the shelter. One time my girlfriend got this beef, kinda looks weird…I ate the food and it started like demons [tapped top of head indicating sound in his head]. In my past, even in Guam, someone spit in my food." He described the voice he heard after eating food as demonic in nature, but did not recall what it said and denied hearing it again after he decided to never eat at that restaurant again. He also denied hearing voices regularly and stated it had been "months" since this happened.

4

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

Evidence of delusions were present throughout the clinical interview and expressed while he completed a questionnaire to assess his general psychological functioning. The following are examples that demonstrate his delusions:

- When asked about the storage unit he keeps for himself he disclosed: "…people like to bother me at the storage. People like to bother me over there. One time I had someone living in there." He was then asked how he believes that person got into his storage to live. He responded, "the air messes with me and my energy level." He was then asked if he believes people follow him to take his things, to which he replied, "miss, I can tell you…I know how they look. This guy just be walking and tried to sneak up on me."
- While discussing his history of homelessness, he revealed that there was a time period in which he was "working and falling asleep and I had to park my car because certain customers were contaminating the air in my car…lights bother me when the air gets contaminated."
- At the start of the clinical interview, he explained that he had an allergy to second-hand smoke which causes him to fall asleep, experience irritability, lose memories, and subsequently have his things stolen from him. At another time in the clinical interview, he explained that, when he was a young child, babysitters would blow smoke on him and "I'm not sure if people in Guam are sharing that information with people here" to take advantage of him.
- During exploration of his occupational history, he noted that he lost one job of removing a tree because "people put me to sleep." He also explained that he left his first job in the mainland United States because he perceived one of the workers as being sick and expressed worry that there were contaminates in the air.
- At one point in the clinical interview, he spontaneously shared that, "I called the FBI on Guam. About a bunch of corrupt things there and they raided the area." He was asked when that was, to which he replied, "Honest. I saw it on TV."
- When he was discussing his participation in ROTC in high school while residing in Guam he expressed feeling worried "at certain times because someone did something to the protein and I would go to my room and badges would be taken."
- At one point in the clinical interview he shared, "I look at things weird." He was asked to elaborate: "I like history…these people smoking things, it affects my memory sometimes. I know what they do. I goes deeper. I used to study different things, history…science…I'm the guy that you know mixes certain things…science and makes amazing things in this world."
- Mr. Cellona explained that he recently saw a new air vent on the bus he was riding and reflected on how he spoke to a CEO about the contaminates in the air, indicating that his complaint resulted in this change.
- During his completion of a self-report measure he noted, "Things I mention end up in the news."

Ms. Moser reported noticing an onset of paranoia around 2017 to 2019. She noted that her brother began to complain of people stealing from him and getting into a fight with someone he caught stealing from the room he was renting at that time. She also disclosed that he began talking about people putting poison in his food and pointing lasers in his eyes. Ms. Moser

5

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

explained that, as a result of his paranoia, he prefers to set up his tent in front of a camera at a church to capture people who may be trying to harm him. She overall described him as someone who has difficulty regulating their emotions, is quick to panic, and responds to stress with anger.

Mr. Cellona denied participating in any current treatment for mental health, and medical records made available to this writer did not document any mental health diagnoses.

## MENTAL HEALTH HISTORY

Mr. Cellona reported being diagnosed with bipolar disorder (type unknown to writer) and ADHD as a child. He shared that he was psychiatrically hospitalized during the second semester of his 9th grade of high school when he received those diagnoses. When asked why he was hospitalized he expressed, "the story goes deeper than that. I didn't belong there." From his recollection, his mother had him hospitalized because she did not like his girlfriend at that time, though he emphasized, "she [mother] wasn't even around." Ms. Moser confirmed that he was psychiatrically hospitalized as a child and confirmed that he was diagnosed with bipolar disorder and another disorder she could not recall. She described Mr. Cellona as "a difficult child" who did not listen to his mother, and displayed frequent anger, physical aggression, and frustration, which she believes is why he was hospitalized. Ms. Moser reported that she believed these behaviors were a manifestation of undisclosed physical and sexual abuse by his babysitter. She elaborated that he had a history as a child of not wanting to take his psychiatric medication which contributed to behavior of washing his medications before taking them. Previous history of suicide attempts or other psychiatric treatment were not endorsed. However, his Wellpath notes indicate danger to self documented on 10/02/2022 with no further details.

## RELEVANT MEDICAL HISTORY

In addition to the above TBI event, the following was gleaned from his Wellpath medical records:

- Mr. Cellona was engaged in an altercation 2/4/2023 resulting in a laceration requiring sutures to his nose.
- On 1/7/2023, he reported a mop bucket being dumped on his head causing an abrasion. No LOC was noted.
- Positive for COVID in December of 2022 without complication.

No other significant medical history was reported by Mr. Cellona. He denied being prescribed any current prescription medication.

With regard to development, Mr. Cellona was unable to comment on his mother's pregnancy with him or whether he met his developmental milestones on time. However, he reported that his father was "older" when he was born.

## NEUROIMAING STUDIES

CTA head and neck with contrast and CT brain without contrast dated 8/6/2022 from Cottage Health: "Impressions: 1. Comminuted left temporal bone fractures with medial displacement. Left sphenoid sinus fractures extending to the left carotid canal. No evidence of associated left

6

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

carotid artery injury. 2. Hyperattenuating regions of the left lateral convexity concerning for temporal lobe intraparenchymal hematoma, left lateral convexity epidural hematoma, and subdural hematoma that tracks along the left tentorium. 3. Large left lateral convexity scalp delayed hematoma. 4. No cervical or intracranial vascular dissection, aneurysm, or occlusion." (end extraction)

CT brain without contrast dated 8/7/2022 from Cottage Health: "Hyperattenuation along the left lateral convexity concerning for acute epidural hematoma. There is adjacent hyperattenuation concerning for acute left temporal intraparenchymal hematoma. Small amount of subdural hematoma tracking along the left tentorium. There is 6mm of left-to-right midline shift with subfalcine herniation and significant mass effect on the left lateral ventricle with near total effacement of the occipital horn." (end extraction)

CT brain without contrast dated 8/7/2022 from Cottage Health: "Interval left pterion craniectomy with hematoma evacuation. Mild decrease in left-to-right midline shift measures approximately 7mm, this previously measured 9mm. Postsurgical pneumocephalus, packing material, and blood products within the resection cavity. Extra-axial soft tissue swelling with blood products and drain in place. Stable subdural hemorrhage along the posterior falx and right tentorium. Small amount of subarachnoid hemorrhage along the right parietal sulci likely redistribution of blood products." (end extraction)

CT brain without contrast dated 8/8/2022 from Cottage Health: "Patient is status post left pterion craniotomy with hematoma evacuation. Interval improvement in left-to-right midline shift now measuring 2mm, previously measuring 7mm. Evolving postsurgical changes. No new hemorrhage. Stable extra-axial soft tissue swelling with blood products in drain in place. Stable subdural hematoma along the posterior falx and right tentorium. Small amount of subarachnoid hemorrhage again noted along the right parietal sulci." (end extraction)

CT brain without contrast dated 8/17/2022 from Cottage Health: "Resolving postop changes status post left pterion craniectomy and hematoma evacuation. Interval removal left frontal temporal drain and stable size of extra-axial swelling with mixed density blood products. Stable left temporal lobe hypoattenuation and improving pneumocephalus. Slight decrease in subdural collections along the falx and tentorium. No midline shift. CSF Spaces: redemonstration of the cavum septum pellucidum et vergae. Ventricles, cisterns, and sulci are appropriate for age. No hydrocephalus, subarachnoid hemorrhage, or mass." (end extraction)

CT brain without contrast dated 8/27/2022 from Cottage Health: "Prior hematoma evacuation. Previous left pterion craniectomy with now interval replacement of bone flap and cranioplasty. Mild increase in extra-axial left cerebral convexity fluid collection measuring approximately 1.1cm with associated pneumocephalus, postsurgical in nature. Stable left temporal lobe hypoattenuation and improving pneumocephalus. Slight decrease in subdural collections along the falx and tentorium. New left-to-right midline shift measuring approximately 4mm. Resolution of blood products seen along falx and tentorium. CSF Spaces: Redemonstration of the cavum septum pellucidum et vergae. Mild decrease in ventricular size when compared to the prior exam." (end extraction)

## FAMILY MEDICAL/PSYCHIATRIC HISTORY

According to Mr. Cellona, his father passed away from an unknown medical condition in his 50s or 60s. He believed he had a type of infection, but was unable to recall. He reported that his mother is still living but, "I don't want to mention her. I've been trying to get a hold of her. I don't want to stress her. I'll always love my mom." He did not know her current age. No other information was able to be gathered about his family medical and psychiatric history.

## SUBSTANCE USE HISTORY

Mr. Cellona denied current use of alcohol, but admitted that he has imbibed in the past, though not to a point that he would consider a problem. Notably, his toxicology report from the time of admit in the ED at Cottage Health was negative for alcohol or other substances, outside of those that could be related to his sedating medications. He denied any current or past history of any illicit substance use, including use of cannabis, but shared that he believed he may have gotten "second hand high" on the bus as evident to him by laughing.

## RELEVANT PSYCHOSOCIAL HISTORY

Mr. Cellona reported that he was born in Guam, left to the mainland United States at the age of 1, but then returned to Guam sometime after and finally settling in the mainland United States in approximately 2013. He indicated that his mother was not heavily involved in his upbringing and he resided with his father in Guam. However, it is unclear whether the person he identified as his father was biologically related to him as he mentioned at one point in the clinical interview that he was in the mainland United States at the time his father passed away and he was unable to legally make medical decisions on his father's behalf due to not being his "real son." In addition, Ms. Moser disclosed that his father passed away when he was a child, which partly contributed to why his mother struggled to manage his behaviors. Mr. Cellona shared that he has six siblings from his father's side and four siblings on his mother's side. He reported his first and only language as English.

He denied any marital history, but expressed a desire to one day be married. He reported he has been in a relationship with his current girlfriend for approximately one year. He denied having any children.

Mr. Cellona was unable to state how long he has been homeless. Notably, he struggled to answer as he did not consider sleeping in shelters or receiving shelter from people helping him as being homeless. Nonetheless, he reported a period of renting a room in Lompoc from 2016 until 2019. When he was asked why he left renting that room he told a story about customers contaminating the air in his car.

Legal History
Mr. Cellona endorsed a history of criminal charges.

Educational History
Mr. Cellona reported his highest education as "some college." He explained that he attended college in Guam and earned 30 units toward a degree in criminal justice stating that he had

8

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

desires to become a police officer, "but my friends didn't want me to become a cop…and other things over there in Guam. I was going to a police academy in college and I left during that time zone because of certain things…my friends…my place got home invaded, I just wanted to leave Guam. My dad got married. I didn't want to be a bother to him. There is a police report back in Guam…one of my best friends, we let him stay there and he kinda tried to burn me in some way." Mr. Cellona also stated that he has earned about 6 units of college since he has been on the mainland. He shared that he stopped attending college here because "I was getting bothered with medical problems. People like to contaminate the air." Regarding grades, he reported earning "good grades" in high school and variable grades throughout college, including failing one non-credit course. He endorsed being told when he was young that he had a type of learning problem, but he could not recall what it was. In slight contrast, Ms. Moser did not believe her brother had any suspected learning difficulty as a child, though she acknowledged that her mother believed he struggled in school.

Occupational History

Mr. Cellona reported holding numerous types of jobs in his lifetime, though the chronology of said occupations could not be determined during the interview. He noted that he has done "some demolition under the table," had a security job, used to serve papers for the court, and had a job removing a tree. As previously mentioned, he acknowledged that he got fired from his job removing the tree due to falling asleep related to contaminated air. Notably, his first mainland employment was in "military sealift command" as a civilian worker. He reported that he eventually left this position due to worries that the air on the ship was contaminated as evident to him by seeing a sick coworker. His sister confirmed this job and his job as a security officer at a Sav-on pharmacy that lasted for approximately 5 years until he developed paranoia related to people stealing from him, putting poison in his food, and pointing lasers in his eyes.

## BEHAVIORAL OBSERVATIONS

Mr. Cellona was evaluated virtually from the Santa Maria office of the retaining attorneys. The entire evaluation lasted approximately 6 hours and he took two breaks throughout the course of the encounter (approximately 10 and 25 minutes). He was three hours late to the evaluation due to significant concerns regarding the nature and purpose of the evaluation, expressing distrust of meeting with me, feeling as though he cannot trust "the system," and does not want to be considered "crazy." After consulting with his attorneys, he agreed to the meet for the evaluation. However, this created significant time limitations and the evaluation was significantly abbreviated. Overall, Mr. Cellona was cooperative, engaging, and pleasant. He did not appear to be responding to internal stimuli during any portion of the evaluation, though at times his behavior appeared pensive as evidenced by long pauses prior to responding to questions. He was a poor to fair personal historian as he struggled to recall specific dates and his responses to direct questions often became tangential and perseverated on expressions of people trying to harm him, steal from him, or contaminate the air around him. His ability to provide history was also complicated by his guarded nature.

Appearance

Mr. Cellona appeared appropriately groomed, though his hair was worn unkempt, and he was dressed in casual attire. He wore an earring in his left ear. He appeared his stated age and

9

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

interacted with the evaluator appropriately, notwithstanding his tangential and circumstantial response pattern. He made good eye contact throughout the appointment. Vision was corrected with prescription lenses and hearing was uncorrected.

Orientation
He was alert and fully oriented to person, place, day, and situation. He was one day off of the correct date.

Movement & Control
Gait was unable to be fully observed due to virtual nature of the encounter, however he ambulated without the use of assistive devices. Gross and fine motor function was not fully appreciated.

Speech & Verbal Expression
His speech was normal with regard to rate, prosody, and volume. At times, slight dysarthria was noted. His verbal communication was marked by incomplete thoughts, tangents, circumstantial responses to questions, and lack of context. Significant perseveration on people playing games with him, bothering him, purposefully contaminating the air around him, or somehow interfering with his daily life was frequent. Grammatical errors were present in his spontaneous speech as well as mild paraphasias (i.e., often stating something was in a different time zone when referring to something in the past). Word finding difficulty was not observed.

Mood & Affect
His mood was described as "kinda down" though he denied presence of depression. Affect appeared euthymic and was full-range. He was largely cooperative, pleasant, and engaged throughout the evaluation. However, he politely declined to discuss multiple things from his past and was observed to be highly guarded.

Verbal Comprehension
Mr. Cellona evidenced appropriate understanding of information during casual conversation despite his response style to questions as evidenced by being able to stay on topic for some questions.

Thought Process
As previously stated, thought processes were tangential and circumstantial, bordering on significantly disorganized. He was occasionally able to be redirected. Perseveration was prominent and marked by delusional paranoia.

Thought Content
Thought content was primarily reflective of non-bizarre delusions of grandeur and persecutory paranoia.

Perceptions
There were no signs of Mr. Cellona responding to internal stimuli and he denied any current auditory or visual hallucinations.

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

Suicidal and Homicidal Ideation
Mr. Cellona denied any current suicidal or homicidal ideation.

Testing observations
Mr. Cellona was cooperative and appeared engaged throughout testing. He appeared to put forth adequate effort. He took a significant amount of time to complete a self-report questionnaire, verbally talking through nearly every statement and providing his justification for his responses. There were also numerous times when he returned to a previous item to change his response. Notably, he read each statement out loud and was observed to have difficulty reading some words (e.g., "seldom," "shift," "anxious") and asked for the definition of others (e.g., deliberately, exaggerated, seldom, anxious). Additional observations will be noted below in the test results section.

## TEST RESULTS

Cognitive screener
Mr. Cellona was administered the Montreal Cognitive Assessment (MoCA) Blind version due to the nature of the virtual appointment. This version eliminates any written or visual items. His scores were as follows:

Attention:
    Digits = 2/2
    A tap = 1/1
    Serial 7 subtraction 2/3
Language:
    Repetition = 1/2
    Fluency = 0/1
Abstraction
    Similarities = 1/2
Delayed recall
    Spontaneous = 1/5
    Category cue = 0/5
    Multiple choice cue = 4/5
Orientation = 5/6
Total score = 13/22

His total score is considered below normal limits. For orientation, he incorrectly identified the date as the 27th when it was actually the 26th. On serial 7's, he correctly subtracted for the first two items, but then lot-set and began subtracting by 10's, ultimately reducing his score. Notably, his repetition of sentences demonstrated perseveration on the second sentence.

Psychological functioning
Mr. Cellona was administered a self-report measure of general psychological functioning (Personality Assessment Inventory, PAI).

11

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

| Scale | T-score |
|---|---:|
| ICN | 43 |
| INF | 67 |
| NIM | 62 |
| PIM | 52 |
| SOM | 74 |
| ANX | 53 |
| ARD | 69 |
| DEP | 52 |
| MAN | 61 |
| PAR | 86 |
| SCZ | 58 |
| BOR | 58 |
| ANT | 52 |
| ALC | 54 |
| DRG | 48 |
| AGG | 50 |
| SUI | 43 |
| STR | 64 |
| NON | 61 |
| RXR | 48 |
| DOM | 40 |
| WRM | 47 |

Based on his responses, a valid profile was rendered. However, he had a tendency to present himself in a favorable light, reluctant to acknowledge some personal limitations. Moreover, he often externalized blame to others when items referred to any negative behaviors or offered justification for said behaviors. For example, on the item "I was usually well-behaved at school," he answered "very true," and explained "but sometimes I got in trouble because people beat me up or stole from me." On another statement, "I've deliberately damaged someone's property" he answered "false," and indicated that he has engaged in such behavior but for "justice reasons." He answered "false" to the statement, "My moods get quite intense," and followed up by stating, "they bother me so it's okay." Similarly, on the item, "sometimes my temper explodes and I completely lose control," he answered "false," and verbalized "because I trained I have to defend myself." Lastly, for the statement, "sometimes I'm very violent," he again marked "false," but expressed "I'll defend myself."

Overall, his pattern of endorsements was marked by significant hostility and suspiciousness. His hostility likely causes relational difficulty and he is prone to attributing these conflicts to how others treat him. This appears consistent with Mr. Cellona's reports that other people are always bothering him. His endorsements further revealed a level of suspiciousness that is consistent with delusional proportions. As a result, he is likely to be hypervigilant to perceived threats or danger and mistrusts the motives of those around him. For example, although he has been in a relationship with his girlfriend for approximately one year, he expressed concern about eating

12

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

her food for fear that she did something to it. Similarly, while completing this self-report measure, he noted that he is always on the look out for people trying to "mess" with him, which he acknowledged sometimes makes people question why he is so intently interested in them.

His responses on this measure also demonstrated an unusual degree of concern about his physical functioning and health matters. Notably, he endorsed items consistent with his belief that he is allergic to second-hand smoke but that no doctor is able to explain why this happens to him.

There are also indications in his pattern of responses that he may have experienced a traumatic event in his past that continues to disturb him.

Lastly, a pattern of grandiose thinking emerged on items he endorsed such as, "I'm pretty successful at what I do," "I have great plans and it irritates me that people try to interfere," and "I have accomplished some remarkable things." These endorsements are reminiscent of his reports of having seen things on the news that he has mentioned or the amazing things he could possibly do.

Regarding treatment considerations, his pattern of endorsements indicates that he does not experience marked distress from his delusions and see little need for any changes to his behavior. Due to his highly suspicious and distrusting nature, he is likely to be resistant to psychological interventions.

Summary and impressions of results

Overall, Mr. Cellona's performance on the cognitive screener did not evidence an amnestic process and instead was more reflective of executive dysfunction as demonstrated by poor retrieval that was aided significantly by multiple choice cues, impaired phonemic fluency, difficulty with mental math, and abstraction. This pattern of executive dysfunction is not consistent with expectations of residual cognitive impairment as a result of a left temporal TBI. Cognitive problems related to a left temporal injury would typically show impairments in verbal storage/memory that is not aided by cues, and expressive aphasia. Although expressive aphasia was noted in his Cottage Health records, it was no longer noted at discharge and not observed during the current evaluation. As such, the contribution of his history of TBI to his current cognitive functioning can be ruled out.

With regard to general psychological functioning, Mr. Cellona's clinical presentation during the evaluation, reported history, and endorsements on a self-report measure of psychological functioning are consistent with DSM-5-TR criteria for **Delusional Disorder, mixed type.** The specifier of mixed type refers to the prominent delusions he is expressing, which are primarily of a persecutory nature (e.g., believing that people are purposefully seeking to harm him, steal from him, spit in or poison his food, and purposefully taking advantage of his perceived allergy to second-hand smoke that contributes to unusual symptoms) and grandiose thoughts (e.g., believing that his reports to the FBI resulted in a raid in Guam, that "things [he] mentions end up on TV," and a general sense that he has a unique view of the world and is someone who can make "amazing things."). Anger and physically aggressive behaviors can occur with persecutory beliefs due to the perceived threats made against the individual and were evident in Mr.

13

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

Cellona's personal history. It is also remarkable that he had a tendency to justify his behaviors as self-defense or a way to push away threats further highlighting the delusional lens from which he views his world. Mr. Cellona also did not respond to attempts to reason with his delusional beliefs despite recognizing that some people may not agree with his thinking style, which is a common experience of individuals diagnosed with delusional disorder.

It must be also be noted that Mr. Cellona reported a history of isolated events of auditory hallucinations and had a presentation marked by tangential and circumstantial thinking which could be more consistent with a diagnosis of schizophrenia. However, in the diagnosis of schizophrenia, hallucinations tend to be a prominent symptom and any disorganized behavior or thinking is significant enough to contribute to incoherent or incomprehensible communication. In Mr. Cellona's case, his reported history of auditory hallucinations is not prominent and although his communication style was difficult to follow, he was able to successfully get his point across on multiple occasions. Furthermore, his verbal expression appeared to be more impacted by his perseveration on persecutory beliefs contributing to his disorganization, as opposed to overtly disorganized incoherent speech. In addition, delusions can also be present in schizophrenia, but are highly bizarre  (e.g., organs have been replaced by an alien being), meaning implausible, whereas delusions in delusional disorder are possible (e.g., Ryan Gosling is my best friend), though highly unlikely. That said, a proportion of individuals diagnosed with delusional disorder go on to develop schizophrenia. Nonetheless, Mr. Cellona's diagnosis is most consistent with delusional disorder at this time.

## SUMMARY & CONCLUSIONS OF OPINION

### 1. *Evaluate the extent and nature of the injury incurred by Mr. Cellona.*

There are many classification systems to help determine the severity of a TBI, but the most comprehensive were established by the Department of Defense (DoD) and the Centers for Disease Control (CDC). The classification systems overlap significantly, thus the DoD classification system will be used to understand Mr. Cellona's TBI severity as it includes one additional factor for consideration in determining severity over the CDC classification system. The criteria used examine abnormality of structural imaging (abnormal or normal), length of loss of consciousness (>24 hours for severe), length of alteration of consciousness (>24 hours for severe), length of posttraumatic amnesia (>7 days), and the Glasgow Coma Scale score (<9 for severe). Only one criteria needs to be met within a severity level to classify that severity of TBI. For example, an individual could have lost consciousness for less than 24 hours (moderate TBI), but if they remain in posttraumatic amnesia for more than 7 days, this automatically classifies their TBI as severe.

Based on this classification system, Mr. Cellona, more likely than not, experienced a severe TBI. His neuroimaging evidenced a penetrating head injury to his left temporal lobe with bleeding in the brain requiring surgical intervention. Although the amount of time he was spontaneously unconscious for is complicated by his sedation at that time, there is evidence in his medical records that disorientation continued until at least 8/11/2022, approximately 6 days after his injury, and after he was extubated and sedation was weaned. Therefore, his alteration in

14

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

consciousness occurred for more than 24 hours post-injury. In addition, his GCS score was documented as a 3 in his ED records, again placing his TBI severity in the severe range.

## 2. *Describe Mr. Cellona's mental health and current condition.*

Based on evaluation of his history, available records, current symptoms and clinical presentation, and results of psychological measures, it is within reasonable medical probability that Mr. Cellona meets the following diagnostic criteria. The following condition is based on the most recent Diagnostic and Statistical Manual, 5th Edition, Text Revision (DSM-5-TR) and/or the 10th revision of the International Statistical Classification of Diseases and Related Health Problems (ICD-10).

| DSM – 5 – TR | CONDITION |
| --- | --- |
| F22 | Delusional Disorder, mixed type |

His clinical presentation is strongly characterized by persecutory beliefs that others are purposefully harming or exploiting him in some way. It is unclear for how long he has had these beliefs, though his sister reported an onset sometime between 2017 and 2019. Though the time of onset cannot be confidently determined, what is remarkable is that Mr. Cellona's recount of his childhood history is viewed through his delusional lens such that he reported multiple times in his childhood when people took things from him, took advantage of his perceived allergy to second-hand smoke, or "messed" with him.

As a result of his paranoia of others' motives and fear that they will harm him, he has a tendency to respond impulsively in a manner that he believes is protective or in self-defense. He is also hypervigilant to perceived signs of threat where threat may not be present, further contributing to his impulsive and reactionary behaviors. Less prominent, though still present, are his grandiose beliefs that his actions somehow contribute to large-scale organized legal interventions (e.g., raid in Guam as a result of his call to the FBI, things he "mention" end up on the news) or changes in his environment (e.g., complaining to a CEO about the air on the bus and noting a new fan was put in).

## 3. *Did the injury Mr. Cellona incurred exacerbate his mental health condition in anyway?*

Delusional disorder is considered a chronic condition. However, individuals view their world through a biased lens continually and unconsciously seeking confirmation of their delusional beliefs. Any psychosocial stressors which reinforce persecutory beliefs will be expected to intensify symptoms of the disorder. In Mr. Cellona's case, and from his recount of the TBI event, he expressed feeling unsafe and running away for that reason because "people are always playing games with me." As his running away eventually resulted in a severe TBI requiring surgical intervention and an extensive hospital course, it is highly likely that his delusional beliefs about needing to remain hypervigilant to threats from others and respond in a way that is protective or in line with self-defense was confirmed and further reinforced making it more difficult for that belief to be reasoned with.

15

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

## SPECIAL COMMENTARY

The above opinions and responses to questions were based on reasonable medical probabilities given the available documentation and information submitted to this evaluator, including Mr. Cellona's direct anamnesis. Should new information be made available, I reserve the right to alter my opinion accordingly.

## PRIOR TESTIMONY

NAME: Matter of C. Martínez Ordóñez
CASE NUMBER: A# 240-083-985
LOCATION: Immigration Court, Adelanto CA

Thank you for the opportunity to serve as a neuropsychological evaluator in this case. Please do not hesitate to reach out if I may be of further service.


Sincerely,

Veronica C. Llamas, Ph.D.
Clinical Neuropsychologist, PSY 28916

16

Cellona, Clinton
DOB: 02/13/1993
2:25-cv-01503-AH-E

**EXHIBIT 74**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CLINTON CELLONA,                    )
                                    )
         PLAINTIFF,                 )
                                    )
    vs.                             )   Case No.
                                    )   2:25-cv-01503-AH-
COUNTY OF SANTA BARBARA, DEPUTY)        (Ex)
CAMERON HOSSLI, AND DOES 1-10  )
INCLUSIVE,                          )
                                    )
         DEFENDANTS.

_____

**CERTIFIED TRANSCRIPT**


VIDEO-RECORDED DEPOSITION OF CLINTON CELLONA

WEDNESDAY, FEBRUARY 4, 2026, 9:54 A.M.

SANTA BARBARA, CALIFORNIA


Reported by:  Brittany Badger
              CSR No. 13970
Job No.:      79129

and then swear in the witness?

THE REPORTER:  Good morning.  My name is Brittany Badger.  I am a certified shorthand reporter and the deposition officer for today's deposition.  My CSR license number is 13970.

CLINTON CELLONA,

having been first duly sworn by the reporter, testifies

as follows:

EXAMINATION

BY MS. BARRY:

Q    Mr. Cellona, I introduced myself before we went on the record, but I'll do it again.  My name is Mary Pat Barry, and I am the attorney for the County of Santa Barbara and for Deputy Cameron Hossli in this case, and I'm the attorney who noticed your deposition.  So thank you for being here this morning.

Can you please state your full name for me?

A    It's Clinton Gumeaux Cellona.

Q    And can you spell that for me?

A    It's C-L-I-N-T-O-N G -- it's G-U-M-E-A-U-X, but they spelled it wrong when I first -- on the birth certificate.  But yeah.  The last name is C-E-L-L-O-N-A.

Q    So they spelled your middle name incorrectly on

Q    And let me just ask you one more question.  You mentioned -- so the photograph of you is you taking a selfie and you have a large -- what appears to be a weapon over your right shoulder; is that correct?

A    That looks like -- that is a BB gun.

Q    Okay.

A    That should be, I think -- I know I had a BB gun.  People have been robbing me for years.  It goes deeper.

I don't have a real gun.  I had somebody pull a handgun out on me even recently.  Like, the person that I've been reporting on the RTA bus, I called the city ranger on him in Santa Maria, and I also told law about it.

He likes to contaminate the air on the bus and tried to put me to sleep.  I fell asleep when he's on the bus, and he's also pointed -- I reported him to the city ranger, told him, "Hey, this guy is, like, smoking when he sees me."  And then you're not even supposed to smoke there.

The city ranger goes to talk to him, and he gets mad at me.  And then later on -- he didn't kill me, but he, like, on Taco Bell video camera he did point a handgun on me.

But it seems like he's nicer to me now.  That's

REPORTER'S CERTIFICATION

I, Brittany Badger, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name on this date:

*Brittany Badger*
_____
Brittany Badger, CSR No. 13970

*McDaniel Reporting*

**EXHIBIT 75**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CLINTON CELLONA,                    )
                                    )
          PLAINTIFF,                )
                                    )
VS.                                 )   CASE NO: 2:25-cv-01503-AH-(Ex)
                                    )
COUNTY OF SANTA BARBARA,            )
DEPUTY CAMERON HOSSLI, AND          )
DOES 1-10 INCLUSIVE,                )
                                    )
          DEFENDANTS.               )
_____)

**CERTIFIED TRANSCRIPT**

REMOTE ZOOM DEPOSITION OF SPECIAL DUTY DEPUTY ROBERT BAISA

WEDNESDAY, FEBRUARY 18TH, 2026

10:08 A.M. - 2:47 P.M.

REPORTED BY WAYNE WALCOFF CSR #4382

CHANDLER ALVINO

-o-

ROBERT BAISA,

HAVING BEEN DULY SWORN,

WAS EXAMINED AND TESTIFIED AS FOLLOWS:

-o-

EXAMINATION

BY MR. SANGER:

Q   Special Duty Deputy Baisa?

A   Yes.

Q   Is there a way that I can refer to you in a shorter form?

A   Deputy Baisa would be fine.

Q   Okay.  So you've taken your oath.  Would you spell your name for the Court Reporter, please.

A   First, Robert, R-O-B-E-R-T.  Last, Baisa.

B, as in boy, A-I-S-A.

Q   So Deputy Baisa, do you understand that even though we are not in a courtroom and we're in various locations, that you're under the same oath to tell the truth as if the judge or jury were present?

A   Yes.

Q   I appears I have lost the audio again.  I can't hear anything.  I assume your answer was yes?

the subject matter areas set forth for this deposition. Therefore, any response would be nonresponsive.  Also call for speculation.

Q   BY MR. SANGER:  You can answer over objection if you remember the question.

A   Can you restate the question?

Q   Probably not.  If we scroll through the table of contents here though, can you tell me if this would be the subject matter of what you would be training as far as use of force in the Santa Barbara Sheriff's Office?

A   Yes.  Everything in there looks like it's encapsulated in our policy and thus we train that.

Q   And do you recall if around 2021 policies were updated with regard to use of force for law enforcement?

A   Yes.  There were changes made to policy and 835A as a result of AB392, Government Code 7286 after those things changed a bit.

Q   Okay.  Let's get back to actual training. Okay.  So going back to training with the Remington 870 with the less lethal, you described different things that you would do.  And I think we ended with talking about firing at a rubber target.  Correct?

A   Yes.

CELLONA vs COUNTY OF SANTA BARBARA
BAISA, ROBERT on 02/18/2026                                      Page 23



Q    And those two rounds, would they be from the same distance from the sheriff to target?

A    Generally.  We change every -- I say that because over time we change what we do as far as ranges and things like that.

Q    So there isn't a typical distance that a deputy trained with less lethal munitions?  There is not a standard distance that they would take those two shots per year?

A    Correct.  It would just be within, somewhere within the manufacturer recommended distance.

Q    And can you describe the range, the actual physical location where this training takes place?

A    Generally it's performed on an outdoor concrete pad beside our indoor range facility.

CELLONA vs COUNTY OF SANTA BARBARA
BAISA, ROBERT on 02/18/2026                                      Page 24



Q     With regard to the Remington 870 less lethal munitions, is that training ever done under stress?

A     Sometimes, yes.

Q     And what type of stress training would that entail?

A     For example, one time for one instance I was quickly responding to get the weapon system up and running, discerning between lethal rounds and less lethal munitions in deploying those appropriately.

Q     And you testified about your military experience.  I know in the military you may have to undergo stress training with the weapon system.  You may have anything from either a drill sergeant telling you you're here or you have times that you have to perform under live firing conditions where they are firing munition overhead.

Is there any type of stress training similar to that that is undergone by the deputies?

A     Can you restate that question?

R E P O R T E R   C E R T I F I C A T E

-o-

I, WAYNE WALCOFF, THE UNDERSIGNED, DULY AUTHORIZED TO ADMINISTER OATH PURSUANT TO SECTION 2093(B) OF THE CALIFORNIA CODE OF CIVIL PROCEDURE, DO HEREBY CERTIFY THAT THE WITNESS IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN TO TESTIFY THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH IN THE WITHIN-ENTITLED CAUSE;

THAT SAID DEPOSITION WAS TAKEN AT THE TIME AND PLACE THEREIN STATED; THAT THE TESTIMONY OF THE SAID WITNESS WAS REPORTED BY ME AND WAS THEREFORE TRANSCRIBED UNDER MY DIRECTION, THAT THE FOREGOING IS A FULL, COMPLETE, AND TRUE RECORD OF SAID TESTIMONY; AND THAT THE WITNESS WAS GIVEN AN OPPORTUNITY TO READ AND CORRECT SAID DEPOSITION AND SUBSCRIBE TO THE SAME.

I FURTHER TESTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING DEPOSITION AND CAPTIONED NAMED OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN THE SAID CAPTION.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 13TH DAY OF MARCH 2026.

_____

WAYNE WALCOFF CSR #4382